**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

ORIGINAL
FILED IN CLERK'S OFFICE
U.S.D.C.

MAR 1 1 2001

LUTHER D. Thomas, Clerk
By:
Deputy Clerk

| | | |
|---|---|---|
| ROBERT CHRISTIAN WOLF, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| vs. | ) | |
| | ) | NO. 00-CIV-1187 (JEC) |
| JOHN BENNETT RAMSEY & | ) | |
| PATRICIA PAUGH RAMSEY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW OF DEFENDANTS JOHN AND PATRICIA RAMSEY IN OPPOSITION TO THE CITY OF BOULDER'S MOTION FOR PROTECTIVE ORDER**

NOW COME Defendants John and Patricia Ramsey ("defendants" or the "Ramseys") and respectfully submit this memorandum of law opposing the City of Boulder's Motion for a Protective Order.[1]

### INTRODUCTION

The City of Boulder seeks to prevent disclosure of and public comment on a December 1996 recording of a "911" call (hereinafter, "911 Tape" or "Tape") placed by Patsy Ramsey after she discovered a ransom note for her daughter, JonBenet Ramsey. Yet the contents of the Tape were disclosed by City police officers to the media and public years ago, in a murder investigation which the City no longer controls.

---

[1] The City's Motion will be referred to as "City Br." herein.

The City of Boulder's motion fails at the outset: the City
has no "standing" to contest disclosure of the Tape because the
City ceded jurisdiction over the JonBenét Ramsey murder
investigation to the Boulder County District Attorney in
December 2002. Moreover, even if the City had standing here,
the Tape is not entitled to "CONFIDENTIAL" status because its
contents were made public years ago. The City's reliance on
vague and conclusory claims of injury could not in any event
meet its burden of showing "good cause" for closure here.

**THE CITY OF BOULDER'S ALLEGED GROUNDS FOR A PROTECTIVE ORDER**

The City refuses to provide a copy of the Tape to the
Ramseys, and seeks to prevent public comment thereon, relying
on the following grounds:

1.   The Tape is not relevant to this case, City Br.
     at 2-3 & 7;

2.   The Tape is protected by the express terms of
     the Protective Order entered in this case, City
     Br. at 4; and

3.   The Tape is protected by the law enforcement
     privilege, City Br. at 5-6.

None of these claims for confidentiality has any basis in
fact or law.

**A. THE 911 TAPE IS RELEVANT TO PLAINTIFF'S THEORY OF MURDER IN THIS CASE AND ITS CONTENTS HAVE BEEN PUBLIC KNOWLEDGE FOR YEARS**

**1.    The Origin Of The Tape**

On the morning of December 26, 1996, Defendants John and Patsy Ramsey awoke to find that their daughter, JonBenét Ramsey, was missing.  Having found a ransom note informing them that she was kidnapped, Patsy Ramsey immediately called "911." The 911 Tape at issue is an audio recording of Patsy Ramsey's call to the 911 operator.

**2.    The 911 Tape Is Relevant To Claims Made In Mr. Wolf's Lawsuit**

In 2000, the Ramseys were sued by Plaintiff Chris Wolf, who alleged that the Ramseys' book The Death of Innocence libeled him because it labeled him one of the Ramseys' potential "suspects" in the murder.  Mr. Wolf claims he cannot properly be called a suspect by the Ramseys because, he claims, Patricia Ramsey murdered JonBenét Ramsey and John Ramsey covered up the crime.  He thus claims "actual malice" is proven to support his defamation claim if he proves Patsy Ramsey murdered her daughter.[2]  [See Plaintiff's Memorandum In

---

[2] The Ramseys' motion for summary judgment and motion in limine are currently before the Court.

3

Opposition To Defendants' Motion for Summary Judgment at 1-2.
[D.I. 87-1.]]

The 911 Tape is relevant to the claim of murder here
because Mr. Wolf incorporates wholesale former Boulder Police
Department Detective Steve Thomas' theory that Patsy Ramsey
killed her daughter, including his account of the Tape's
contents. [D.I. 87-1 at 6 & 21; Plaintiff's Statement Of
Material Facts To Which There Are No Genuine Issues To Be
Tried, ¶ 55 [D.I. 88-1].]³

   Mr. Wolf thus claims an "enhancement" of the Tape reveals:

> . . .the FBI and the US Secret Service could not lift
> anything from the background noise on the tape.  As a
> final effort several months later, we contacted the
> electronics wizards at the Aerospace Corporation in
> Los Angeles and asked them to try and decipher the
> sounds behind the noise.
>
> Their work produced a startling conclusion.  Patsy
> apparently had trouble hanging up the telephone, and
> before it rested in the cradle she was heard to moan,
> "Help me Jesus."  Her husband was heard to bark,
> "We're not talking to you."  And in the background
> was a young-sounding voice:  "what did you find?"  It
> was JonBenét's brother, Burke.

(ST Book Page 15.)⁴

And also this conflicting interpretation:

---

³ Mr. Thomas' murder theory is set forth in JonBenét: Inside
The Ramsey Murder Investigation (St. Martin's Press 2000)("ST
Book").
⁴ Copies of the relevant pages concerning the Tape, including a
word-by-word transcript, are attached at Tab A.

4

> . . .Pete Hofstrom would later take the 911 tape
> enhanced by the Aerospace Corporation to New Mexico
> to let his brother-in-law, who worked in the Los
> Alamos scientific complex, have a crack at analyzing
> it.   The brother-in-law apparently declared that he
> heard a voice say, "I scream at you."   That
> meaningless comment managed to cast doubt on the
> Aerospace conclusion that Burke said, "What did you
> find?" and was another gift to the defense lawyers.
> They would now be able to point out that even the
> prosecutor's office and the police did not agree
> about what was on the tape.

(ST Book at 334.)

The Ramseys vigorously contend there is no "third voice"
whatsoever on the Tape, but cannot document this fact because
the City refuses to produce it.   Relevancy is clear.

## 3.   The Contents Of The 911 Tape Have Been Public Knowledge For Years

In addition to Mr. Thomas' book, the alleged "enhancement"
of the Tape is mentioned in Lawrence Schiller's Perfect Murder,
Perfect Town (HarperCollins 1998).[5]   Mr. Schiller's book cites a
different Boulder Police Detective -- Melissa Hickman -- for
this information.

Not surprisingly, given the broad dissemination of its
contents, the Tape and its alleged "enhancement" have since

---

[5] Copies of the relevant pages from the paperback version of Mr.
Schiller's book are attached at Tab B.

been discussed many times in the tabloid media, purportedly to support claims of Patsy Ramsey's guilt. Many of these stories cite "unnamed police sources" as vouching for their accounts of the Tape. Some examples of articles and transcripts from The National Enquirer, The Globe, The Rocky Mountain News and ABC's "20/20" concerning the Tape are attached at Tab C.

**4.        The City Has Not Produced The Tape To The Ramseys.**

In December 2002 the City of Boulder agreed to allow Ramsey counsel L. Lin Wood to hear, but not record, the Tape. (Tab D.)  The Ramseys do not have a copy of the Tape, and thus have not been allowed to publicly disclose or examine the alleged "background noise" or "enhancement."

### THE CITY OF BOULDER NO LONGER HAS JURISDICTION OVER THE JONBENET RAMSEY MURDER INVESTIGATION

In December 2002, City of Boulder Chief of Police Marc Beckner announced that the Boulder Police would no longer be investigating the JonBenét Ramsey murder, and that he was handing the investigation to the Boulder County District Attorney's Office.  (Tab E.)  Chief Beckner later commented:

"The investigation is theirs now," Beckner said. "Their responsibility is to investigate it in the direction they see fit as the right way to go, and I wish them the best of luck."

*Ramseys aren't focus of inquiry, letter hints*, Owen S. Good, Rocky Mountain News, December 24, 2002 (attached at Tab F).

6

Further, Boulder County District Attorney Mary Keenan, in a December 2002 letter to Ramsey counsel L. Lin Wood, stated that she was taking control of the investigation, and that Chief Beckner "joins [her] in this decision and has agreed to cooperate in our efforts." (Tab G (Affidavit of L. Lin Wood).)

Thus, it is the District Attorney's Office, and not the City of Boulder, that currently controls the JonBenét Ramsey murder investigation.[6] And the Boulder County District Attorneys Office is <u>not</u> a subdivision of the City of Boulder -- it is a political entity separate from the City of Boulder. <u>People of State of Colorado v. Losavio</u>, 199 Colo. 212, 214, 606 P.2d 856, 857 (1980)(en banc)(district attorney is a state officer and is not an agency for any county or city).

## THE PROTECTIVE ORDER

The Protective Order entered by the Court in this case, attached at Tab H, directs that information generated by law enforcement investigation is generally considered confidential, but "[n]o Discovery Material that prior to its production in this litigation is known by the producing party to have been

---

[6] Although it is clear that the Boulder County D.A. currently controls the investigation and its strategy, the Ramseys do not know whether the Boulder Police or the District Attorney is in actual <u>physical</u> possession of the Tape. The Ramseys have been informed that the District Attorney now controls release of the Tape. (Tab G, ¶¶ 7-8.)

available to the public shall be designated as 'Confidential'".
(Tab H, ¶ 1.)

## LEGAL STANDARD

Rule 26(c) permits the Court to issue a protective
order requiring "that a trade secret or other confidential
research, development, or commercial information not be
revealed or be revealed only in a designated way." Fed.
R. Civ. P. 26(c)(7). The movant at all times bears the
burden of justifying "good cause" for the protective
order. In re Alexander Grant & Co., Litigation, 820 F.2d
352, 356 (11th Cir. 1987)("the burden of proof justifying
the need for a protective order remains on the movant");
Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263
F.3d 1304, 1312 (11th Cir. 2001)("the prerequisite is a
showing of 'good cause' made by the party seeking
protection."). Even if good cause is shown, the Eleventh
Circuit requires the district court to go further and
balance the interests of those requesting and opposing the
order. Farnsworth v. Procter & Gamble, 758 F.2d 1545,
1547 (11th Cir. 1985).

"Good cause" is not satisfied by generalized claims of
confidentiality -- the movant must specifically demonstrate
that disclosure will cause a clearly defined and serious

8

injury. E.g., Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483-485 (3d Cir. 1995)("Absent a showing that a defined and serious injury will result from open proceedings, a protective order should not issue.") and Alexander, 820 F.2d at 356 (court must consider "severity of harm" caused by disclosure).

In some cases, public interest in the information, alone, may require disclosure. Pansy v. Borough of Stroudsbourg, 23 F.3d 772, 787-88 (3d Cir. 1994) (factor weighing against confidentiality is that matter is of public concern).

## ARGUMENT

## A. The City Of Boulder Has No Standing To Assert Confidentiality

The City of Boulder's motion fails because it lacks any "standing" to object to producing evidence in an investigation which it no longer controls. In other words, the City of Boulder cannot show any "good cause" for confidentiality here because it cannot show any injury that it would incur if the 911 Tape is released -- if there were harm to the investigation, only the Boulder County District Attorney's Office could suffer it.

Quite simply, the City of Boulder is not the correct party to assert a claim of confidentiality now; instead, the Boulder County D.A.'s Office, a separate entity, is the correct party.

To paraphrase Chief Beckner, "the investigation is [the Boulder County District Attorney's] now," and it is the Boulder County District Attorney's "responsibility" to determine whether to release the 911 Tape to the public. The City's motion should therefore be denied. See Warth v. Seldin, 422 U.S. 490, 499 (1975)(party cannot base claim for relief on the legal rights of third parties).[7]

## B. Even If The City Had Standing, It Cannot Show "Good Cause" For Withholding The Tape From The Ramseys

Even if the City of Boulder could be said to have standing here, its motion for a protective order is meritless.

If standing were assumed, the City does not show the required "good cause" needed for secrecy; instead, the City asserts that the Ramseys must show why the 911 Tape should be made public. This assertion merely attempts to reverse the burden of proof, and has no merit.

---

[7] In the alternative, the motion is moot: the City no longer has control over the investigation, and thus no longer has the power to decide whether or not to release the Tape to the public. Indeed, the City is asking the Court for a mere advisory opinion as the Boulder County D.A. may decide to release the 911 Tape to the public. See generally Golden v. Zwickler, 394 U.S. 103 (1969)(mootness doctrine); Florida Assoc. of Rehab. Facilities v. Fla. Dept. of Health & Rehab. Svcs., 225 F.3d 1208, 1217 (11th Cir. 2000)(if case mooted by subsequent events, jurisdiction ceases to exist).

As this Court ruled in September 2002 regarding similar claims made by Steve Thomas, the City, not the Ramseys, bears the burden of showing good cause why the materials should not be made public. And here, there is no reason for secrecy: the contents of the 911 Tape were made public years ago in numerous publications and media.

The City's claim that the Tape is not relevant to this litigation is meritless. (City Br. at 2-3.) In this libel litigation, Plaintiff accuses the Ramseys of murder, and the Ramseys are entitled to defend themselves from all accusations and scurrilous rumors -- as well as alleged "evidence" -- regarding same. As discussed above, Plaintiff has adopted the factual claims of Mr. Thomas regarding the Tape, as well as embracing factual theories offered by the tabloid media. On summary judgment, and if this case were to go trial, the Ramseys are entitled to defend these allegations. It is not the City's prerogative to determine what is relevant to the Ramseys' defense. E.g., Alexander v. F.B.I., 186 F.R.D. 54, 59 (D.D.C. 1998)(parties may not "arrogate to themselves the power to determine" what is relevant).[8]

_____

[8] In their Rule 56 Statement of Facts, the Ramseys submitted facts regarding Mr. Thomas' media leaks to prove, in part, that the Boulder Police attempted to use the media to manipulate public opinion so as to try to coerce the Ramseys to (con't.)

11

Further, the City misreads the terms of the Protective
Order when it claims that the 911 Tape is protected law
enforcement investigative material. (City Br. at 4 citing Para.
1(e) of the Order.) The City omits the last sentence of Para.
1, which states that "[n]o Discovery Material that prior to its
production in this litigation is known by the producing party
to have been available to the public shall be designated as
'Confidential'". Here, as shown above, the contents of the
Tape were made public years before this litigation in a series
of best-selling books and in national tabloids such as the
National Enquirer.

Moreover, the City's claim that release of the Tape will
hurt the murder investigation is meritless. The City of
Boulder has not made any particularized showing of how it or
the investigation would be harmed if the 911 Tape were made
public. Alexander, 352 F.2d at 356.

_____

confess. The Ramseys believe that a mere review, or an
unbiased analysis, of the 911 Tape will unequivocally
contradict Mr. Thomas' "enhancement" theory about the Tape, and
will support the fact that the media "whisper" campaign was
begun because the murder investigation lacked evidence of the
Ramseys' culpability. [See D.I. 67-3 (Statement of Material
Facts) at ¶¶ 76-82.]

12

Indeed, the City has not shown how release of the Tape will affect the investigation at all. It offers no affidavit or other evidence showing how disclosure of the Tape could possibly "hurt" the investigation, violating Local Rule 7.1. Its bare, conclusory claim that public comment on the Tape "could compromise" the investigation by "reveal[ing] potential evidence and implicated persons," City Br. at 7, is insufficient -- the injury cited must be specific.[9]

## C.    Even If The City Had Standing, And Could Show "Good Cause", The Balance Of Interests Favors Public Disclosure

The Court need not "balance" any interests here because no good cause has been shown by the movant. But the public interest, and the City of Boulder's "unclean hands" in allowing the contents of the 911 Tape to be leaked to the press, clearly warrant disclosure of the 911 Tape. See Chicago Tribune, 263 F.3d at 1313 (noting that if good cause is shown, court should still balance interests before deeming information confidential).

Indeed, even though the Ramseys are not required to prove good cause for release of the Tape, such good cause exists.

---

[9] The only conceivable harm to the investigation would be if the Ramseys did not know of the Tape's contents; but the City's purported theory of why this "evidence" is crucial -- that an enhancement of the Tape may show John Ramsey speaking to Burke Ramsey -- has already been publicly aired and is known to all.

13

First, the Ramseys are entitled to their own copy of the
911 Tape. Mr. Wolf relies on an interpretation of an
enhancement of the Tape. If the Ramseys are to adequately
investigate or combat this claim, they must be allowed to
examine the Tape, and have their own experts review it , and if
necessary, "enhance" any parts which allegedly contain a "third
voice". The City's claim that the Ramseys can rely on Mr.
Wood's one-time audio access to the Tape, City Br. at 7, and
have experts opine on its contents based on his memory and
impressions is unrealistic and patently unfair.

Second, once it is in their possession, the Ramseys have
every right to publicly comment on the contents of the Tape, as
well as the City of Boulder's history of leaks regarding its
contents.  See In re Agent Orange Product Liability Litigation,
821 F.2d 139, 146 (2d Cir. 1987)(in absence of showing of good
cause for confidentiality, parties are free to disseminate
discovery materials to the public).  Whether the tests run by
the Boulder Police are fair and credible is an issue of public
interest favoring public disclosure.  See Pansy, 23 F.3d at
787-88 (public has substantial interest in the integrity of
public officers).

The Boulder Police Department has allowed, whether tacitly
or through inaction, the so-called "enhanced" version of the

Tape to be released publicly by numerous sources (including Mr. Thomas, and various unnamed police sources). As a matter of fairness and due process the Ramseys should have every right to discuss what is heard (and what is not heard) on the Tape.[10]

The arena of public opinion is not for control by the government alone; the First Amendment ensures that citizens and their attorneys, including former suspects, have the right, if not the duty, to speak publicly in their own defense.[11] Here the City of Boulder has used the 911 Tape to falsely and unfairly manipulate public opinion. The Ramseys have a need as well as a right to respond. The City's motion for a protective order should be denied.

## CONCLUSION

Defendants respectfully request that this Honorable Court DENY the City of Boulder's motion for a protective order.

This 11th day of March, 2003.

---

[10] In view of the numerous books, news articles and shows mentioning the Tape, and the numerous sources cited for its contents, the City's claim, City Br. at 7, n.5, that it has kept the contents of the 911 Tape in strict confidence, lacks any credibility.

[11] Cf. Gentile v. State Bar of Nevada, 501 U.S. 1030, 1042 (1991) (attorney has duty to represent client in "court of public opinion"; attorney may only be prevented from issuing statements that have a "substantial likelihood of materially prejudicing" adjudicative proceeding).

15

_(signature)_

James C. Rawls
Georgia Bar No. 596050
Eric P. Schroeder
Georgia Bar No. 629880
S. Derek Bauer
Georgia Bar No. 042537

POWELL, GOLDSTEIN, FRAZER
 & MURPHY LLP
Sixteenth Floor
191 Peachtree Street, N.E.
Atlanta, Georgia  30303
TEL: (404) 572-6600
FAX: (404) 572-6999

L. Lin Wood
Georgia Bar No. 77458

L. LIN WOOD P.C.
The Equitable Building
Suite 2140
100 Peachtree Street
Atlanta, Georgia 30303
TEL: (404) 522-1713

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

ROBERT CHRISTIAN WOLF, )
)
      Plaintiff, )    CIVIL ACTION FILE
  vs. )
)    NO. 00-CIV-1187 (JEC)
JOHN BENNETT RAMSEY & )
PATRICIA PAUGH RAMSEY, )
)
      Defendants. )
)

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served opposing counsel in the foregoing matter with a copy of the **MEMORANDUM OF LAW OF DEFENDANTS JOHN AND PATRICIA RAMSEY IN OPPOSITION TO THE CITY OF BOULDER'S MOTION FOR PROTECTIVE ORDER** via United States Mail:

> Evan M. Altman, Esquire
> 6085 Lake Forrest Drive
> Suite 300-B
> Atlanta, GA 30328
> (770) 394-6466
>
> Darnay Hoffman, Esquire
> 210 West 70th Street, Suite 209
> New York, New York 10023
>
> Joe D. Whitley, Esquire
> Alston & Bird LLP
> One Atlantic Center
> 1201 W. Peachtree Street
> Atlanta, GA 30309

This is __ll__ th day of March, 2003.

_Eric P. Schroeder_ (signature)

Eric P. Schroeder



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

# JonBenét

## INSIDE THE RAMSEY MURDER INVESTIGATION

FROM A LEADING DETECTIVE ON THE CASE

## STEVE THOMAS WITH DON DAVIS



DISPATCHER: I'm . . . OK, I'm sending an officer over, OK?

PATSY RAMSEY: Please.

DISPATCHER: Do you know how long she's been gone?

PATSY RAMSEY: No, I don't. Please, we just got up and she's not
here. Oh my God, please.

DISPATCHER: OK.

PATSY RAMSEY: Please send somebody.

DISPATCHER: I am, honey.

PATSY RAMSEY: Please.

DISPATCHER: Take a deep breath (inaudible).

PATSY RAMSEY: Hurry, hurry, hurry (inaudible).

DISPATCHER: Patsy? Patsy? Patsy? Patsy? Patsy?

The telephone call gave us a cornerstone of evidence, not so much
for what was easily heard but for what was found when experts washed
out the background noise. It has been my experience as a police officer
that such emergency calls are virtually unchallengeable. They are tape-
recorded, and either something was said or it was not. Tapes can be so
powerful that prosecutors regularly play them so a jury can hear the
actual voices and emotions of the participants.

In preliminary examinations, detectives thought they could hear
some more words being spoken between the time Patsy Ramsey said,
"Hurry, hurry, hurry" and when the call was terminated. However,
the FBI and the U.S. Secret Service could not lift anything from the
background noise on the tape. As a final effort several months later, we
contacted the electronic wizards at the Aerospace Corporation in Los
Angeles and asked them to try and decipher the sounds behind the
noise.

Their work produced a startling conclusion. Patsy apparently had
trouble hanging up the telephone, and before it rested in the cradle
she was heard to moan, "Help me, Jesus. Help me, Jesus." Her husband
was heard to bark, "We're not talking to you." And in the background
was a young-sounding voice: "What *did* you find?" It was JonBenét's
brother, Burke.

The Ramseys would repeatedly tell us that their son did not wake up
at any point throughout the night of the crime. We knew differently.

ment. This analysis by someone who, in my opinion, had hindered our investigation was the worst sort of Monday-morning quarterbacking.

The man who wouldn't sign search warrants, opposed polygraphs of the Ramseys, and had come up with the incredible Five-Year Plan seemed to think he had a crystal ball on what a jury would believe.

How do you prove the marks on her skin were not caused by a stun gun? How do you prove she did not scratch her killer? Did the work hours spent developing other suspects rival the work hours spent on the Ramseys? Did you fingerprint the Doctor Seuss book that was found in the suitcase, and if not, why not? He attacked the FBI and CBI labs. On and on and on. Before our eyes, his Five-Year Plan grew into a Ten-Year Plan. "This is the most watched case in American jurisprudence. There will be no excuse for not doing all these things I'm suggesting," he said.

Then DeMuth criticized us for "shopping experts" until we got an answer we liked. This was ironic, since his boss Pete Hofstrom would later take the 911 tape enhanced by the Aerospace Corporation down to New Mexico to let his brother-in-law, who worked in the Los Alamos scientific complex, have a crack at analyzing it. The brother-in-law apparently declared that he heard a voice say, "I scream at you." That meaningless comment managed to cast doubt on the Aerospace conclusion that Burke said, "What did you find?" and was another gift to the defense lawyers. They would now be able to point out to a jury that even the prosecutor's office and the police did not agree about what was on the tape.

DeMuth even cast doubt on Officer Rick French's version of what happened in the Ramsey home that first morning, saying that the officer could be mistaken and that John Ramsey might simply have "misspoken" about his description of events.

DeMuth maintained that we had full access to the FBI, yet at the same time he was barring the further testing of the mysterious alleged pubic hair.

When he completed his presentation, one detective noted wryly that DeMuth "forgot to tell us to compare a fiber in the Ramsey attic to a hair in the beard of General Ulysses S. Grant."

We noted that DeMuth did not prove an intruder committed the murder. He never mentioned that we had identified Patsy as the writer of the ransom note, nor did he address the confirmation of prior vaginal trauma, and some of his evidentiary points were in error. DeMuth threw a mass of little things at us, but I believed they were pebbles bouncing against a steel wall, for our macro-perspective overwhelmed

his
sive

W
that
from
claim
was tan
piece of

Even a
decent han
gone far be
did it," he sa
and aiding an

And Sergean
I considered to
case, visited Dis
that Hunter believe

But Wickman w
comment. "I never
comes out of the gu
tended to tell people w

As if to underline that poin
had begun direct communic

John Ramsey wrote Hun
telephone call. The DA wou
on the telephone but would

The letter, however, got a
office for three weeks befor
wrote that he resorted to th
communicate through attorn

Ramsey accused the Boul
a family member had killed J
his house on December 26.
he claimed, and the Ramsey

That was a rehash of lies,
investigating the alleged kid
mediately focused on the fa
was discovered, this case mig
a year and a half later.



# EXHIBIT / ATTACHMENT

## B

(To be scanned in place of tab)

*NEW YORK TIMES* Bestseller

# PERFECT MURDER



# PERFECT TOWN

## THE UNCENSORED STORY
### OF THE
## JONBENET MURDER
### AND THE GRAND JURY'S SEARCH
### FOR THE TRUTH

## LAWRENCE SCHILLER

* * *

On April 23, Detective Melissa Hickman returned
Boulder from the Aerospace Corporation in El Segu[ndo]
California. In addition to its work for the government
company did sound and photographic enhancement
nonprofit basis for law enforcement agencies. using sta[te]
of-the-art technology. Hickman had taken the audio t[ape]
of Patsy Ramsey's 911 call to the Southern California fir[m.]
The tape included a few additional seconds of sound alon[g]
with Patsy's frantic call for help. sounds that may hav[e]
been recorded when she replaced the headset improper[ly.]
The police had been unable to decipher the addition[al]
sounds.

In February. Detective Trujillo had sent a copy of th[e]
tape to the U.S. Secret Service. but their attempt to enhanc[e]
the recording had not succeeded. Aerospace used a differ[ent] technology. and voices in the background could now b[e]
heard more clearly.

Hickman listened to the tape and wrote down what she
heard.

"Help me Jesus. help me Jesus." That was clearly
Patsy's voice. Then. in the distance. there was another voice.
which sounded like JonBenét's brother.

"Please. what do I do?" Burke said.

"We're not speaking to you." Hickman heard John Ram-
sey say.

Patsy screamed again. "Help me Jesus. help me Jesus."

And then. more clearly. Burke said. "What *did* you find?"

This snippet of conversation was obviously important.
Patsy and John had told the police. and CNN on January 1,
that when they found JonBenét missing. they checked
Burke's room for their daughter. who sometimes slept
there. They had never said what they found in Burke's
room. Later. Patsy said they did not awaken Burke until

about 7:00 A.M., when her husband roused him to have him taken to the Whites' home.

In Boulder. Hickman and her colleagues debated the scenarios. They couldn't believe that John Ramsey would have forgotten to mention to the police that his son had gotten up and spoken to him and his wife that morning after Patsy checked on him and before the police arrived. Perhaps it was conceivable that *she* didn't remember because she was so distraught. But on the tape, John had directed a statement directly to Burke. How could he have forgotten talking to his son? The Ramseys' credibility was now seriously in question.

The police decided not to tell Hunter or anyone on his staff what they had learned. They feared leaks of this valuable evidence. The police also decided not to ask John or Patsy Ramsey about the 911 call in their scheduled interviews. for fear of tipping their attorneys to what they had discovered. More than a year would elapse before the police told Hunter's staff about the enhancement tape of the 911 call.

When Burke had been interviewed on January 8. he was not questioned about his whereabouts that morning. But even in that interview, the boy had not told the police that he was asleep when the 911 call was made. The police needed to know what he remembered about that morning and if his memory differed from Patsy's. The detectives would have to wait until June 10, 1998, when Burke was interviewed again, to ask him.

# 7

James Thompson, known to his friends as J. T. Colfax, worked for M&M Transport in Denver. His job was to pick up cadavers and deliver them to funeral homes. On April



# EXHIBIT / ATTACHMENT

C

(To be scanned in place of tab)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| ROBERT CHRISTIAN WOLF, | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION FILE |
| vs. | ) |
| | ) NO. 00-CIV-1187 (JEC) |
| JOHN BENNETT RAMSEY & | ) |
| PATRICIA PAUGH RAMSEY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## AFFIDAVIT OF ERIC P. SCHROEDER

**STATE OF GEORGIA,**

**COUNTY OF FULTON.**

Personally appearing before the undersigned officer duly authorized by law to administer oaths, ERIC P. SCHROEDER, who being first duly sworn, deposed and said as follows:

1.

My name is Eric P. Schroeder. I am over twenty-one (21) years of age and I am competent to make and give this Affidavit, and do so from personal knowledge.

2.

I am an associate attorney at Powell, Goldstein, Frazer & Murphy LLP.

Attached at Tabs A and B to Defendants' memorandum of law in opposition to the City of Boulder's motion for a protective order are true and correct copies of pages from JonBenet, Inside The Ramsey Murder Investigation, by Steve Thomas, and Perfect Murder, Perfect Town, by Lawrence Schiller.

4.

Attached at Tab D is a true and correct copy of correspondence between representatives of the City of Boulder and counsel for John and Patsy Ramsey.

5.

Attached at Tabs E and F to Defendants memorandum' and at Tabs 1, 2, 3 and 4 to this affidavit are: accurate transcriptions of 1998 news articles appearing in The National Enquirer (Tab 1 hereto) and The Globe (Tab 2 hereto); transcriptions and copies of news articles appearing in The Rocky Mountain News (Tabs E, F and 3 hereto); and excerpts from a 1998 transcript reflecting a portion of ABC's "20/20" (Tab 4 hereto), all of which relate to an alleged "enhancement" of the 911 call placed by Patsy Ramsey on the morning of December 26, 1996.

**FURTHER AFFIANT SAYETH NOT.**

Eric P. Schroeder

Sworn to and subscribed
before me this _____ day
of _____, 2003.

_____
Notary Public



# EXHIBIT / ATTACHMENT

$\mathcal{1}$

(To be scanned in place of tab)

**Developments the week of September 8, 1998:**
**National Enquirer: 911 Call Nails Brother in Murder Cover-Up - and it's on tape.**
**JonBenét 911 Call Breaks the case - Hysterical brother is caught on tape**
**Special Report by Don Gentile and David Wright.**

The 911 call came in at 5:52 a. m., on Dec. 26, 1996. Patsy Ramsey, hysterical and weeping, was screaming that her daughter JonBenét was missing. "Send help," she shouted.

But Patsy had trouble hanging up the phone - and that has provided Boulder police with an astonishing breakthrough.

In those fumbling seconds, the 911 tape captured the terrified voice of Burke Ramsey, at time his parents say he was sleeping.

Cops suddenly had rock-solid proof to show John and Patsy Ramsey lied about the events surrounding the horrible murder of their beauty queen daughter.

The ENQUIRER has learned exclusively that detectives achieved the major breakthrough in the case by enhancing Patsy's 911 call with state-of-the-art equipment at a California lab.

"Burke is heard begging John and Patsy Ramsey to tell him what to do and asking what they found," said an insider. And a source close to the investigation told The ENQUIRER: "It's major evidence of a cover-up by the Ramseys and proof they were lying from the earliest stages of the case.

From day one, cops felt that Burke, 9 at the time, could not have slept through the horror surrounding 6-year-old JonBenét's murder. "Not could this frantic mother not have awakened Burke after she discovered the fake ransom note (at 5:30 a. m. ) and found JonBenét missing from her bedroom," said the source. "How could this frantic mother not have awakened Burke to ask him if he'd seen his sister."

But the Ramseys told the first cops on the scene that Burke slept the whole night and was still asleep. At 7 a. m., an hour and eight minutes after the 911 call, it was John Ramsey who said it was time to wake Burke up, the insider revealed. "By now, the house was filling with cops and family friends."

Fleet White Jr. -- who'd later discover JonBenét's body with Ramsey on a basement search -- went with John to Burke's room on the second floor of the sprawling Tudor home. White told authorities that Ramsey woke his son by telling him, "Why don't you get up, buddy."

"When John told Burke he was going to Fleet's house, the boy's only reaction was to say, "O. K.," the insider revealed. "Burke dressed, grabbed a Nintendo game and followed his father quickly out of the house to Fleet's car through a pack of uniformed officers.

"Cops noticed that Burke never asked why police officers were in the home. Fleet said Burke talked only about Nintendo on the drive to his home a mile away."

Despite their suspicions about Burke cops needed a break to prove it.

It came in pure Kodak moment in April 1997, four months after the murder of JonBenét Ramsey, with the case going nowhere. "A detective was listening to a tape of the 911 call from Patsy for the umpteenth time," said the source. "And suddenly, he thought he could faintly hear people speaking after Patsy stopped talking to the dispatcher. "Someone had the brilliant idea of getting the tape enhanced-and bingo."

The enhancement task fell to Boulder Det. Melissa Hickman. With a copy of the 911 call, she flew to California on April 21 last year to meet with engineers at The Aerospace Corporation in Southern California.

The non-profit government supported firm does research and Development for the Air Force. And it has a special division renowned for aiding law enforcement agencies throughout the country with the latest in high-tech crime-fighting techniques.

Two engineers first listened to Patsy as she reports JonBenét missing to Boulder dispatchers Mary Hester and Kim Archuletta.

"She screams to them that her daughter is missing and to send help," said the insider." But then the engineers heard Patsy fumbling to hand up the phone and muffled sound of people talking. "It's those second on the tape that the two engineers were able to amplify and clarify."

"Patsy is heard screaming, "Help me Jesus, help me Jesus, then suddenly the voice of Burke begs "Please what do I do?"

"John Ramsey is then heard to say in an angry voice, "We're not speaking to you."

"Patsy again screams, Help me Jesus, help me Jesus, And finally Burke's voice is very clear and he says, "Well, what DID you find?".

"Detective Hickman didn't know what the engineers picked up before she listened to the enhanced tape and wrote down what she heard. What she wrote matched exactly with the words that the engineers had transcribed from the enhancement."

Asked to comment on the tape enhancement one of the engineers told The ENQUIRER." I can't comment on it." The second engineer referred all questions to the firm's public relations division.

But a highly placed Colorado law enforcement official confirmed that voices of John Patsy and Burke were recovered from the enhanced 911 tape. The official said that enhancement work on the tape continues in the hope that it may reveal even more dramatic secrets -- secrets that began unraveling when Patsy Ramsey fumbled the phone. Said the insider, "It's a mishap that could help solve the murder of JonBenét."

**Developments the week of November 10, 1998:**
**National Enquirer - JonBenét's Brother Tells Cops: I Know What Happened**

It was just 13 days after the murder of JonBenét Ramsey--and her 9-year-old brother Burke stunned a police psychologist by snapping in an irritated voice: "I know what happened.

The boy's outburst came as Dr. Suzanne Bernhard, a specialist in child psychology, gently probed to find out whether he knew about the brutal killing of the 6-year-old beauty queen.

"The doctor asked him what he thought had happened to his sister - and Burke became irritated for the first time during the interview," an insider revealed to the ENQUIRER.

"Then he blurted out, 'I know what happened. She was killed. Someone took her quietly and took her down in the basement. . . . took a knife out . . . hit her on the head."

Cops were stunned, a source close to the case told The Enquirer.

"They're particularly intrigued by Burke's mention of a knife at that early stage of the investigation."

"In the basement where JonBenét was battered and strangled to death, police found a Swiss Army knife, which her father John Ramsey had bought as a present for Burke during a trip to Switzerland.

"But John didn't mention seeing the knife when he found JonBenét's body. And the first time it was publicly reported was nine months later when the police search warrants were released."

So then how did Burke know about the knife, police in Boulder, Colo., wondered.

"They're convinced Burke knows more than he's saying about the murder," said the close source.

What particularly piqued the cops' interest, the ENQUIRER has been told, is that the knife had vanished several weeks before JonBenét's death.

"The Ramseys' housekeeper told police that she became irritated because Burke was continually whittling with the knife and leaving wood shavings all over the carpet," another source revealed.

"Finally, in exasperation, the housekeeper took the knife and hid it at the bottom of a linen cupboard on a landing outside JonBenét and Burke's bedrooms.

"This was several weeks before JonBenét was murdered. And the whittling never started again, indicating that Burke never found the knife.

"But someone did--because it ended up near JonBenét's body."

Police now believe that Burke's knife was used to cut black duct tape that gagged JonBenét.

Burke's interview with Dr. Bernhard--arranged by the Boulder police department--took place on Jan. 8, 1997.

"Burke told Dr. Bernhard right away that he felt safe--which she thought was highly unusual," said the insider. "She told police that children who have a family member killed don't usually feel safe.

"Burke seemed to have difficulty in revealing his feelings about his family, and Dr. Bernhard reported to police that this was common in children who felt there were things they shouldn't say.



# EXHIBIT / ATTACHMENT

## 2

(To be scanned in place of tab)

**Developments the week of October 13, 1998:**
**GLOBE: Stunning Grand Jury Evidence - Cops Catch Patsy in Damning New Lie -say sources**

Investigators probing the JonBenét Ramsey murder have caught the tyke's mom Patsy in an outrageous lie, and the Grand Jury will soon be hearing all about it -along with a mountain of other damning evidence, sources reveal.

On Dec. 26, 1996, the day JonBenét's battered, strangled body was found in the Ramsey's Boulder, Colo., home, Patsy made a frantic 911 call to police at 5:52 a. m.

She told cops that she woke up before 5:30 a. m. and discovered the sweet 6-year old- was missing.

But insiders say that at the time of the call, Patsy was in full makeup and still wearing the red and black blazer, red sweater and black trousers she wore at a Christmas Party the night before.

"It seems clear that she never went to bed", says a source. "Instead, she may have spent the night covering up JonBenét's death."

This new information from sources close to the investigation is a vital part of the case against John and Patsy Ramsey now being presented to a GRAND JURY in Boulder after a 21-month investigation.

There is no single "smoking gun" that proves the Ramsey's were involved in the murder of their pageant princess daughter. But police are convinced that the sheer weight of circumstantial evidence against them proves that nobody else could possibly have done it.

Here is some of the crucial evidence investigators hope will persuade the Grand Jurors to indict the 53-year-old computer tycoon and his 41-year-old wife:

- The Ransom Note:

Patsy said she found it in their Boulder home. But cops believe she wrote it, say sources. Reports say Prof. Donald Foster, a linguistics expert at prestigious Vassar College, identified her as the author after comparing the style, use of words and exclamation points with other examples of her writing.

Amazingly, although the Ramseys say they handled the note, sources say there were no fingerprints on it, indicating that they wore gloves or wiped it clean.

- The Blueprint:

Police believe that the Ramseys used ex-FBI profiler John Douglas' book Mindhunter as a guide to cover-up, say sources. The so-called ransom note began "Listen Carefully" - the very words used by the killer in a message to his victim's family in a case that Douglas highlighted.

- The Scream:

As revealed by Globe, sources say a blood-curdling scream emanated from the Ramsey home around midnight on Dec. 25, waking a neighbor across the street. But John and Patsy say they never heard it.

- The Lights:

Another neighbor saw strange lights in the Ramseys' kitchen and heard the grating of metal on concrete late on Christmas night. Again John and Patsy denied all knowledge of the lights and noises.

- The Telltale Tape:

Patsy told cops that when she found JonBenét missing the tot's 9-year-old brother Burke was asleep. But when experts enhanced the 911 tape, Burke could be heard in the background asking," what did you find?"



# EXHIBIT / ATTACHMENT

## 3

(To be scanned in place of tab)

**Ramsey case still producing surprises**
**Two years after crime, two defense attorneys see opposite outcomes if parents put on trial**
**By Charlie Brennan Rocky Mountain News Staff Writer December 20, 1998**

Two of America's most prominent criminal defense attorneys clash over whether JonBenét Ramsey's killer will ever be convicted.

Stephen Jones, who earned prominence through his failed defense of Oklahoma City bomber Timothy McVeigh, and Gerry Spence, known as well for his buckskin jacket as his fiery defense of civil liberties, provide conflicting forecasts in the notorious unsolved murder.

But, in doing so, both cast one or both of the child's parents as likely defendants.

"The conviction of these people has almost already been assured, and the reason is that there isn't a person in America who doesn't believe they're not guilty," said Spence, who bases his practice in Wyoming. "If they think the mother is guilty, they'll probably think he is in it, too."

That's not the way Jones sees it.

"I just know that convicting parents of a child murder -- not the step-parents, not the live-in boyfriend, but the biological parents -- is swimming upstream," Jones said.

"That's because it runs so counter to human expectations. The jurors don't want proof beyond a reasonable doubt. They want to know. Unless they have a confession or forensics -- and they don't have either -- you can't go in on the theory that it was Christmas night, they're the only ones home, so who else but them? That will get you thrown out on your backside."

Saturday marks two years to the day since police were summoned to the upscale Boulder residence of John and Patsy Ramsey. The 5:52 a.m. call to 911 came from Patsy Ramsey, who reported that their youngest child was missing and that they had discovered a ransom note demanding $118,000 for her safe return.

Now, the parents are suspects in a continuing probe by a Boulder grand jury that might not conclude until spring.

John and Patsy Ramsey have consistently maintained they are innocent.

The rambling 2 1/2-page ransom note, which Patsy told police she found on a bottom step of a spiral staircase leading to the kitchen, said that a call with more instructions from the kidnappers would come between 8 and 10 a.m. Such a call never came.

Shortly after 1 p.m., Boulder police Detective Linda Arndt, the only officer in the house at the time, asked John Ramsey to search the 15-room home. One officer had toured the house at 6:30 a.m. without noting anything significant.

John Ramsey and family friend Fleet White responded to Arndt's request by heading straight for the basement, according to a search warrant affidavit, where John Ramsey pushed open the door to a small windowless room and found his daughter's body. She had a fractured skull and had been strangled by a garrote. Another cord was found tied loosely around one wrist, and John Ramsey told police he removed a piece of duct tape from her mouth.

An autopsy showed that JonBenét's cause of death was asphyxia by strangulation associated with craniocerebral trauma. It also showed she had vaginal injuries consistent with sexual contact.

Within days, police established that the ransom note -- and the salutation "Mr. and Mrs. Ramsey" on what appeared to be a second, aborted ransom note -- had been written on a pad of paper belonging to the Ramseys. And, while Colorado Bureau of Investigation handwriting analysis ruled out John Ramsey as the note's author, the CBI found "indications that the writer was Patsy Ramsey."

A number of details emerged in the first year -- as media from as far as Norway and Japan covered the killing -- that stoked the public's fascination with the case:

Not only was Patsy Ramsey a former Miss America contestant, representing her native state of West Virginia, but JonBenét had starred in the world of child beauty pageants. Videotapes from her brief career ran endlessly on television news programs, revealing a bizarre blend of adolescent charm, sequined glitz and nascent sexuality.

The family promptly retained some of the best criminal defense lawyers in Colorado -- despite no charges having been filed in the case -- and then reminded Americans of a right few realized they had: to refuse a police interview. They didn't agree to an interrogation until four months after the murder.

The Ramseys' lawyers also hired a public relations adviser, an act that earned the family a negative public relations backlash that persists to this day.

For the better part of a year, the case was enveloped in an air of taut anticipation, as rumors of an imminent arrest -- and questions as to why one had not occurred -- kept everyone from Larry King to Peter Boyles to the next-door neighbor talking.

During its second year, the case didn't lose its ability to surprise.

In January, it was revealed that Ramsey family friends Fleet and Priscilla White had gone to Gov. Roy Romer to ask that he appoint a special prosecutor. They claimed that witnesses and police had lost all confidence in Boulder District Attorney Alex Hunter's ability to professionally and impartially handle the case. A scathing piece in the October 1997 Vanity Fair had portrayed Hunter and his staff as conciliatory and collegial, rather than adversarial, toward the Ramseys and their lawyers.

Romer, however, voiced faith in Hunter's office and denied the Whites' request.

Hunter soon started to concede that a resolution to the case might be best achieved through the grand jury process.

The Ramseys' lawyers said in a statement that they welcomed such a move, if it meant "this investigation will at last be in the hands of competent and unbiased professionals." They added, "We have lost all confidence that the police can be either fair or objective."

On March 12, police officially called for a grand jury investigation of the case. Hunter answered by saying a decision to take it to the grand jury would only be made after a thorough presentation of the case by police to his office.

Nevertheless, twelve jurors and five alternates were selected on April 22 for one year's grand jury service. It would be four more months before a decision would be announced as to whether they would hear the Ramsey case.

On June 1 and 2, police laid out their case for Hunter, key members of his staff and numerous consultants, including noted criminalist Henry Lee and nationally known attorney and DNA expert Barry Scheck.

Afterward, Boulder Police Commander Mark Beckner, who has since become police chief, shared a few statistics: The investigative file now numbered 30,000 pages; 1,058 items were logged into evidence; 590 people were formally interviewed; 68 people were investigated as possible suspects.

Beckner was asked if there was a viable suspect or suspects: "I have an idea who did it, yes," he said. He would give no names.

John, Patsy and Burke Ramsey were interviewed over several days that month by prosecutors and police working under Alex Hunter. If those videotaped sessions resulted in any bombshells, the information wasn't released.

But people around the world got to hear from John and Patsy themselves. Who Killed JonBenét?, a documentary co-produced by University of Colorado journalism professor Michael Tracey, aired in England July 9 and in Colorado Aug. 5, featuring extensive interviews with JonBenét's parents, plus other relatives and friends.

The Ramseys spoke as one voice, saying they are innocent targets of a botched police investigation and a media witch hunt.

Then, on Aug. 6, on what would have been JonBenét's eighth birthday, Boulder police Detective Steve Thomas gave ABC News his resignation letter. It exposed the raw nerve that had plagued the investigation since its inception.

Ever since Assistant Boulder District Attorney Bill Wise openly criticized the police department in February 1997, it was common knowledge that police and prosecutors had clashed during the case. Never, however, had the seriousness of the rancor been revealed in such detail.

On five, single-spaced pages, Thomas unloaded 18 months worth of frustration over the criminal justice system's failure to bring JonBenét's killer to justice.

He saved his most biting criticism for Hunter's office.

"I believe the district attorney's office is thoroughly compromised," Thomas said. He claimed that police viewed some in Hunter's office as "defense witnesses" because of their chumminess with Ramsey lawyers.

Thomas wrote that in Boulder, "a criminal justice system designed to deal with such an event was not in place. Instead, we had an institution that, when needed most, buckled."

Thomas charged that Hunter's office had "effectively crippled this case," and claimed that only the appointment of a special prosecutor could save it.

Thomas' letter hit while Hunter was vacationing in Alaska. By the time he returned to Colorado four days later, Romer had met with the four metro-area district attorneys with whom Hunter had consulted in the case for 18 months.

They told Romer there was no cause to replace Hunter and that there was no merit in refuting Thomas' letter in public.

On Aug. 12, Romer and those four prosecutors announced that prosecutorial assistance would be brought in under Hunter -- and that the case would go to a grand jury on Sept. 15.

But that didn't stop a flood of fiery and passionate letters in the next few weeks further attacking Hunter -- and another resignation letter from a key player.

Respected veteran homicide investigator Lou Smit, who came out of retirement to work the case for Hunter, resigned Sept. 20. While Thomas' letter had bemoaned Hunter's failure to prosecute, Smit expressed dismay over Hunter's apparent targeting of people he thought to be innocent: the Ramseys.

"The case tells me there is substantial, credible evidence of an intruder," Smit wrote in a 2 1/2-page letter.

And as summer gave way to fall, the new season seemed to usher in a new wave of leaks about evidence in the case.

The National Enquirer reported that a laboratory-enhanced copy of Patsy Ramsey's 911 call at 5:52 a.m. about JonBenét's disappearance appeared to reveal the questioning voice in the background of her brother, Burke. John and Patsy Ramsey have maintained that he had slept soundly until 7 a.m.

Newsweek then reported that some within the prosecution ranks weren't sure what they were hearing on the enhanced tape.

And, as the grand jury carried on quietly with its work, other leaks seeped out. An ABC News report in September, citing unnamed sources, said that Vassar College professor Donald Foster, a textual and linguistic analyst, had concluded that Patsy Ramsey had authored the ransom note.

But the only opinions that matter now are those of the grand jurors.

The grand jury has met only 18 times since it convened Sept. 15, and is not scheduled to meet again until the first week of January.

Witnesses have been limited to police and forensic experts. It is expected that Ramsey family members, friends and other civilians will be called.

The greatest anticipation among those following the case has centered around the testimony of John and Patsy Ramsey. But not everyone assumes they will even be called.

"I don't think it's a foregone conclusion at all," said Christopher Mueller, a professor at the University of Colorado School of Law.

"If the focus of the proceedings remains the parents, then it's very unlikely that either one of them would say anything that would in any way indicate that they did anything wrong.

"Also," he said, "much of what the Ramseys have had to say before is available in other forms."

The grand jury is expected to continue meeting on the case at least through February. Only nine jurors would have to agree to return a true bill, which becomes an indictment once it is signed by a prosecutor.

What if grand jurors are convinced that Patsy Ramsey wrote the 2 1/2-page ransom demand -- but feel no other charge is supported by the evidence?

Adams District Attorney Bob Grant, a consultant to Alex Hunter on the case, says Colorado law allows for indictment on accessory charges in a felony even if no second person has been charged with the central act -- providing prosecutors can prove the accessory knows the second person's identity.

"Conceptually, I believe you could do that," Grant said. "As a practical matter, I don't recall it being done."

If a Ramsey family member is indicted, Wyoming attorney Spence can't imagine finding an impartial jury in Colorado.



# EXHIBIT / ATTACHMENT

## 4

(To be scanned in place of tab)

**ABC 20/20 Investigates: Transcript, September 27, 1998**
**(Excerpts)**

DIANE SAWYER: Good evening, and welcome to 20/20 Sunday. Let's us say at the outset that we've all seen a lot of stories about the JonBenét Ramsey case. But tonight, we have new details, new information.

BARBARA WALTERS: Isn't it amazing, Diane, that it's been two years and we are still fascinated by this case?

DIANE SAWYER: And two years in which no charges have been brought, no indictment has been brought. And we can't emphasize enough that the Ramseys are presumed innocent under the law and evidence is still being gathered. But tonight, we have provocative new information that sources tell us comes from the police investigation.

BARBARA WALTERS: We also have the first interview ever with one of the lead detectives who served on the case from the beginning, and who recently resigned in protest. You will find out why. A grand jury in Colorado was just beginning to review the murder evidence in secret now. But, tonight, Elizabeth Vargas has the JonBenét Ramsey story with brand new revelations.

ANCHOR: Frantic family members began searching the Ramsey home. They found JonBenét's body inside a rarely used room in the basement. She had been strangled. Duct tape covered her mouth.

ELIZABETH VARGAS: It is clearly a new chapter in the case of JonBenét, a bright, blonde 6-year-old the world knows best through the distorting lens of the beauty pageant cameras, and the spotlight of a bizarre crime scene. Around 9:00 pm on Christmas Day 1996, the Ramseys say they came home from dinner with friends and carried a sleeping JonBenét upstairs to bed. They say it was the last time they saw her alive.

1 year, 8 months and 21 days after the murder of JonBenét Ramsey, grand jurors assembled here in Boulder to begin reviewing evidence in the case. Sources say much of it implicates her parents. The proceedings here are secret. And unlike witnesses in federal grand juries, witnesses here cannot even reveal they testified.

Now, we don't know exactly what the district attorney is presenting to those grand jurors, but sources have told us some of the key evidence Boulder police have collected. Last June 1st and 2nd, Boulder detectives made a preparation to the DA. That presentation included evidence, sources say, suggesting that one or both of the Ramseys were involved in or had guilty knowledge of the crime.

BECKNER (from back in June): We also discussed and identified and articulated 30 specific reasons that we believe a grand jury is necessary in this case and why we think it will be helpful in moving us forward.

ELIZABETH VARGAS: Our information of what was said in that meeting comes from well-placed sources in various law enforcement agencies. We emphasize there may be evidence to the contrary not available to us or different conclusions that might be drawn. And a reminder-in law, and in fairness, all people are considered innocent until proven guilty.

. . .

*The 911 Call*
Experts were hired to enhance the 911 call placed by Patsy Ramsey at 5:52 am the morning of the crime. Sources report the enhancement appears to reveal the voice of 9-year-old Burke, the Ramseys' son, asking his parents "what did you find?" In that June presentation, the suggestion was the Ramseys were not being truthful when they told the police that Burke was asleep until after the police arrived.



# EXHIBIT / ATTACHMENT

## D

(To be scanned in place of tab)

# LeBoeuf, Lamb, Greene & MacRae
### L.L.P.
A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

NEW YORK
WASHINGTON, DC.
ALBANY
BOSTON
DENVER
HARRISBURG
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
NEWARK
PITTSBURGH
SALT LAKE CITY
SAN FRANCISCO

633 SEVENTEENTH STREET
SUITE 2000
DENVER, CO 80202
(303) 291-2600
FACSIMILE: (303) 297-0422

LONDON
(A LONDON-BASED
MULTINATIONAL PARTNERSHIP)
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD
MOSCOW
RIYADH
(AFFILIATED OFFICE)
TASHKENT
BISHKEK
ALMATY
BEIJING

December 3, 2002

## BY FACSIMILE AND FEDERAL EXPRESS

L. Lin Wood, Esq.
The Equitable Building, Suite 2140
100 Peachtree Street
Atlanta, Georgia 30303

> Re: *Robert Christian Wolf v. John Bennett Ramsey and Patricia Paugh Ramsey,*
> *Case No. 00-CIV-1187 (JEC), U.S. District Court, Georgia*

Dear Lin:

This letter will confirm our final agreement as to the terms under which you will be allowed to review the original 911 audit tape pursuant to a subpoena issued to the Boulder Police Department in connection with the above-referenced case. We agree to your proposed date of Tuesday, December 17, 2002. Please go to the front desk at the Public Safety Building at 1805 33rd Street in Boulder at 9:00 a.m. and ask for Sgt. Weiler. Given the short duration of the tape, we agree to permit you a reasonable time, not to exceed one hour, to review the tape. We have further agreed as follows:

(1)     An officer of the Boulder Police Department will be present while you review the tape;

(2)     No one may accompany you while you review the tape;

(3)     You may not copy or record the tape;

(4)     You may not use your review of the tape as a basis to request subsequent materials;

(5)     The fact that you are being allowed to listen to the tape does not in any way waive the confidentiality or privilege asserted by the Boulder Police Department; and



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

## Rocky Mountain News

To print this page, select **File** then **Print** from your browser

URL: http://www.rockymountainnews.com/drmn/state/article/0,1299,DRMN_21_1624402,00.html

## Boulder DA takes lead in Ramsey case

**By Charlie Brennan, Rocky Mountain News**
**December 21, 2002**

BOULDER - Police Chief Mark Beckner announced Friday that District Attorney Mary Keenan is now taking charge of following up all fresh leads in the JonBenet Ramsey murder case.

All new leads and information, he said, will be forwarded directly to the prosecutor's office for review and investigation.

"Our interest here is to solve the case," said Beckner. "We don't care who, or how, it is solved. We're willing to do what it takes to move this investigation forward."

Beckner said a key motivation for this decision is that the child's parents, John and Patsy Ramsey, have made repeated statements that they have information they want to see investigated - but that they have lost faith in the Boulder Police Department's willingness to handle leads in a fair and impartial manner.

"We had really not been moving forward here because we were not getting information that the Ramseys had," said Beckner. "You can't investigate information that you don't have. We're not going to let our egos stand in the way. This is the right thing to do at this time."

The Ramseys said that not only do they welcome this development, but they would agree to meet with Keenan anytime, anywhere, to discuss their daughter's unsolved slaying on Christmas night 1996.

"If Mary Keenan makes a request of me that she be allowed, or the district attorney's office be allowed, the Ramseys would quickly and unconditionally agree to speak with her, or a member of her staff," said their Atlanta attorney, Lin Wood.

The Ramseys have submitted to interrogations by police and Boulder prosecutors on three separate occasions, most recently in August 2000.

Wood first learned of Keenan's increased role in the case Thursday. But he said his clients, who vow they had no involvement in JonBenet's slaying, welcome it.

"John and Patsy are elated by these reports, and so am I," said Wood.

Beckner's announcement came on the heels of revelations that Keenan has been meeting over recent weeks with several area prosecutors and legal experts for detailed discussions about the child beauty queen's murder.

Keenan has declined to discuss those meetings or any other aspect of the case, but Beckner said he met with Keenan Friday morning, along with Boulder Sgt. Kurt Weiler, who is currently the department's point man on the Ramsey case.

"We met this morning to go over these ideas and to talk about how would it work," Beckner said.

"And one of the things I made clear is that we did not want to be a filter for anything that they're going to do. One of the things we want to eliminate here is the contention that we are somehow biased in this case. If we get stuff, we're going to forward it as raw material."



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)



Enter **the**
**Colorado Snow Expedition** !
colorado

MARKETPLACE · AUTOS · JOBS · HOMES · AD SEARCH

RockyMountainNews.com

**Local**

SEARCH SITE FOR: **go**



HOME   NEWS   SPORTS   BUSINESS   ENTERTAINMENT   RECREATION   LIFESTYLES   OPINION

## NEWS

- **Local**
  - » Weather
  - » Columbine
  - » JonBenet Ramsey
- **State**
- **Nation**
- **World**
- **Election**
- **Legislature**
- **Education**
- **Census 2000**
- **Opinion**
- **Columnists**
- **Lottery**
- **Commuting**
- **Obituaries**
- **AP wire**

**AP awards**
The Rocky Mountain News won more awards than any other major Colorado newspaper, including best Web site, in the Colorado Associated Press Editors and Reporters annual contest. Click here.

**Special reports**
In-depth and investigative reports from the pages of the Rocky Mountain News. Click here.

**Multimedia**
Video, 360-degree photography and other multimedia news coverage. Click here.

PRINT THIS STORY | E-MAIL THIS STORY

## Ramseys aren't focus of inquiry, letter hints

### But Boulder DA says probe 'will not exempt' the couple

**By Owen S. Good, Rocky Mountain News**
**December 24, 2002**

A letter from Boulder District Attorney Mary Keenan to the lawyer for John and Patsy Ramsey strongly implies that a renewed investigation into the death of their daughter will not focus on them as suspects.

Keenan, in a Dec. 20 letter to L. Lin Wood of Atlanta, said that "the Boulder Police Department has done an exhaustive and thorough investigation of the Ramseys as potential suspects" in the Dec. 26, 1996, slaying of their 6-year-old daughter, JonBenet.

That investigation effectively ended in October 1999, when a grand jury refused to return an indictment against either parent.

Keenan's letter does not disclose any opinion about the Ramseys' innocence or guilt and says the new investigation "will not exempt the Ramseys."

But it states that Keenan's office will work with Lou Smit, a Colorado Springs detective who continues to investigate leads he says points to an intruder.

The decision to conduct an investigation led by Keenan's office "is being made for one reason only," she wrote. "The fact that a violent child murderer is at large."

Keenan was not in her office Monday and could not be reached for comment. But her letter said she would not "go to the press now or in the future to publicize this decision."

Wood, reached Monday, said he believes Keenan's letter signals the end of his clients' status as suspects.

"This is an effort to move this case forward, and it would never move forward unless it could move beyond John and Patsy Ramsey (as

**Databases**
Learn more about your neighborhood, city and schools with our searchable databases.
- Soft money contributions
- Police shootings
- Terrorist victims
- Election 2003
- 2000 Census
- CSAP results
- T-Rex construction
- Crime comparisons
- DPS ethnicity
- School report cards

**Denver Square**
See Colorado life through the pen of News editorial cartoonist Ed Stein. Click here. Stein also draws "Stein's View" for the opinion page. Click here.

**E-newsletters**
Sign up for daily e-News updates and receive the latest local news. Click here.

**Columbine**
Read the latest on the Columbine investigation and the community's recovery. Click here.

**Ramsey**
Coverage of Boulder's 6-year-old beauty queen slaying includes extensive archives and photo galleries. Click here.

**AP awards**
The Rocky Mountain News won more awards than any other major Colorado newspaper, including best Web site, in the Colorado Associated Press Editors and Reporters annual contest. Click here.

suspects)," Wood said.

"While the Ramseys will not be exempt from the investigation, the truth is, this is not about going back and reinvestigating John and Patsy Ramsey."

Wood said Boulder police "gave the theory of John and Patsy Ramsey its best shot, and it just didn't fly because the evidence is not there."

Boulder Police Chief Mark Beckner demurred when asked what direction Keenan's investigation will take.

"The investigation is theirs now," Beckner said. "Their responsibility is to investigate it in the direction they see fit as the right way to go, and I wish them the best of luck."

Although Keenan said in her letter that the Ramsey case "has weighed heavily on my mind" since taking office in January 2001, her decision to enter the investigation conflicts with a two-year stance that, at least publicly, was to maintain a distance from the case.

Keenan, on taking office, vowed not to become a "talking head" for the case. Last year, she said she was glad to have been minimally involved with the case during her career as a deputy prosecutor.

Granting Wood's request for an investigation that doesn't involve Boulder police also conflicts with previous stances. In June 2001, Wood made the same demand in a letter to Keenan.

She refused to respond then, saying, "I am not going to be baited by the Ramseys' attorney."

Wood said he believes Keenan is confronting the case out of professional commitment, not because he has threatened to file a civil rights suit against the Boulder police for what he called a campaign to smear the Ramseys and sweat out a confession.

"If it is believed this was a deal for Mary Keenan to take the investigation and cut a deal with Lin Wood to avoid being sued, it just didn't happen," Wood said. "I say that even though I made it very clear to Mary Keenan that we would be willing to forgo the lawsuit if she transferred the case."

Wood said he already has given Keenan some items of physical evidence related to the case, without elaborating, and has asked Smit and Ramsey private investigator Ollie Gray to forward their tips and leads.

Smit, who worked for Keenan's predecessor, Alex Hunter, and left the investigation in 1998, said Thursday that he is still working on "numerous leads."

"I'm assembling information on these leads continually," he said. "Certain priorities will be put on certain leads.

"It'll be Mary's job to take the information and run with it."

goodo@RockyMountainNews.com *or (303)442-8729*

**ABOUT US**
**CONTACT US   SITE MAP   SUBSCRIBE**
**ARCHIVES   PHOTO REPRINTS   FAQ**

2003 © The E.W. Scripps Co.
**PRIVACY POLICY** *and* **USER AGREEMENT**
Questions / Comments : **TALK TO US**



# EXHIBIT / ATTACHMENT

## G

(To be scanned in place of tab)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ROBERT CHRISTIAN WOLF, )
)
       Plaintiff, ) CIVIL ACTION FILE
  vs. )
) NO. 00-CIV-1187 (JEC)
JOHN BENNETT RAMSEY & )
PATRICIA PAUGH RAMSEY, )
)
       Defendants. )
_____ )

## AFFIDAVIT OF L. LIN WOOD

**STATE OF GEORGIA,**

**COUNTY OF FULTON.**

Personally appeared before the undersigned officer duly authorized by law to administer oaths, L. LIN WOOD, who being first duly sworn, deposed and said as follows:

1.

My name is L. Lin Wood. I am over twenty-one (21) years of age and I am competent to make and give this Affidavit, and do so from personal knowledge.

2.

I am an attorney duly licensed to practice law in the State of Georgia. I was admitted to the State Bar of Georgia in June 1977 and I have remained an active member of the State Bar of Georgia in good standing since admission.

I am co-counsel in this case for Defendants John and Patsy Ramsey.

I am submitting this affidavit in support of defendants' opposition to The City of Boulder's Motion for a Protective Order. This affidavit is made on the basis of my own personal knowledge.

On December 17, 2002, pursuant to an agreement designed to avoid or delay the necessity for the filing of a motion to quash a subpoena served upon it in this case, the Boulder Police Department granted me one-time audio access to the "911" tape at the police department in Boulder, Colorado. I was not allowed to record its contents. To date, the City of Boulder has not produced the tape to the Ramseys and through its counsel, has informed me of its position that I am prohibited from publicly discussing my impressions of the tape and from publicly disclosing what I heard (or did not hear) on the tape.

Prior to my December review of the 911 tape, in November of 2002, I met with Boulder County District Attorney Mary Keenan in Boulder, Colorado. During our

meeting, District Attorney Keenan indicated that the Boulder County District Attorney's Office was seriously considering assuming jurisdiction over the investigation into the murder of JonBenét Ramsey.

7.

Attached at Tab 1 is a true and correct copy of the December 20, 2002 letter I subsequently received from District Attorney Keenan informing me that the Boulder County District Attorney's Office as of that date would be conducting the investigation into JonBenét Ramsey's death. Since that date, based on further discussions with members of the District Attorney's Office, including discussions with District Attorney Keenan, it is my understanding that District Attorney Keenan is now in fact in total control of the murder investigation and the Boulder Police Department is not. It is my understanding the Boulder Police Department's only role in the investigation is to cooperate with any requests for assistance made to it by the District Attorney's Office and to pass to the District Attorney's Office any new tips or leads received by it.

8.

In recent weeks, I have been involved in ongoing discussions with counsel for the Boulder Police Department and the District Attorney's Office in an effort to reach an

agreement with respect to the release of the 911 tape to my clients. On February 28, 2003, I received a voice mail message from Walter Fricke, Assistant City Attorney for Boulder, informing me that the District Attorney's Office would be "calling the shots" with respect to the release of the 911 tape.

**FURTHER AFFIANT SAYETH NOT.**

L. Lin Wood

Sworn to and subscribed
before me this ⟨14⟩ day
of March , 2003.

Notary Public



# EXHIBIT / ATTACHMENT

_____|_____

(To be scanned in place of tab)



# DISTRICT ATTORNEY'S OFFICE
## TWENTIETH JUDICIAL DISTRICT

MARY T. KEENAN, DISTRICT ATTORNEY

December 20, 2002

Dear Mr. Wood:

Since I took office in January of 2001, the Ramsey case has weighed heavily on my mind. I assigned Bill Nagel to review the file. Bill and I have discussed at length the history and the status of this investigation.

In early October, shortly after much of our review had been completed, you sent me a letter outlining a request from Mr. and Mrs. Ramsey that an independent investigation of this case be initiated. I discussed your letter with Chief Beckner and I let both of you know that I would consider that request seriously and thoughtfully before responding.

In deciding how to proceed at this point in time, I met with you and Chief Beckner to discuss your request. I have consulted extensively with my senior staff. I have also conferred with many of my metro area colleagues individually and with the Attorney General and the prosecutors who assisted with the Grand Jury. In short, I believe I have been thorough in my consideration of the options.

There are overriding principles that dictate my approach to this request:

1    My oath of office to uphold the Constitution and the law;
2    My obligation to seek to ensure that the Ramseys be afforded the protection of the Constitution in that they are presumed innocent until proven guilty beyond a reasonable doubt in a court of law;
3    My belief that this case can benefit from additional investigation by fresh eyes;
4    My belief that the Boulder Police Department has done an exhaustive and thorough investigation of the Ramseys as potential suspects.

Based on the above and after consultation with Chief Beckner, I have made a decision to conduct further investigation from within my office, using our investigative resources. Our efforts will focus on following up on leads which have not previously been investigated or that are brought to our attention in the future. We will not exempt the Ramseys from this investigation. We will work cooperatively with Lou Smit, the Ramseys, and the Boulder Police Department. I will make every effort to communicate openly with you. I will not go to the press now or in the future to publicize this decision. I will act in good faith in all matters and of course will continue to keep and protect the secrecy of the Grand Jury proceedings.

Please understand that this decision is being made for one reason only, the fact that a violent child murderer is at large.

I believe that we can move forward in this matter in a spirit of good faith and cooperation. I cannot expend unlimited resources in this case. However, I will use what resources I can to pursue the investigation until the case is brought to justice in a court of law or until I believe that no further forward progress can be made.

I met again with Chief Beckner today. He joins me in this decision and has agreed to cooperate in our efforts.

Please feel free to contact me to discuss this matter at any time.

Respectfully,

Mary T. Keenan
District Attorney
Twentieth Judicial District



# E**X**H**ACHMENT**

(To be scanned in place of tab)

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT CHRISTIAN WOLF,           )
                                 )
         Plaintiff,              )     CIVIL ACTION FILE
   vs.                           )
                                 )     NO. 00-CIV-1187(JEC)
JOHN BENNETT RAMSEY &            )
PATRICIA PAUGH RAMSEY,           )
                                 )
         Defendants.             )
_____  )

### STIPULATION AND PROTECTIVE ORDER

IT IS HEREBY STIPULATED, that in order to protect the legitimate interests of the parties in maintaining the confidentiality of certain sensitive private and/or proprietary information that may be disclosed during the course of these actions, the parties agree as follows:

1. Designation of Material as Confidential. Any party to the above-captioned actions that provides discovery materials (whether by producing documents, answering interrogatories, responding to requests for admissions, providing testimony at a deposition or through some other device) (hereinafter, "Discovery Material(s)") may designate such Discovery Materials as "Confidential." Such a designation shall constitute a representation by the party or person and its counsel that they, in good faith, believe that the material so designated contains or constitutes: (a) sensitive private information the unauthorized disclosure of which the producing party reasonably believes is prohibited by

federal or state statute or common law privacy rights; (b) unpublished financial data, financial or investment forecasts or strategies, or other information of a non-public nature treated by the producing party or person as confidential and commercially or personally proprietary; (c) information that is the subject matter of a confidentiality agreement between plaintiffs or defendants or their respective representatives and third parties; (d) information that a party feels in good faith would expose plaintiffs or defendants or their respective representatives to tort claims by third parties; or (e) information generated by the law enforcement investigation of the homicide of JonBenét Ramsey. Material designated as ˇConfidential" shall be accorded the protections set forth in paragraph 5 of this Stipulation and Protective Order. No Discovery Material that prior to its production in this litigation is known by the producing party to have been available to the public shall be designated as ˇConfidential."

2. <u>Designation of Deposition Testimony as Confidential</u>. Any party or person may designate as ˇConfidential" such portions of his/her deposition testimony (including exhibits) as implicate ˇConfidential" information of the type described in Paragraph 1 hereof by advising the reporter and all parties of such fact on the record during the deposition or within ten (10) days, not including weekends or holidays, after the transcript of the deposition is received by his or her counsel. Until the ten (10) day period expires,

all of the party's testimony will be considered "Confidential." No person shall be present during any portion of the deposition designated as "Confidential" unless that person is an authorized recipient of Discovery Materials containing such confidential information under the terms of this Stipulation and Protective Order. Consistent with the amendments to the Federal Rules of Civil Procedure ("Rules") which became effective December 1, 2000, the parties recognize the right of parties' counsel to issue appropriate instructions to parties during their depositions in order to maintain the appropriate scope of discovery as defined in the Rules.

3. Designation of Documents and Other Discovery Material As "Confidential". Documents, portions of documents, answers to interrogatories, responses to requests for admission, and other Discovery Materials that meet the "Confidential" criteria of Paragraph 1 hereof may be designated as "Confidential" by stamping or otherwise marking the document, the portion of the document, or the Discovery Material as "Confidential." Documents need not be designated as "Confidential" at the time they are made available for inspection but may be so designated at the time copies are produced, and information in such documents will be considered "Confidential" until copies are produced.

4. Subsequent Designation of Discovery as "Confidential". Any Discovery Material that is produced without being designated as "Confidential" may be so

3

designated, with respect to future disclosure, by the producing party or person by sending a letter making such designation to each party who has received such material. Disclosure of such material prior to its designation as "Confidential" shall not violate the terms of this Stipulation and Protective Order, provided, however, that a person possessing material that is subsequently designated as "Confidential" shall prevent further disclosure of such material except as authorized in this Stipulation and Protective Order.

5. Restrictions on the Disclosure of Confidential Discovery Material.

Discovery Material designated as "Confidential" and all information contained therein shall not be disclosed to or discussed with any person except:

A. inside and outside counsel to the parties, their insurer(s) and their staffs (including legal assistants and other persons employed and supervised by such counsel as reasonably necessary to assist such counsel in the conduct of these litigations);

B. the parties and any agents of the parties as reasonably necessary to assist counsel in the conduct of these litigations;

C. witnesses, experts, consultants, and other persons from whom counsel may seek to obtain evidence or advice, to the extent deemed reasonably necessary by counsel for the conduct of these litigations;

4

D. the Court (including the jury);

E. court reporters and deposition transcript reporters; and,

F. other persons only upon consent of the designating party or person or if the Court, after reasonable written notice to all affected parties, orders such disclosure.

Persons having knowledge of Confidential Discovery Material by virtue of their participation in the conduct of these litigations shall use that Confidential Discovery Material only in connection with the prosecution or appeal of these litigations, and shall neither use such Confidential Discovery Material for any other purpose nor disclose such Confidential Discovery Material to any person who is not listed in Paragraphs 5A-F of this Stipulation and Protective Order.

6. Compliance. Prior to the disclosure of material which has been designated as `Confidential" to those persons or entities authorized under paragraphs 5C and 5F of this Stipulation and Protective Order to receive such material, any such individual or entity shall be provided with a copy of this Stipulation and Protective Order, which he or she shall read. Upon reading this Stipulation and Protective Order, such person or entity shall sign a certification, substantially in the form annexed hereto as Exhibit A, acknowledging that he or she has read this Stipulation and Protective Order and will abide by its terms. Copies of

signed certifications shall be retained by counsel for the party obtaining them.

7. Inadvertent Production. If information subject to a claim of attorney-client privilege, attorney work product, or any other ground on which production of such information should not be made to any party is nevertheless inadvertently produced to such party, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege, work product, or other ground for withholding production to which the producing party or other producing person would otherwise be entitled. If a claim of inadvertent production is made, pursuant to this Paragraph, with respect to information then in the custody of another party, such party shall promptly return to the claiming party or person that material as to which the claim of inadvertent production has been made. The party returning such material may then move the Court for an order compelling production of the material, but said motion shall not assert as a ground for entering such an order the fact or circumstances of the inadvertent production.

8. Resolution of Challenges to Designations. Entering into, agreeing to and/or producing or receiving materials, or otherwise complying with the terms of this Stipulation and Protective Order shall not: (a) operate as an admission by any party that any particular Discovery Material contains or reflects proprietary or sensitive commercial or personal information or other confidential matter; (b)

prejudice in any way the rights of any party to apply to the Court for an order that information designated as "Confidential" need not be treated as confidential; (c) prejudice in any way the rights of any producing party or person to object to any discovery requests that seek information or documents that it considers not subject to discovery; or (d) prejudice in any way the rights of a party to seek a determination of the Court that particular Discovery Materials should be produced. No party to this action is obliged to challenge the projected status of any Discovery Material at the time of receipt, disclosure, or designation thereof, and a failure to do so shall not preclude a subsequent challenge thereto. In the event that a receiving party seeks to challenge the appropriateness of the "Confidential" designation of any Discovery Material, such party shall consult in good faith with the designating party or person in an effort to resolve the matter on an informal basis. In the event no agreement is reached, the receiving party shall give the producing party written notice challenging the designation of specified Discovery Material designated as "Confidential." The producing party shall have ten (10) business days after receipt of the required written notice within which to seek a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. Any document, testimony or other material designated as "Confidential" shall continue to be treated as confidential until the Court rules on any motion concerning the

"Confidential" designation, or until such motion is otherwise resolved.

9.   Filing of Confidential Material Under Seal.   In the event any material designated as "Confidential" is included in, attached to, referred to, or is an exhibit to any brief, memorandum, document, or transcript that is filed with either the Court or the Clerk during the course of proceedings arising out of either of these actions, the party using such material shall file the same or submit it to the Court in a sealed envelope bearing the following legend:

"CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER.

NOT TO BE OPENED EXCEPT BY ORDER OF THE COURT."

10.   Receipt of Subpoena.   If any party in possession of material designated as "Confidential" under this Stipulation and Protective Order receives a subpoena or other formal or written request seeking production or other disclosure of such material, that party shall within two (2) business days after receipt of such subpoena or request give written notice to counsel for the party or person who designated the materials as "Confidential," and shall enclose a copy of the subpoena or request in the required written notice.   The party in possession of such material shall not incur any further obligation with respect to resisting such compulsory process.   Where possible, at least ten (10) business days' notice before production or other disclosure

shall be given to counsel for the party or person who designated the materials as "Confidential."

11. Return Of Discovery Material Upon Termination of This Action. Within forty-five (45) days after the final conclusion of an action covered by this Stipulation and Protective Order (including any appeals), and unless the Court otherwise orders, any Discovery Material produced in that action and any copies thereof which have been made shall be returned to the producing party or person upon request or such material shall be certified in writing to have been destroyed, provided, however, that counsel shall be permitted to retain such materials as constitute a part of the record file of the litigation.

12. Modification of Order. A party or non-party may at any time apply to the Court for modification of this Order pursuant to a regularly noticed motion.

13. Non-parties. Any person or entity not a party that provides Discovery Materials in the above-captioned matter, may, through his, her or its counsel, choose to become subject to this Stipulation and Protective Order for the purposes of designating as "Confidential" Discovery Materials provided by that person. Materials designated as "Confidential" by any person or entity not a party that chooses to become subject to this Stipulation and Protective Order shall be accorded the protections set forth in Paragraph

5 of this Order. Any person or entity not a party that chooses to become subject to this Stipulation and Protective Order may do so by signing a copy of this Stipulation and Protective Order, having his, her or its counsel sign the Stipulation and Protective Order, and sending a signed copy of the same to counsel for each party.

14. Court Approval. The parties agree forthwith to submit this Stipulation and Protective Order to the Court for approval, and further agree that, pending approval by the Court, this Stipulation and Protective Order shall be effective as if approved.

SO STIPULATED this 28th day of May, 2001.

James C. Rawls
Georgia Bar No. 596050
Eric P. Schroeder
Georgia Bar No. 629880
S. Derek Bauer
Georgia Bar No. 042537

POWELL, GOLDSTEIN, FRAZER & MURPHY LLP
191 Peachtree treet
Sixteenth Floor
Atlanta, Georgia 30303
(404) 572-6600

L. Lin Wood
Georgia Bar No. 774588

The Equitable Building
Suite 2140
100 Peachtree Street
Atlanta, Georgia 30303
(404) 522-1713

ATTORNEYS FOR DEFENDANTS


_Evan M. Altman by JCR. with permission_

Evan M. Altman
Georgia Bar No. 014066

5901-C Peachtree Dunwoody Rd.
Suite 495
Atlanta, Georgia 30328
(770) 394-6466

Darnay Hoffman
PRO HAC VICE

Law Office of Darnay Hoffman
210 West 70th Street
Suite 209
New York, New York 10023
(212) 712-2766

ATTORNEYS FOR PLAINTIFF


I hereby certify that the foregoing STIPULATION AND
PROTECTIVE ORDER was prepared using Courier New 12 point type
face.

James C. Rawls
Georgia Bar No. 596050

## EXHIBIT A

Wolf v. Ramsey, Case No. 00:CIV-1187(JEC)

### ACKNOWLEDGMENT

I hereby acknowledge that I have read the Stipulation and Protective Order entered by the Court in the above-captioned action on May __, 2001, and understand the terms thereof and agree to be bound thereby.

DATED: _____

Name (typed or printed)

Signature

**ORDER**

Based upon the foregoing Stipulation, IT IS SO ORDERED.

Dated:     May 25, 2001

Honorable Julie E. Carnes
U.S. District Court Judge