IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT CHRISTIAN WOLF,

       Plaintiff,

v.

JOHN BENNET RAMSEY and
PATRICIA PAUGH RAMSEY,

       Defendants.

CIVIL ACTION NO.

1:00-CV-1187-JEC

## O R D E R

This case is presently before the Court on defendants' motion for summary judgment [67]; defendants' motion in limine to exclude the testimony of Cina Wong and Gideon Epstein [68]; and defendants' motion for oral argument [79].[1] The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendants' motion for summary judgment [67] should be **GRANTED**; defendants' motion to exclude the testimony of Cina Wong and Gideon Epstein [68] should be **GRANTED** as to Ms. Wong **and GRANTED in part and DENIED in part** as to Mr. Epstein; and defendants' motion for oral argument [79] should be **DENIED**.

---

[1] The Court has addressed, by separate Order, movant Steven Thomas's motion for a protective order [94]; movant City of Boulder's motion for oral argument [105]; and movant City of Boulder's motion for a protective order [106].

**BACKGROUND**

This diversity case is one of the many civil suits that arose in the wake of the widely-publicized and unsolved murder of six-year-old JonBenét Ramsey in Boulder, Colorado, on December 26, 1996.  Plaintiff Robert Christian Wolf is a Boulder, Colorado, resident who was named by defendants, JonBenét's parents, on national television and in their book about their daughter's murder, *The Death of Innocence: The Untold Story of JonBenét's Murder and How Its Exploitation Compromised the Pursuit of Truth* (hereinafter referred to as the "Book"), as a potential suspect in JonBenét's death.  Plaintiff claims that, to the extent defendants expressed an opinion that he might have killed their daughter, defendants knew such a statement to be untrue because defendant Patsy Ramsey killed her daughter and John Ramsey assisted her in covering up the crime.

The Court draws the undisputed facts from "Defendants' Statement of Undisputed Material Facts" ("SMF")[67] and "Plaintiff's Response to Defendants' Statement of Material Facts" ("PSMF"), in which plaintiff does not dispute the overwhelming majority of defendants' factual allegations.  When plaintiff has disputed a specific fact and pointed to evidence in the record that supports its version of events, the Court has viewed all evidence and factual inferences in the light most favorable to plaintiff, as required on a defendant's motion for summary

2

judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993). In addition, the Court has reviewed plaintiff's separate statements of disputed material facts [88] ("PSDMF"), which consist, for the most part, of a restatement of theories espoused by former Boulder Police Detective Steven Thomas[2], (PSDMF ¶¶ 44-75), and of a lengthy recounting of statements previously made by defendants, accompanied by editorial comments suggesting such statements to be untruthful, but without an explanation or evidence for such an assessment. (PSDMF ¶¶ 103-117, 120-249, 250-261.)[3] When the Court could discern a material factual dispute from this pleading, the Court has drawn all

---

[2] Steven Thomas is a former Boulder Police Detective who was assigned, from January 1997 through June 1998, to investigate JonBenét's murder. He has co-authored a book entitled *JonBenét: Inside the Ramsey Murder Investigation*, published in 2000. He professes to believe that Mrs. Ramsey wrote the ransom note found at the crime scene and murdered her daughter. (PSDMF ¶ 6.)

[3] The actual title of plaintiff's pleading is "Plaintiff's Statement of Material Facts To Which There Are no General Issues To Be Tried" [88]. On September 30, 2002, defendants filed a "Notice of Objection" to this pleading, correctly noting that Local Rule 56.1(B)(2) directs a respondent to file a statement of material facts about "which the respondent contends there exists a genuine issue to be tried." (*See* Notice of Objection [92] at 2.) In a response filed on October 9, 2002, plaintiff acknowledges that he mislabeled the pleading and that it properly should read "Plaintiff's Statement of Material Facts to Which There Are General Issues To Be Tried." (*See* Pl.'s Resp. To Defs.' Not. Of Objection" [95] at 2.)

3

inferences in a light most favorable to plaintiff.  Accordingly, the following facts are either not disputed or are viewed in the light most favorable to plaintiff.

**I.   The Timeline of the Crime and the Crime Scene**

Sometime on the night of December 25 or the early morning of December 26, 1996, JonBenét Ramsey was murdered.  (SMF ¶ 2.) JonBenét's body was found in the basement of defendant's home. (SMF ¶ 5; PSMF ¶ 5.)   Defendants have never been charged, arrested, or indicted for any offense in connection with the murder of JonBenét, and they deny any involvement in her death, although they have been under an "umbrella of suspicion" from almost the beginning of the murder investigation.  (SMF ¶¶ 6-7; PSMF ¶¶ 6-7.)

On the night of December 25, 1996, the Ramsey family attended a Christmas party at the home of their friends Fleet and Priscilla White.   (SMF ¶ 12; PSMF ¶ 12.)   Nothing out-of-the-ordinary occurred at the party and the Ramsey family appeared happy.  (SMF ¶ 13; PSMF ¶ 13.)  On the drive home from the party, JonBenét and her brother Burke fell asleep in the car.  Defendants put the children to bed when they returned home and then went to bed soon there after.  (SMF ¶ 13; PSMF ¶ 13.)  The family planned to rise early the following morning because they were to fly to Charlevoix, Michigan for a family vacation.  (SMF ¶ 13; PSMF ¶ 13.)

4

AO 72A
(Rev.8/82)

JonBenét and Burke's bedrooms were located on the second floor of the Ramsey home. There was also an empty guest bedroom on the second floor, located atop the garage. Defendants' bedroom was located on the third floor of the Ramsey home in a converted attic space. The home also contained a basement. (SMF ¶ 14; PSMF ¶ 14.) There were two stairwells leading from the second floor to the ground floor level. The back stairwell led into the kitchen, where there was a butler door that led into the basement.

Defendants claim they were not awakened during the night. A neighbor who lived across the street from defendants' home, however, reported that she heard a scream during the early morning of December 26, 1996. Experiments have demonstrated that the vent from the basement may have amplified the scream so that it could have been heard outside of the house, but not three stories up, in defendants' bedroom. (SMF ¶ 148; PSMF ¶ 148.) The following morning, defendants assert they woke around 5:30 a.m. and proceeded to get ready for their trip. While Mr. Ramsey took a shower, Mrs. Ramsey put back on the same outfit she had on the night before and reapplied her makeup. (SMF ¶ 15.) Mrs. Ramsey then went down the backstairs towards the second floor, then the spiral stairs to the ground floor, where, on a step near the bottom of the stairs, she discovered a handwritten note on three sheets of paper that indicated JonBenét had been kidnapped (the "Ransom Note"). (SMF ¶ 16.)

5

Plaintiff, however, contends that Mrs. Ramsey did not go to sleep the night of December 25, but instead killed her daughter and spent the rest of the night covering her crime, as evidenced by the fact she was wearing the same outfit the following morning. (PSMF ¶ 15.)   He further posits that Mrs. Ramsey authored the Ransom Note in an attempt to stage a crime scene to make it appear as if an intruder had entered their home. (PSMF ¶ 16; PSDMF ¶¶ 38-39.)   Plaintiff theorizes that, at some point in the night, JonBenét awoke after wetting her bed[4] and upon learning of the bed-wetting, Mrs. Ramsey grew so angry that an "explosive encounter in the child's bathroom" occurred, during which tirade, Mrs. Ramsey "slammed" JonBenét's head against "a hard surface, such as the edge of the tub, inflicting a mortal head wound." (PSDMF ¶¶ 45, 47.)   Plaintiff has provided no evidence for this particular theory.[5]

---

[4] Crime scene photos taken the following morning do not indicate that JonBenét's bed was wet or suggest that the sheets to the bed had been changed.   (Defs.' Exs. 56-58 attach. To Defs.' Summ. J. Mot.)   Urine stains, however, were reported to have been found on JonBenét's underwear and leggings that she was wearing when her body was discovered. (See Coroner's Report at 2.)   Thus, at some point after going to bed, but before being murdered, JonBenét urinated in her clothing.   The evidence does not indicate whether this occurred in her bedroom, the basement, or during the route between the two rooms.

[5] Plaintiff offers evidence, primarily hand-writing analyses, that plaintiff alleges to be evidence that Mrs. Ramsey wrote the Ransom Note.   The above theory is merely speculation by plaintiff as to what might have motivated Mrs. Ramsey to act so violently toward her daughter.

Plaintiff further contends, based again solely on Mr. Thomas's speculation, that "Mrs. Ramsey thought JonBenét was dead, but in fact she was unconscious with her heart still beating." (PSDMF ¶ 47.)   Mr. Thomas then surmises that "[i]t was that critical moment in which she had to either call for help or find an alternative explanation for her daughter's death." (PSDMF ¶ 48.)   Plaintiff then speculates that Mrs. Ramsey chose the latter route and spent the remainder of the night staging an elaborate coverup of the incident.[6]

Specifically, plaintiff theorizes that, with Mr. Ramsey and Burke still asleep, Mrs. Ramsey moved the body of JonBenét to the basement, returned upstairs to draft the Ransom Note, then returned to the basement where she "could have seen--perhaps by

---

[6] Relying solely on the testimony of Mr. Thomas, who has no apparent expertise as a medical examiner, plaintiff fixes the time of death at around one a.m. "suggested by the digestion rate of pineapple found in the child's stomach." (PSDMF ¶ 47.)   The coroner's report does indicate that a vegetable or fruit matter consistent with pineapple was found in JonBenét's stomach during the autopsy.   (Boulder Coroner Report at 6.)   The report, however, does not establish a time of death based on the digestion rate of the unidentified matter.

Plaintiff also theorizes, based on the presence of the unidentified matter in JonBenét's stomach that, contrary to Mrs. Ramsey's testimony, she was up during the night and fed JonBenét the pineapple.   (PSDMF ¶ 45.)   There is no evidence in the record that indicates when JonBenét ate the pineapple. Defendants state they did not feed JonBenét pineapple upon returning home from the White's party that evening.   (SMF ¶ 13.)   Mr. White does not recall if pineapple was served at his dinner party on December 25, 1996.   (F. White Dep. at 202.)

7

detecting a faint heartbeat or a sound or slight movement--that although completely unconscious, JonBenét was not dead." (PSDMF ¶¶ 49-50.)   In Mr. Thomas's scenario then, rather than being grateful that her child was alive, Mrs. Ramsey nevertheless decided to finish the job off by fashioning a garrote from one of her paintbrushes, looping the cord around the girl's neck, and then choking JonBenét to death.   (PSDMF ¶¶ 51-52.)   Plaintiff notes that the fact JonBenét was "choked from behind" is consistent with the murder being committed by someone who knew JonBenét and did not want to look at her face as he or she killed her.

After murdering her child and staging the crime, plaintiff opines that, to cover her tracks, Mrs. Ramsey must have taken the items she used in the staging out of the house, "perhaps dropping them into a nearby storm sewer or among Christmas debris and wrappings in a neighbor's trash can."   (PSDMF ¶¶ 53-54.)   Indeed, the sources for the duct tape and cord used in the crime were never located, nor sourced,[7] to defendants' home.   Plaintiff claims that Mrs. Ramsey next placed the Ransom Note in a place "where she would be sure to 'find' it."   (PDSMF ¶ 53.)

---

[7]   The word "sourced" is used by the parties as a verb. When a sentence indicates that a particular item was not "sourced" to the Ramsey home, it means that there is no evidence that those items were ever in the Ramsey home at any time before the murder.

8

Mrs. Ramsey disputes the above recitation of facts. She claims that, upon waking, she put back on the same clothes she had on the night before and applied her makeup. She then states she went downstairs to prepare for their departure on the family trip. (SMF ¶ 17.) As she descended the back stairwell, she discovered the Ransom Note and read only those few lines stating that JonBenét was kidnapped, but "safe and unharmed," and demanding $118,000 for her return. (SMF ¶ 17; PSMF ¶ 17.) Mrs. Ramsey immediately screamed and proceeded to check JonBenét's room, which was empty. (SMF ¶ 18; PSMF ¶ 18.) After hearing Mrs. Ramsey's scream, Mr. Ramsey ran downstairs and met Mrs. Ramsey in the stairwell. Together, they checked on their son who appeared to be asleep in his room. (SMF ¶ 18; PSMF ¶ 18.) Mr. Ramsey then went downstairs to read the Ransom Note, while Mrs. Ramsey called the police, informing them that her child had been kidnapped. (SMF ¶ 19; PSMF ¶ 19.) In addition to calling the police, defendants called several friends to their house, including Fleet and Priscilla White, who promptly came to the defendants' home. (SMF ¶ 20; PSMF ¶ 20.)[8]

---

[8] Defendants did not heed the warning in the letter that stated:

> The two gentlemen watching over your daughter do not particularly like you so I advise you not to provoke them. Speaking to anyone about your situation, such as Police, F.B.I., etc, will result in your daughter being beheaded. If we catch you talking to a stray dog, she dies. If you alert

AO 72A
(Rev.8/82)

Plaintiff contends Mr. Ramsey probably first grew suspicious while reading the Ransom Note that morning, which surmise is again based solely on the opinion of Mr. Thomas. (PSDMF ¶ 56.) Plaintiff speculates that upon examining the Ransom Note, Mr. Ramsey "must have seen his wife's writing mannerisms all over it, everything but her signature." (PSDMF ¶ 56.) Upon determining that his wife was involved in JonBenét's disappearance, plaintiff surmises that Mr. Ramsey chose to protect his wife, rather than to facilitate the capture of his daughter's murderer. (PSDMF ¶ 57.) Mr. Ramsey asserts, however, that he never once suspected his wife to be involved in the crime. (PSDMF ¶¶ 254-255.)[9]

---

authorities, she dies.

(Ransom Letter, attach. as pl.'s Ex. 16 to J. Ramsey Dep.)

[9] Plaintiff seeks to introduce the testimony of Linda Hoffman-Pugh, who worked for the family as a cleaning woman for nearly fourteen months prior to JonBenét's death, who asserts the Ramseys had a troubled marriage. (PSDMF ¶ 4.) Ms. Hoffman-Pugh states that Mr. Ramsey "berated" Mrs. Ramsey for being "a lousy homemaker and cook" shortly before the murder and that the couple "never once demonstrated any affection for each other, physical or otherwise, in front of [her]." (PSDMF ¶¶ 95-98.) Defendants strongly deny any such marital problems. (*See*, *e.g.*, J. Ramsey Dep. at 52; *see also* F. White Dep. at 170 (stating he perceived no marital problems between defendants).) Defendants have objected to such testimony as inadmissible, based on a lack of foundation and general irrelevance. (Defs.' Not. Of Objection to Exhibits [91] at 5.) Plaintiff responds that Ms. Hoffman-Pugh's testimony is relevant on a point placed in issue by defendants through their assertion that no marital problems existed between them. (*See* Pl.'s Resp. To Defs.' Not. Of Objection to Exhibits [96] at 7.)

The Court will consider Ms. Hoffman-Pugh's testimony.

A series of events transpired that severely compromised the crime scene. Office Rick French of the Boulder Police arrived at the defendants' home in a marked car a few minutes before six a.m., followed soon after by Detective Linda Arndt. (SMF ¶ 21; PSMF ¶ 21.) Contrary to normal protocol, the police did not seal off the defendants' home, with the sole exception being the interior of JonBenét's bedroom. In other words, any person in the Ramsey house could, and often did, move freely throughout the home. (SMF ¶ 21; PSMF ¶ 22.)

The Whites arrived at defendant's home at approximately 6:00 a.m., and Mr. White, alone, searched the basement within fifteen minutes of arrival. (SMF ¶ 23; PSMF ¶ 23.) Mr. White testified that when he began his search, the lights were already on in the basement and the door in the hallway leading to the basement "wine cellar" room[10] was opened. (SMF ¶ 25; PSMF ¶ 25; White Dep. at 147, 151-52.) He further testified that a window in the basement playroom was broken. (SMF ¶ 26; PSMF ¶ 26; White Dep. at 28, 152

---

The Court notes, however, that although plaintiff presents such evidence in support of his theory that Mrs. Ramsey was depressed and that her depression contributed to her state of mind on the night of December 25, such evidence, if accepted as true, cuts against plaintiff's theory that Mr. Ramsey assisted his wife in the "cover-up" of JonBenét's murder. In other words, if the marriage was shaky, it arguably seems less likely that the innocent spouse would help the guilty spouse cover up her murder of their child.

[10] Although referred to as the "wine cellar," the room was actually used for storage and was "a dark, dirty area" with mold growing on the floor. (F. White Dep. at 228.)

AO 72A
(Rev.8/82)

& 154.)   Under the broken window, Mr. White states there was a suitcase, along with a broken shard of glass.   (SMF ¶ 27; PSMF ¶ 27; White Dep. at 28-29, 156-59, & 265.)   He does not, however, remember whether the window was opened or closed.[11]   (SMF ¶ 28; PSMF ¶ 28; White Dep. at 153.)   Mr. White also opened the door to the wine cellar room, but he could not see anything inside because it was dark and he could not find the light switch.   (SMF ¶ 29; PSMF ¶ 29; White Dep. at 159-61.)

Later that same morning, at around ten a.m., Mr. Ramsey also searched the basement area alone.   He testified he found the broken window partially open.   (SMF ¶ 30; PSMF ¶ 30; J. Ramsey Dep. at 30.)   Under the broken window,  Mr. Ramsey also saw the same suitcase seen earlier by Mr. White.   Mr. Ramsey testified that the suitcase belonged to his family, but was normally stored in a different place.   (SMF ¶ 31; PSMF ¶ 31; J. Ramsey Dep. at 17.)   Mr. Ramsey then returned upstairs.   Plaintiff theorizes that Mr. Ramsey actually found JonBenét's body at this time.   (PSDMF ¶ 57.)

Later that afternoon, Mr. Ramsey and Mr. White together returned to the basement at the suggestion of the Boulder Police.   (SMF ¶ 32; PSMF ¶ 32; White Dep. at 212-217; J. Ramsey Dep. at 17-20.)   During this joint search of the basement, the men first

---

[11]   Mr. Ramsey testified that the window had been broken the previous summer. (SMF ¶ 30; PSMF ¶ 30; J. Ramsey Aff. ¶ 30.)

examined the playroom and observed the broken window. (SMF ¶ 33; PSMF ¶ 33.) The men next searched a shower stall located in the basement. (SMF ¶ 34; PSMF ¶ 34.) Mr. Ramsey then noticed a heavy fireplace grate propped in front of a closet and Mr. White moved the grate so the closet could be searched. (SMF ¶ 35; PSMF ¶ 35.) Upon finding nothing unusual in the closet, the men proceeded to the wine cellar room. Mr. Ramsey entered the room first, turned on the light and, upon discovery of JonBenét's dead body, he exclaimed "Oh my God, my baby." (SMF ¶ 36, 37; PSMF ¶ 36, 37; White Dep. at 162-63, 193-93.)

JonBenét had black duct tape covering her mouth, a cord around her neck that was attached to a wooden garrote, and her hands were bound over her head in front of her; she was covered by a light-colored blanket. (SMF ¶ 38; PSMF ¶ 38.) A "Barbie" nightgown belonging to JonBenét was also found in the wine cellar near her body. (SMF ¶ 149; PSMF ¶ 149.) JonBenét's blood was found only on her body and the Barbie nightgown. (SMF ¶ 150; PSMF ¶ 150.) Mr. Ramsey ripped the duct tape off JonBenét's mouth and attempted to untie her hands. (SMF ¶ 39; PSMF ¶ 39.) He then carried her body upstairs. (SMF ¶ 39; PSMF ¶ 39.) It was only upon the discovery of JonBenét's body that the Boulder police began to secure properly the home as the crime scene. (SMF ¶ 53; PSMF ¶ 53.)

13

JonBenét's body was bound with complicated rope slipknots and a garrotte attached to her body. (Defs.' Br. In Supp. Of Summ. J. [67] at 19; SMF ¶ 163; PSMF ¶ 163.) The slipknots and the garrote are both sophisticated bondage devices designed to give control to the user. (SMF ¶¶ 161, 164; PSMF ¶¶ 161, 164.) Evidence from these devices suggests they were made by someone with expertise using rope and cords, which cords could not be found or "sourced" within defendants' home. (SMF ¶ 169; PSMF ¶ 169.) The garrote consisted of a wooden handle fashioned from the middle of a paintbrush, found in the paint tray in the boiler room. The end of a nylon cord was tied to this wooden handle and, on the other end, was a loop with a slipknot, with JonBenét's neck within the loop. (SMF ¶¶ 157-158; PSMF ¶¶ 157-158.) The end portion of the paintbrush used to construct the garrote was never found. (SMF ¶ 159; PSMF ¶ 159.) No evidence exists that either defendant knew how to tie such knots. (SMF ¶ 162; PSMF ¶ 162.) Further, fibers consistent with those of the cord used to make the slip knots and garrote were found on JonBenét's bed. (SMF ¶ 168; PSMF ¶ 168.) Although plaintiff agrees the garrote is the instrument used to murder JonBenét, he argues that the cord with which the wrists were tied would not have bound a live child and is evidence of a staging. (PSDMF ¶ 51.)

The black duct tape used on JonBenét's mouth has also not been sourced to defendants. (SMF ¶ 170; PSMF ¶ 170.) Both ends

14

of the duct tape found on her were torn, indicating that it came from a roll of tape that had been used before. (SMF ¶ 171; PSMF ¶ 171.)  No similar duct tape was found in the house, nor is there evidence that defendants ever used or owned such duct tape.  (SMF ¶ 172; PSMF ¶ 172.)  Plaintiff also notes that the strip of duct tape found on JonBenét's mouth had a bloody mucous on it and a "perfect set of child's lip prints, which did not indicate a tongue impression or resistance." (PSDMF ¶ 53.)  Animal hair, alleged to be from a beaver, was found on the duct tape.  (SMF ¶ 183; PSMF ¶ 183.)  Nothing in defendants' home matches the hair. (SMF ¶ 183; PSMF ¶ 183.)  Dark animal hairs were found on JonBenét's hands that also have not been matched to anything in defendants' home.  (SMF ¶ 184; PSMF ¶ 184.)

Several recently-made unidentified shoeprints were found in the basement, imprinted in mold growing on the basement floor. (SMF ¶ 151; PSMF ¶ 151.)  In particular, a shoeprint of a "HI-TEC" brand mark on the sole of a shoe was found.  (SMF ¶ 152; PSMF ¶ 152.)  Defendants do not own any "HI-TEC" brand shoes, and none of the shoes found in their home match the shoeprint marks.  (SMF ¶ 153; PSMF ¶ 153.) Another partial shoeprint was found near where JonBenét's body was found.   (SMF ¶ 155; PSMF ¶ 155.)   This shoeprint left only a partial logo.  The owner of the "HI-TEC" shoe that made the shoeprints at the murder scene has never been identified.  (SMF ¶ 154, 155; PSMF ¶ 154, 155.)  In addition, on

15

the wine-cellar door, there is a palmprint that does not match either of defendants' palmprints. (SMF ¶ 156; PSMF ¶ 156.) The individual to whom it belongs had not yet been identified. (SMF ¶ 156; PSMF ¶ 156.)

Finally, items were left behind that defendants assert they did not own. (Defs.' Br. In Supp. Of Summ. J. [67] at 18-19.) A baseball bat not owned by the Ramseys found on the north side of the house has fibers consistent with fibers found in the carpet in the basement where JonBenét's body was found. (SMF ¶ 185; PSMF ¶ 185.) A rope was found inside a brown paper sack in the guest bedroom of defendants' home, neither of which belonged to defendants. (SMF ¶ 181; PSMF ¶ 181.) Small pieces of the brown sack material were found in the "vacuuming" of JonBenét's bed and in the body bag that was used to transport her body. (SMF ¶ 181; PSMF ¶ 181.) Brown cotton fibers on JonBenét's body, the paintbrush, the duct tape and on the ligature were not sourced and do not match anything in the Ramsey home. (SMF ¶ 181; PSMF ¶ 181.)

The autopsy of JonBenét's body was conducted on December 27, 1996 by the Boulder County Coroner's Office. (SMF ¶ 40; PSMF ¶ 40.) The cause of JonBenét's death was asphyxia by strangulation associated with craniocerebral trauma. (SMF ¶ 41; PSMF 41.) The autopsy report supports the conclusion that she was alive before she was asphyxiated by strangulation and that she fought her

16

attacker in some manner.  (SMF ¶ 42-43, 46, 48; PSMF ¶ 42-43, 46, 48.)  Evidence gathered during the autopsy is consistent with the inference that she struggled to remove the garrote from her neck. (SMF ¶ 44; PSMF ¶ 44.)  Moreover, both parties agree the autopsy report reveals injury to JonBenét's genitalia consistent with a sexual assault shortly before her death.  (SMF ¶ 48; PSMF ¶ 48.)[12] Although no head injury was visible when she was first discovered, the autopsy revealed that she received a severe blow to her head shortly before or around the time of the murder.  (SMF ¶ 51; PSMF ¶ 51.  *See also* Report of Michael Doberson, M.D., Ph.D. at 6(C) attach. as Ex. 3 to Defs.' Ex. Vol. I, Part A (stating the "presence of hemorrhage does indicated that the victim was alive when she sustained the head injury, however the relative small amount of subdural hemorrhage indicates that the injury occurred in the perimortem (close to death)[13] period.").)

The coroner took nail clippings from JonBenét.  Male DNA was found under JonBenét's right hand fingernail that does not match that of any Ramsey.  (SMF ¶ 174; PSMF ¶ 174.)  Defendants also

---

[12] The bleeding in JonBenét's genital area indicates she was alive when she was assaulted.  (SMF ¶ 48; PSMF ¶ 48.)  Her hymen was torn and material consistent with wooden shards from the paintbrush used to make the garrote were found in her vagina.  (SMF ¶ 48-49; PMSF ¶ 48-49.)  No evidence, however, suggests that she was the victim of chronic sexual abuse. (SMF ¶ 50; PSMF ¶ 50.)

[13] The Court has not been able to determine from the record how close to death the perimortem period would have been.

17

assert that <u>male</u> DNA was found under JonBenét's left hand fingernail, which also does not match that of any Ramsey. (SMF ¶ 173.)   In addition, <u>male</u> DNA was found in JonBenét's underwear that does not match that of any Ramsey and has not yet been sourced. (SMF ¶¶ 175, 178; PSMF ¶¶ 175, 178.) The Boulder Police Department has yet to identify the male whose DNA was found at the crime scene.   (SMF ¶ 177; PSMF ¶ 177.)   Finally, a Caucasian "pubic or auxiliary" hair was found on the blanket covering JonBenét's body.   (SMF ¶ 179; PSMF ¶ 179.)   The hair does not match that of any Ramsey and has not been sourced. (SMF ¶ 180; PSMF ¶ 180.)

Finally, the coroner's report notes injuries on the right side of JonBenét's face and left lower back.   While defendants assert that these injuries are consistent with the use of a stun gun, plaintiff notes that the coroner's report does not expressly state the injuries were the result of such an instrument. (SMF ¶ 47; PSMF 47.) Dr. Michael Doberson, a forensic pathologist retained by defendants who examined the Boulder Coroner's autopsy report and autopsy photos, concludes the injuries to "the right side of the face as well as on the lower left back are patterned injuries most consistent with the application of a stun gun." (Report of Michael Doberson, M.D., Ph.D. at 5(A), attach. as Ex. 3 to Defs.' Ex. Vol. I, Part A.)

18

## II.   The Ransom Note

The Ransom Note is believed by all parties to have been written by the killer or an accomplice of the killer and remains an extremely important clue in the murder investigation.   (PSDMF ¶ 14.)   Plaintiff claims that the single best piece of evidence that ties Mrs. Ramsey to the crime is the Ransom Note.   (*Id.*) Mrs. Ramsey, however, flatly denies that she had anything to do with the note's creation.   (SMF ¶ 189; PSMF ¶ 189.)   Due to the pivotal role the Ransom Note plays in plaintiffs' allegation that Mrs. Ramsey was the murderer of her child, the facts surrounding the Ransom Note will be discussed in detail.

The Ransom Note was quite long, and in fact is one of the longest ransom notes in the history of kidnapping cases.   (PSDMF ¶ 17.)   This fact is important because the longer a document is, the harder it becomes to disguise one's handwriting.   (PSDMF ¶ 19.)   The Ransom Note is addressed to Mr. Ramsey alone and purports to be written by a group of individuals who "represent a small foreign faction" that have kidnapped defendants' daughter and seek $118,000 for her safe return.   The Ransom Note was signed "S.B.T.C.", after the salutation "Victory!".   (Ransom Note at 3.) The author of the Ransom Note instructs Mr. Ramsey to "[u]se that good southern [sic] common sense," an obviously inaccurate reference as Mr. Ramsey was originally from Michigan, whereas Mrs. Ramsey was originally from West Virginia.   (*Id.*)

19

In addition, the Ransom Note was drafted on paper taken from the middle of a pad of paper located at defendants' home and with a pen found at defendants' home. Additional sheets were missing from the pad and were never located at defendants' home. The pen used to write the Ransom Note was sourced to defendants' home and found placed back in its normal place by the phone. Finally, there was another page in the pad that had written on it "Mr. and Mrs. I," which many believe to have been an early "false start" of the Ransom Note.   (PSDMF ¶ 51.)

Both parties agree that the Ransom Note is not an ideal specimen for handwriting analysis, primarily due to the type of writing instrument, a broad fiber-tip pen, used to draft the note. This type of pen distorts and masks fine details to an extent not achievable by other types of pen, as for example a ball point pen. (SMF ¶ 243; PSMF ¶ 243.)   In addition, the stroke direction used to construct certain letters and subtle handprinting features, such as hesitations and pen lifts, are difficult to ascertain because of the pen used in the Ransom Note.   (SMF ¶ 244; PSMF ¶ 244.)   Finally, the handwriting in the original Ransom Note showed consistency throughout the entire writing.   (SMF ¶ 246; PSMF ¶ 246.)   One of the most common means to disguise one's handwriting is to attempt to make the script erratic throughout the text.   In sum, for the above reasons, the Ransom Note is not an ideal

20

specimen for handwriting analysis. Nevertheless, the writer does not appear to have been trying to disguise his or her handwriting.

During the investigation, the Boulder Police Department and Boulder County District Attorney's Office consulted at least six handwriting experts. (SMF ¶ 191; PSMF ¶ 191.)  All of these experts consulted the original Ransom Note and original handwriting exemplars from Mrs. Ramsey. (SMF ¶ 205; PSMF ¶ 205.) Four of these experts were hired by the police and two were hired by defendants. (SMF ¶ 191; PSMF ¶ 191.)  All six experts agreed that Mr. Ramsey could be eliminated as the author of the Ransom Note. (SMF ¶ 194; PSMF ¶ 194.)  None of the six consulted experts identified Mrs. Ramsey as the author of the Ransom Note. (SMF ¶ 195; PSMF ¶ 195.)  Rather, the experts' consensus was that she "probably did not" write the Ransom Note. (SMF ¶ 196; PSMF ¶ 196.)[14] On a scale of one to five, with five being elimination as

_____

[14]   Chet Ubowski of the Colorado Bureau of Investigation concluded that the evidence fell short of that needed to support a conclusion that Mrs. Ramsey wrote the note. (SMF ¶ 197; PSMF ¶ 197.)   Leonard Speckin, a private forensic document examiner, concluded that differences between the writing of Mrs. Ramsey's handwriting and the author of the Ransom Note prevented him from identifying Mrs. Ramsey as the author of the Ransom Note, but he was unable to eliminate her. (SMF ¶ 198; PSMF ¶ 198.)   Edwin Alford, a private forensic document examiner, states the evidence fell short of that needed to support a conclusion that Mrs. Ramsey wrote the note. (SMF ¶ 197; PSMF ¶ 197.)   Richard Dusick of the U.S. Secret Service concluded that there was "no evidence to indicate that Patsy Ramsey executed any of the questioned material appearing on the [R]ansom [N]ote." (SMF ¶ 200; PSMF ¶ 200.)   Lloyd Cunningham, a private forensic document examiner hired by defendants, concluded that there were no

21

the author of the Ransom Note, the experts placed Mrs. Ramsey at a 4.5 or a 4.0.   (SMF ¶ 203; PSMF ¶ 203.)   The experts described the chance of Mrs. Ramsey being the author of the Ransom Note as "very low."   (SMF ¶ 204; PSMF ¶ 204.)   The two experts hired by defendants both assert that this evidence strongly suggests that Mrs. Ramsey did not write the Note.   (SMF ¶ 254.)

Plaintiff, however, asserts that his retained experts believe Mrs. Ramsey to be the author of the Ransom Note.   Indeed, Gideon Epstein and Cina Wong, the handwriting experts proffered by plaintiff, opine that they are "100 percent certain" Mrs. Ramsey wrote the Ransom Note.   (SMF ¶ 256; PSMF ¶ 256; PSDMF ¶¶ 1-2.)   In contrast to the experts relied upon by defendants and by the Boulder Police Department, however, neither of these experts have ever seen or examined the original Ransom Note.   (SMF ¶ 256; PSMF ¶ 256.)   In fact, Mr. Epstein and Ms. Wong do not know what "generation" copy of the Ransom Note they examined.   (SMF ¶ 257; PSMF ¶ 257.)   Ms. Wong received her copy of the Ransom Note and certain writings alleged to be historical writings of Mrs. Ramsey from the tabloid, The National Enquirer.  (SMF ¶ 258; PSMF ¶ 258.)   Although it is widely considered "very important" to consult the

---

significant similar individual characteristics shared by the handwriting of Mrs. Ramsey and the author of the Ransom Note, but there were many significant differences between the handwritings.   (SMF ¶ 201; PSMF ¶ 201.) Finally, Howard Rile concluded that Mrs. Ramsey was between "probably not" and "elimination," on a scale of whether  she wrote the Ransom Note.   (SMF ¶ 202; PSMF ¶ 202.)

AO 72A
(Rev.8/82)

original versions of writings when engaging in handwriting analysis, plaintiff asserts it was impossible for his experts to consult such materials because defendants failed to provide him with original exemplars.[15]   (PSMF ¶¶ 259-260.)   Mr. Epstein, however, consulted with some of his peers, who concur with his analysis.[16]   Defendants' experts base their conclusion that Mrs. Ramsey is not the author of the Ransom Note on the "numerous significant dissimilarities" between the individual characteristics of Mrs. Ramsey's handprinting and of that used in the Ransom Note.  (SMF ¶ 247.)  For example, defendants asserts Mrs. Ramsey's written letter "u" consistently differs from the way the same letter is written throughout the Ransom Note.   (SMF ¶

----

[15]   The Court is unaware that plaintiff ever sought to compel Mrs. Ramsey to produce original exemplars.  Presumably, the original Ransom Note is in the custody of the police.

[16]   Specifically, Mr. Epstein asserts that he consulted two former FBI forensic document examiners, Larry F. Zeigler and Richard Williams, as well as Donald L. Lacy, David Lieberman, and Thomas Miller.  (PSDMF ¶¶ 3-4, 33-34, 35-36A.) Defendants have objected to plaintiff's use of affidavits from Mr. Liebman, Mr. Lacy, Mr. Zeigler, and Mr. Williams, as well as an anonymous handwriting report, to support plaintiff's opposition to defendants' motion to exclude the testimony of Ms. Wong and Mr. Esptein.  (See Notice of Objections to Pl.'s Exhibits [91] at 2.)   Defendants assert that these expert reports were not disclosed pursuant to Federal Rule of Civil Procedure 26(a)(2).  (See id.)  Plaintiff has responded with excerpts from a letter drafted by defendants' attorney which reveal that he was aware of the fact that plaintiff had secured opinions for Mr. Liebman, Mr. Lacy and Mr. Zeigler with regard to the handwriting at issue in the instant litigation.  (See Pl.'s Resp. To Defs.' Not. Of Objections to Pl.'s Exhibits [96] at 3-4.)

23

248.)  Plaintiff's experts responds that this variation may be due
to a conscious effort by Mrs. Ramsey to change her handwriting or
to her heightened stress level.  (PSMF ¶ 248.) In support of their
conclusion that Mrs. Ramsey authored the Ransom Note, plaintiff's
experts assert that there are similarities between letters found
in the Ransom Note and exemplars and that the note contains proof-
reader marks[17] of the kind often used by newspaper reporters and
journalists.  (PSDMF ¶ 41.)  Plaintiff also notes that Mrs. Ramsey
was a journalism major in college.   (PSDMF ¶ 42.)

     Other experts believe the Ransom Note may have been authored
by other people.   In addition to Mrs. Ramsey, there were other
individuals "under suspicion" who had their handwriting analyzed
and who were not eliminated as the possible author of the Ransom
Note.   (SMF ¶ 205; PSMF ¶ 205.)  For example, forensic document
examiner Lloyd Cunningham cannot eliminate plaintiff as the author
of the Ransom Note.   (SMF ¶ 279; PSMF ¶ 279.)  Plaintiff's ex-
girlfriend has also testified that she was "struck by how the
handwriting in the note resembled [plaintiff's] own handwriting"
and believes that he is the note's author.  (J. Brungardt Aff. ¶
43.)  Further, to the extent that the use of a single editing mark
might suggest to plaintiff's experts that Mrs. Ramsey was the

---

[17]  The "proof reader marks" to which plaintiff refers is
actually a lone "carrot symbol" used in one sentence where the
word "not" had been left out and was later added.   (Ransom
Note at 2.)

author, given her bachelor's degree in journalism, one should also note that plaintiff, himself, has a Masters' degree in journalism. (*Id.* ¶ 13.)

### III. The Investigation of the Murder

At the time of JonBenét's murder, the Boulder Police Department had limited experience in conducting a murder investigation. (SMF ¶ 70; PSMF ¶ 70.) Commander Jon Eller was primarily responsible for the investigation, which was his first murder investigation. (SMF ¶ 67; PSMF ¶ 67.) One lead detective assigned to the case, Steven Thomas, had no prior experience with a murder investigation and had previously served as an undercover narcotics officer. (SMF ¶ 68; PSMF ¶ 68.) Finally, the officer who took charge of the investigation in October 1997, Mark Beckner, also had limited homicide experience. (SMF ¶ 69; PSMF ¶ 69.)

Many mistakes were made during the course of the investigation. For example, a series of events compromised the crime scene, as discussed *supra*. Moreover, the police did not request to interview defendants separately on the day that JonBenét's body was found. (SMF ¶ 57; PSMF ¶ 57.) They did, however, question defendants jointly at various times on December 26, 27 and 28, and, soon thereafter, began to focus the investigation on defendants as the main subjects. (SMF ¶¶ 54, 71-72; PSMF ¶¶ 54, 71-72.) Pursuant to the FBI's suggestion that the

25

Boulder Police publicly name defendants as subjects and apply intense media pressure to them so that they would confess to the crime, the police released many statements that implied defendants were guilty and were not cooperating with police. (SMF ¶¶ 74-75; PSMF ¶¶ 74-75.) In addition to official police releases, many individual officers also released information about the investigation without official authorization, some of which disclosures were highly confidential and potentially undermined the investigation.

During the course of the investigation, defendants signed *over one hundred releases for information requested by the police,* and provided all evidence and information requested by the police. (SMF ¶ 61; PSMF 61.) Upon request, within days after the murder and in the months that followed, defendants provided the police with historical handwriting samples and supervised written exemplars. (SMF ¶ 55; PSMF ¶ 55.) Defendants also gave hair, including pubic hair, and DNA samples to the police. (SMF ¶ 56, 60; PSMF ¶ 56, 60.) Despite widespread criticism that defendants failed to cooperate in the murder investigation, defendants note that they agreed, on at least three occasions, to be interviewed separately by representatives of the police or the Boulder County District Attorney's Office. (SMF ¶ 62; PSMF ¶ 62.)

In March 1997, Andrew Louis Smit was hired by the Boulder District Attorney's Office due to his extensive experience as a

26

homicide investigator for thirty years. (SMF ¶ 94; PSMF ¶ 94.) Detective Smit is widely considered to be an expert investigator who has successfully cracked other child murder investigations. (*See, e.g.*, SMF ¶ 94; PSMF ¶ 94; Hunter Dep. at 46-47; Steven Thomas, *JonBenét: Inside the Ramsey Murder Investigation* 167-169 (2001).) During the course of his tenure with the police department, Detective Smit became familiar with all aspects of the murder investigation. (SMF ¶¶ 95-96; PSMF ¶¶ 95-96.) He resigned from the investigation at some point in September 1998, however, because he felt that the Boulder Police Department refused to investigate leads that pointed to an intruder as the murderer of JonBenét, and instead insisted on focusing only on defendants as the culprits. (SMF ¶¶ 97, 101; PSMF ¶ 97, 101.) Two other men, Detective Steve Ainsworth and Assistant District Attorney Trip DeMuth, who also believed the evidence pointed toward an intruder as the killer, were soon thereafter removed from the investigation. (SMF ¶¶ 98-100; 102; PSMF ¶ 99-100; 102.)

In June 1998, the Boulder police presented their evidence to the Boulder County District Attorney. (SMF 84; PSMF ¶ 84.) At some point in the summer of 1998, then-District Attorney Alex Hunter decided to convene a grand jury to investigate the murder of JonBenét and possibly bring charges. (SMF ¶ 86; PSMF ¶ 86.) On October 13, 1999, the grand jury was discharged by District Attorney Hunter with no indictment issued. (SMF ¶ 91; PSMF ¶ 91.)

AO 72A
(Rev.8/82)

The District Attorney, and all other prosecutors involved in the proceedings, believed at that time that there was insufficient evidence to bring charges against any person, including defendants, in connection with the murder. (SMF ¶¶ 91-92; PSMF ¶¶ 91-92.)

## IV.  Publicity Surrounding the Crime

Beginning on the morning of December 26, 1996, there has been and continues to be considerable public interest and media attention devoted to JonBenét's murder and the subsequent investigation into the crime. As discussed *supra*, the Boulder Police Department utilized the press, in an attempt to "smoke out" JonBenét's killer.  In addition to this intentional use of the press, a number of leaks of confidential information, at various stages of the murder investigation, served to hamper the ability of the Boulder Police Department to conduct an effective investigation into crime. Finally, many people have attempted to capitalize on and profit from the widespread interest in JonBenét's murder.  Indeed, plaintiff has attempted to gain a book deal and the chief theorist behind plaintiff's claims, former Detective Steve Thomas, also wrote a book.  Likewise, the defendants have written a book about the murder, entitled *The Death of Innocence: The Untold Story of JonBenét's Murder and How Its Exploitation Compromised the Pursuit of Truth.*  (SMF ¶ 8.)

Defendants assert that they wrote their book in response to

media speculation that they were involved in their child's murder and to correct inaccurate media reports. Plaintiff, in contrast, asserts that defendants' Book was authored in an attempt to "escape prosecution for the murder of JonBenét." (PSMF ¶ 8.) The Book sets forth defendants' account of the investigation of their daughter's murder and their view that the police did not adequately investigate several leads. (SMF ¶ 9; PSMF ¶ 9.) In the Book, defendants promote the theory that an unknown intruder entered their home and murdered their daughter. (SMF ¶ 2, 11.) Defendants state they believed when writing the Book, and believe now, that the statements contained in the Book represent either truthful fact or sincere opinion. (SMF ¶ 9.)

Defendants' Book names five people, including plaintiff, whom defendants contend should be further investigated. (SMF ¶ 328; PSMF ¶ 328.) For example, one lead mentioned is Michael Helgoth, a man who committed suicide two months after the murder and one day after District Attorney Hunter issued a statement that the authorities were narrowing their search for the murderer of JonBenét Ramsey. (SMF ¶ 281; PSMF ¶ 281.) Indeed, a stun gun was found near Mr. Helgoth's body, as well as boots with a "HI-TEC logo like that left on the basement floor of defendants' home. (SMF ¶ 281; PSMF ¶ 281.) See discussion supra at 15, 18.

Another lead mentioned is Gary Oliva, a transient with a history of child molestation, who was seen in the Boulder area in

29

December 1996, picked up his mail one block from the Ramsey home, and was present at a memorial service for JonBenét.  (SMF ¶ 282; PSMF ¶ 282.)

Another purported lead was Bill McReynolds, who portrayed Santa Claus at a Christmas Party at defendants' home in December 1996, whose wife had written a play about a young girl held captive in a basement, whose daughter had been kidnapped and sexually assaulted twenty-two years to the day before JonBenét's death, and who had written a card to JonBenét that was found in her trash can after the murder.  (SMF ¶ 283; PSMF ¶ 283.)

Finally, another lead identified by Detective Smit was plaintiff, who in his estimation presented too many "unanswered questions."  (SMF ¶ 284; PSMF ¶ 284.)  Defendants identified all of these men, and others, in their book as possible suspects. (SMF ¶ 328; PSMF ¶ 328; *The Book* at 165-168, 199-201, 215-216, & 310-312.)   In addition, the Book discusses, but does not name, eight other leads.  (SMF ¶ 328; PSMF ¶ 328.)  In Chapter 33 of the Book, defendants present a detailed profile of the murderer.   The profile offered is that of a male ex-convict, aged 25-35, who is familiar with and owns a stun gun.  (SMF ¶ 329; PSMF ¶ 329.)  The passage at issue from the Ramsey book, that is the heart of the present libel claim, criticizes the Boulder Police Department for failing to investigate these possible leads in the murder investigation. (SMF ¶ 180; PSMF ¶ 180.)

30

In addition to authoring the Book, defendants have appeared on various news programs. (PSDMF ¶¶ 105-118.)  On March 24, 2000, defendants appeared on NBC's "Today Show," a television broadcast, in a segment taped in February 2000 with Katie Couric.  (SMF ¶ 330; PSMF ¶ 330.)  It is from this broadcast that plaintiff's slander claim arises.  Defendants did not have any influence or control over the visuals displayed when they spoke, were not told that a photograph of plaintiff would be displayed during their appearance on the show, and were not told before taping what specific questions would be posed to them during the taping.  (SMF ¶ 331; PSMF ¶ 331.)  In other words, defendants had no editorial control over how the interview was edited or presented.  (SMF ¶ 332; PSMF ¶ 332.)  During the interview, Mr. Ramsey stated that:

> I can tell you when- when we first started looking at - at one particular lead early on - my reaction was This is it.  This is the killer.  And our investigator said 'Whoa, whoa, whoa.'  He'd say, 'Don't do a Boulder Police on me.  Don't rush to conclusions' --

(Transcript of Interview attach. as Tab 38 to Defs.' Ex., Vol. 1; J. Ramsey Aff. ¶ 19.)  He claims that these statements were not in relation to plaintiff, but rather to Michael Helgoth,[18] although plaintiff's photograph was being superimposed on the telecast by NBC.  (SMF ¶¶ 335; 338.)  Plaintiff contends that the above

---

[18]  Mr. Helgoth was the suicide victim whose body was found near a stun gun and HI-TEC boots.  *See, supra* at 29.

31

statement, however, was intended by defendants to relate to him.
(PSMF ¶¶ 335, 338.)

For his part, plaintiff too has appeared before the media and
profited from discussing and critiquing the murder investigation.
(SMF ¶ 292; PSMF ¶ 292.)   In 1997, plaintiff voluntarily gave an
interview to *Hard Copy*, a syndicated television program, in which
he claimed to be a suspect in the murder of JonBenét and for which
he received $5,000 compensation.   (SMF ¶ 293; PSMF ¶ 293.)   In
addition, plaintiff discussed his status as a suspect with the
news tabloid, *The National Enquirer,* and received $250 for that
interview.    (SMF ¶ 294; PSMF ¶ 294.)    In addition, plaintiff
provided information to Lawrence Schiller for use in his 1998 book
about the murder, entitled *Perfect Murder, Perfect Town*.   In
several passages, attributed to plaintiff, the latter discusses
his arrest and interrogation by the Boulder Police Department.
(SMF ¶¶ 295-296; PSMF ¶¶ 295-296.)[19]

Plaintiff also attempted to capitalize on his association
with the murder investigation through a book deal.  On plaintiff's
computer was a letter dated March 2, 1999, addressed to David

---

[19]  In addition, sometime during or before 1998, plaintiff
wrote a letter to FOX television reporter Carol McKinley
recounting his "interrogation as a suspect in the Jon Benet
[sic] Ramsey murder investigation."   (SMF ¶ 292; PSMF ¶ 292.)
In the letter, he claimed that John Ramsey sexually abused
JonBenét Ramsey, that the Ramseys' then-eleven year old son
may have killed JonBenét, and that Mr. Ramsey was a "Merchant
of Death," responsible for the murder of innocent women and
children in third world countries.   (SMF ¶ 292; PSMF ¶ 292.)

Granger of *Esquire* magazine, discussing his status as a suspect in the murder and his related media and print appearances. (SMF ¶ 298; PSMF ¶ 298.) The letter requests a "generous fee" in return for plaintiff authoring a book about JonBenét's murder. (SMF ¶ 298; PSMF ¶ 298.)

Plaintiff's counsel Darnay Hoffman also became interested in the case early in the murder investigation and has contributed to the continued media interest through the filing of various lawsuits. In March 1997, Mr. Hoffman sent a letter to the Boulder County District Attorney Alex Hunter suggesting that Charles Lindbergh had killed his child in a hoax kidnapping and that one of the defendants had killed JonBenét in a similar type hoax. (SMF ¶ 339; PSMF ¶ 339.) In May 1997, Mr. Hoffman sent Mr. Hunter a second letter in which Mr. Hoffman theorized that Mrs. Ramsey killed her daughter, through a blow to the head, in a fit of rage caused by unhappiness, depression and marital problems. (SMF ¶ 340; PSMF ¶ 340.) The Boulder authorities did not take Mr. Hoffman's unsubstantiated theories seriously and considered much of his submissions to be "off the wall." (SMF ¶ 341; PSMF ¶ 341.)

In the fall of 1997 Mr. Hoffman began to solicit the involvement of various handwriting experts, claiming that, although prior expert reports given to the Colorado Bureau of Investigation showed Mrs. Ramsey to be at the "very lowest end of the spectrum, i.e. there is little or no basis for a match," it

AO 72A
(Rev.8/82)

would be a "career move" for an expert to submit an affidavit for use by Mr. Hoffman. (SMF ¶ 343; PSMF ¶ 343.) Indeed, forensic document examiners were eager to jump into the high-profile investigation. In July 1997, Ms. Wong, now plaintiff's expert, had originally contacted defendants' attorneys and offered to analyze the Ransom Note and point out weaknesses in analysis by "Government handwriting experts." (SMF ¶ 342; PSMF ¶ 342.) Defendants declined such an offer. In September 1998, Ms. Wong wrote District Attorney Hunter, Assistant District Attorney Michael Kane, and Judge Roxanne Bailin, asking to testify before the Grand Jury. (SMF ¶ 347; PSMF ¶ 347.) By letter dated January 20, 1999, Mr. Hunter rejected the request, informing Ms. Wong that it was his opinion that she did not use scientifically reliable methods, her testimony would be inadmissible, and that she lacked credibility. (SMF ¶ 348; PSMF ¶ 348.) In addition, Mr. Epstein, defendants' other handwriting expert, also wrote to Mr. Hunter, at sometime before the end of 2000, to offer his assistance in examining the Ransom Note. (SMF ¶ 349; PSMF ¶ 349.) Mr. Hunter did not take Mr. Epstein up on his offer, either. (SMF ¶ 349; PSMF ¶ 349.)

On November 14, 1997, Mr. Hoffman filed a Complaint in the District Court for Boulder County, Colorado, on his own behalf as a plaintiff, asking that Mr. Hunter be forced to explain why he had not filed murder charges against Mrs. Ramsey. (SMF ¶ 344;

34

PSMF ¶ 344.)   Attached to the Complaint was the affidavit of Ms. Wong who, notwithstanding her earlier overture to the Ramseys, now claimed that Mrs. Ramsey had written the Ransom Note.  (SMF ¶ 345; PSMF ¶ 345.)  Mr. Hoffman's complaint was dismissed on January 20, 1998.   (SMF ¶ 346; PSMF ¶ 346.)

In March 2000, Mr. Hoffman again filed suit, again on his own behalf as plaintiff, against defendants in the Supreme Court of New York, County of New York, for $25,000,000 in damages based on the allegation that he was defamed by certain passages in the defendants' Book.  (SMF ¶ 353; PSMF ¶ 353.)  On April 21, 2000, Mr. Hoffman dismissed this complaint.  (SMF ¶ 354; PSMF ¶ 354.)

In addition, Mr. Hoffman has served as a long time source to news tabloids for information about the investigation.  (*See, e.g.,* John Latta, "JonBenét's Dad Was Framed- by Mom, say insiders," NATIONAL EXAMINER, June 24, 1997 (insider referred to is Mr. Hoffman); Art Dworkin, "JonBenét's Dad Lied Under Oath to Hide Death Fight," NATIONAL EXAMINER dated March 7, 2000 (quoting Mr. Hoffman's comments about Mr. Ramsey's deposition testimony); Art Dworkin, "Five Years Later JonBenét Parents Are Doing Little To Find Killer," NATIONAL EXAMINER, December 11, 2001 (quoting Mr. Hoffman as stating, among other things, that defendants "JUST DON'T CARE" about their daughter's murder investigation.)[20]

---

[20]   In the course of representing his clients, Lin Wood, the attorney for defendants, has also served as a source for articles on the investigation and has appeared on NBC's

## V.   History of This Case

Plaintiff filed suit on May 11, 2000, alleging intentional infliction of emotional distress.  He amended his Complaint on June 15, 2000 to add claims for libel and slander stemming from the Book and from comments by Mr. Ramsey on NBC's "Today" show, respectively.  Mr. Wolf has stipulated that he is a limited public figure.  (*See* Stipulation [8].)  On February 9, 2001, the Court denied defendants' motion to dismiss.  (*See* Order dated February 12, 2002 [15].)

After discovery ended, plaintiff withdrew his claim for intentional infliction of emotional distress.  (*See* Stipulation of Dismissal [64].)  The libel and slander claims still remain.  On August 30, 2002, defendants filed the present motion for summary judgment [67].

There are also other motions currently pending before the Court.  On August 28, 2002, defendants filed a motion *in limine* to exclude the testimony of Cina Wong and Gideon Epstein as plaintiff's experts [68].  On the same day, defendants also moved for oral argument on defendants' motion for summary judgment as to the remaining claims [79].

---

"Today" Show on multiple occasions.  Both attorneys have litigated their position in the court of public opinion at almost every opportunity presented.

36

## DISCUSSION

### I.   Motion in Limine to Exclude Testimony

Defendants have filed a motion in limine to exclude the expert testimony of Cina Wong and Gideon Epstein [68], two witnesses proffered by plaintiff as "forensic document examiners." For the reasons discussed below, the Court concludes that defendants' motion should be **GRANTED** as to Ms. Wong and **GRANTED in part and DENIED in part** as to Mr. Epstein.

#### A.   *Daubert* Principle

Federal Rule of Evidence 702 is quite liberal in the scope of evidence it deems properly admissible.    The Rule states in relevant part that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.   The trial court must, however, act as a gatekeeper and determine, at the outset, whether the purported expert is qualified to express a reliable opinion based on sufficient facts or data and the application of accepted methodologies.   *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,

37

152 (1999).  *See also Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592-93 (1993).[21]

In performing this gate-keeping responsibility, the Supreme Court has articulated four factors the court may consider:

(1) Whether a theory or technique can be or has been tested;

(2) Whether it has been subjected to peer review and publication;

(3) Whether, in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and

(4) Whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Kumho Tire*, 526 U.S. at 149-50 (citing *Daubert*, 509 U.S. at 592-94) (internal quotations marks and alterations omitted).  These various factors are not an exhaustive list of all possible ways to assess reliability, nor must all of the factors be applied in every case.  *Id.* at 150.  Depending on the facts of the case and the type of testimony being challenged, it may very well be

---

[21]   As the Supreme Court explained in *Daubert* and *Kumho*, Rule 702 requires the district judge to ensure that the expert's testimony is both relevant and reliable before it may be admitted, regardless of whether the testimony is scientific or based on technical or other specialized knowledge.  *See Kumho*, 526 U.S. at 147; *Daubert*, 509 U.S. at 589.  When the expert's testimony's "factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Kumho*, 526 U.S. at 149 (emphasis added(quoting *Daubert*, 509 U.S. at 592).

AO 72A
(Rev.8/82)

unreasonable to apply all of these factors. *Id.* at 151. Accordingly, the trial judge is given discretion in determining how and in what manner to make reliability determinations pursuant to *Daubert*. "The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). *Accord U.S. v. Gilliard*, 133 F.3d 809, 815 (11th Cir. 1998)(stating that expert testimony is admissible only if its proponent demonstrates the underlying methodology is reliable and relevant).

## B.   Background on Handwriting Analysis

Defendants argue that the opinions of plaintiffs' expert should not be admitted because the field of forensic document examination is not sufficiently reliable. In their Brief in Support of the Motion in Limine, defendants argue that the "science" of handwriting analysis does not meet the reliability standards of Rule 702: as the theoretical bases underlying this science have never been tested; error rates are neither known nor measured; and the field lacks both controlling standards and meaningful peer review. (Br. In Supp. Of Mot. In Limine [68] at 2.)

In examining defendants' contention, the Court notes that both parties agree that the field of forensic document examination

39

is premised on the assumption that no two persons' handwriting is exactly alike; instead, each person has a unique handwriting pattern that allows the person to be identified through a comparison of proper handwriting specimens.[22]  (SMF ¶ 209; PSMF ¶ 209.)  Forensic document examination involves the subjective analysis and assessment of writing characteristics found in a persons's handwriting or handprinting style, by examination of subtle and minute qualities of movement such as pen lifts, shading, pressure and letter forms.  (SMF ¶ 210; PSMF ¶ 210.) Handwriting identification is an inexact endeavor that "cannot boast absolute certainty in all cases."  (SMF ¶ 212; PSMF ¶ 212.) Two or more handwriting experts can reach different conclusions of authorship, even when examining the same questioned document and handwriting exemplars.  (SMF ¶ 213; PSMF ¶ 213.)

Forensic document examiners are generally trained through a "guild-type" apprenticeship process, in which supervised trainees study methods of document examination described by the field's leading texts.  (Defs.' Mot. In Limine [68] at 3; Epstein Dep. at 40-41.)  The only recognized organization for accrediting forensic document examiners is the American Board of Forensic Document Examiners ("ABFDE").  (Defs.' Mot. In Limine [68]; Epstein Dep. At

---

[22]  Defendants agree that this is the bedrock assumption of practitioners in this area; they disagree that this assumption has any validity, inasmuch as it has never "been seriously tested, much less proven." (Defs.' Mot. In Lim. [68] at 16 and n.9)

36.)  There are common terms used within the field.  For example, the unidentified writing is generally referred to as the "questioned document."  (SMF ¶ 214; PSMF ¶ 214.)  Writings prepared by a person in the past in the normal course of business are referred to in the field as "historical writings" or "course-of-business" writings.  (SMF ¶ 215; PSMF ¶ 215.)  In contrast, writings prepared on request for the purpose of comparison are referred to as "request exemplars."  (SMF ¶ 216; PSMF ¶ 216.)  Ideally, a handwriting expert should consult the original unidentified writing, not a copy, to increase the reliability of his or her assessment.  (SMF ¶¶ 218-219; PSMF ¶¶ 218-219.)  The most reliable method of forensic document examination occurs when an examiner compares both historical writings and request exemplars to the questioned document.  (SMF ¶ 217; PSMF ¶ 217.)

    The recognized method for forensic document analysis occurs in several important steps.  First, the expert determines whether a questioned document contains a sufficient amount of writing and enough individual characteristics to permit identification.  After determining that the questioned document is identifiable, the expert examines the submitted handwriting specimens in the same manner.  If both the questioned document and the specimens contain sufficient identifiable characteristics, then the expert compares those characteristics often through the use of a chart.  (SMF ¶¶ 230-232; PSMF ¶¶ 230-232.)  For example, the slant of the writing,

41

the shapes of the letters, the letter connections, the height of the letters, the spacing between letters, the spacing between words, the "I" dots and "t" crosses are aspects of handwriting that can be used for comparison.  Next, the expert weighs the evidence, considering both the similarities and the differences of handwriting, and determines whether or not there is a match. (SMF ¶ 232; PSMF ¶ 232.)  Ignoring differences between characteristics is a frequent cause of error in handwriting identification.  (SMF ¶ 233; PSMF ¶ 233.)  Similarly, dismissing differences as merely the product of intentional disguise is another common mistake made in the analysis.  (SMF ¶ 235; PSMF ¶ 235.)  In addition, an examiner should not know the identity of the comparators and should consult more than one comparator to increase the reliability of his or her analysis.  (SMF ¶¶ 256-57 & 268-72; PSMF ¶¶ 256-57 & 268-72.)

In addition to a recognized methodology, there are some accepted standards that should be employed when engaging in handwriting analysis.  One standard is that the genuineness of the historical writing or request exemplar must be verified; that is, the forensic document examiner should ensure the purported author is the true and historical writing is indeed the author.  (SMF ¶ 223; PSMF ¶ 223.)  In addition, any differences between the questioned document and the comparison writings are generally considered to be more significant than are similarities, when

attempting to determine whether someone is the author of a
questioned document. (SMF ¶ 224; PSMF ¶ 224.) The reason that
similarity, by itself, is not dispositive is because most people
are taught handwriting as children from the same or similar
"notebook styles" and, therefore, many people will share common
handwriting characteristics called "class characteristics."
(Defs.' Mot. In Limine [68] at 4; Albert S. Osborn, QUESTIONED
DOCUMENTS 226 (2nd Ed. Patterson Smith, 1973), attach. to Defs.'
Evid. In Supp., Vol. I, at Tab 16.) The existence of even one
consistent fundamental difference between writings, however, has
historically been viewed as a legitimate basis for concluding that
two writings were not produced by the same person.[23] (SMF ¶ 225;
PSMF ¶ 225.)   Finally, it is generally accepted that consistent
characteristics present over the course of a long writing should
be viewed as genuine characteristics of the author's handwriting,
and not the product of an attempt to disguise. (SMF ¶ 237; PSMF ¶
237.)

Based on the above undisputed information, the Court
concludes, as a general proposition, that forensic document
examiners, who are equipped with the proper background
qualification and who employ the accepted methodology in their

---

[23] Plaintiff contends, however, that modern handwriting
analysis literature also views significant similarities as
strong evidence that, in some instances, can outweigh an
unexplainable difference between the writings. (PSMF ¶ 225.)

analysis, can serve to assist the trier of fact, in some regards, through providing reliable testimony about similarities or differences, or both, between a questioned writing and comparative exemplars.[24]   Such a holding is consistent with the precedent established by the Eleventh Circuit in *U.S. v. Paul*, 175 F.3d 906 (11th Cir. 1999).   In *Paul*, the Eleventh Circuit held that a forensic handwriting expert can, in some instances, assist the "jury or trier of fact to understand the evidence or to determine a fact in issue." *Id*. at 911.   In *Paul*, the expert was deemed qualified to provide reliable testimony based on his thirty years of experience in the field and application of widely accepted methods of analysis.   Likewise, this Court concludes that when a forensic handwriting expert possesses the proper qualifications and when he or she employs reliable methodology, the testimony can qualify as "specialized knowledge" that can be admitted pursuant to Federal Rule of Evidence 702.   *See also United States v. Jolivet*, 224 F.3d 902, 906 (8th Cir. 2000) (affirming the district court's admission of forensic document expert testimony and

---

[24] Rule 702's requirement that evidence "assist the trier of fact in reaching its conclusion" goes primarily to relevance; an assessment of reliability is an additional component of the judge's gatekeeper function. *Daubert*, 509 U.S. at 591-92. "Simply put, expert testimony that does not relate to any issue in the case is not relevant, and thus, not helpful. Reliability, on the other hand, is an assessment of whether the expert's reasoning or methodology is valid and warrants the relaxation of the common law first-hand knowledge requirement for witnesses." *United States v. Lewis*, 220 F.Supp.2d 548, 552 (S.D.W.Va. 2002).

finding such opinion reliable because the expert was well-qualified in handwriting analysis and his testimony "may be properly characterized as offering the jury knowledge beyond their own and enhancing their understanding of the evidence before them."). *Accord United States v. Jones*, 107 F.3d 1147, 1160-61 (6th Cir.), *cert. denied*, 521 U.S. 1127 (1997).

### C.   Background and Qualifications of Plaintiff's Experts

Although the Court has concluded that a proper expert may assist a jury in a comparison of handwriting between a known and an unknown piece of writing, that conclusion does not mean that a person can be deemed as an expert in forensic document examination merely by announcing himself as such. Indeed, defendants assert that plaintiff's experts, in particular Ms. Wong, lack the necessary credentials to qualify as experts. (Defs.' Br. In Supp. Of Mot. In Limine [68] at 5-7; Reply Br. In Supp. Of Mot. In Limine [90] at 2.)   For the reasons discussed below, the Court agrees with defendants that Wong is not qualified to provide expert testimony.  The Court, however, finds that Epstein is qualified to present certain expert testimony in this case.

Mr. Epstein is a forensic document examiner who served as the past president of the American Society of Questioned Document Examiners, is a registered member of the ABFDE, and has authored several authoritative texts in the field.  (PSDMF [88] ¶ 1; Epstein Aff. ¶¶ 12-15.)  He has a Bachelor of Science in Criminal

45

Justice from the University of Nebraska, a Masters of Forensic Science from Antioch School of Law, successfully completed a two-year resident training program in the forensic science of Questioned Document Examination at the U.S. Army Crime Laboratory in Fort Gordon, Georgia, and has trained with the Post Office Identification Laboratory. (*Id.* ¶ 2.) Plaintiff notes that Mr. Epstein has "appeared in 200 cases over a thirty year period, having examined thousands of documents . . .[, has] established questioned document laboratories for not only the U.S. government, but for those of Eastern Europe and the Philippines as well, while teaching hundreds of government document examiners their professions." (Pl.'s Br. In Opp. To Defs.' Mot. In Limine [87] at 8.) In addition, Epstein has taught Forensic Document Examination at the George Washington Graduate School of Forensic Sciences, the Federal Law Enforcement Training Center, and in programs offered to the United States Army Criminal Investigators. (Epstein Aff. ¶¶ 6-7.) The Court concludes that Mr. Epstein's background constitutes sufficient qualifications to allow him to testify in the field of forensic documents' examination. *See, e.g., United States v. Paul*, 175 F.3d at 911 (finding handwriting expert with fourteen years of experience should be admissible); *United States v. Velasquez*, 64 F.3d 844, 846 (3rd Cir. 1999)(finding same); *Unites States v. Gricco*, 2002 WL 746037, *2 (E.D. Pa. April 26,

46

2002)(finding forensic document analyst with similar extensive qualifications to be qualified as an expert).

In stark contrast to Epstein, Wong has never taken a certification exam, completed an accreditation course in document examination, been an apprentice to an ABFDE certified document examiner, or worked in a crime lab. (Wong Dep. at 87-112.) She does, however, claim nearly ten years of experience in the field. (Pl.'s Br. In Opp. To Defs.' Mot. In Limine [87] at 9.) She, however, is not a member of the ABFDE, the sole recognized organization for accreditation of qualified forensic document examiners. Although she is the former vice president of the National Association of Document Examiners ("NADE"), (PSDMF ¶ 2), defendants note that this organization does not meet ABFDE certification requirements, has no permanent office and has no membership requirements other than the payment of a fee. (Defs.' Mot. In Limine [68] at 6.) Wong, herself, admits that NADE does not require specialized training or experience for its certification. (Wong Dep. at 87-89.) Finally, even Epstein, plaintiff's other expert, testified that Wong is not qualified to render opinions in this case. (Epstein Dep. at 32-33.) Accordingly, the Court concludes Ms. Wong is not qualified to provide reliable handwriting analysis in this case. Therefore, the Court **GRANTS defendants' motion in limine to exclude the**

47

**testimony of Ms. Wong** and the Court does not consider Ms. Wong's testimony in its analysis of defendants' summary judgment motion.

### D.    The Reliability of Epstein's Proffered Testimony.

Although the Court has concluded, as a general matter, that Epstein is qualified to testify as a forensic documents examiner, it must still determine the parameters of his expertise with regard to the opinions he seeks to offer.    Specifically, Epstein claims that he can state, with absolute certainty, that Mrs. Ramsey is the author of the Ransom Note.    The Court, as gatekeeper, must therefore examine the methodology that he puts forward in support of such a categorical conclusion.    First, Epstein states that he used the standard methodology of forensic document examiners when assessing the Ransom Note and Mrs. Ramsey's writing samples.    (Epstein Aff. ¶ 25.)    He initially determined that he had a sufficient amount of handwriting by Mrs. Ramsey to allow an examination.    (*Id.* ¶ 26.)    He then proceeded to examine the submitted materials for similarities and dissimilarities.    (*Id.*)    After conducting the examination, he then determined that the original writing and the exemplars matched to a "one hundred percent" degree of certainty.    (*Id.* ¶¶ 26, 31.) Finally, he consulted other forensic document analysts who approved of his methodology and result.    (*Id.* ¶ 32.)

Defendants move to exclude the testimony of Epstein because they assert that the methodology he employed does not meet the

48

accepted standards of handwriting analysts.   In particular,
defendants argue that Epstein's opinions are not reliable because
he did not consult the original Ransom Note, original handwriting
exemplars of Mrs. Ramsey, nor original course-of-business writings
of Mrs. Ramsey.   (Defs.' Mot. In Limine [68] at 8.)   Epstein
acknowledges the importance of consulting original documents in an
article he coauthored, appearing in the 1971 edition of
Identification News, a publication of the International
Association for Identification.  (SMF ¶ 220; PSMF ¶ 220.)  In this
text, Epstein writes that:

> All investigative agencies should be aware of the
> limitations that are imposed upon the Questioned
> Document Examiner by the submission of copies (Xerox,
> Photo, or Thermofax) in place of the original. By
> having to use the copies, the examiner is being deprived
> of one of the most important elements of scientific
> examination, the study of line quality of the writing.
> Those breaks, pressure areas, and even spacing, can
> often be attributed to the mechanical method of
> reproduction and not to the actual writing itself.   A
> qualified conclusion based on examination of only copies
> is not rare. ATTEMPT TO OBTAIN THE ORIGINALS WHENEVER
> POSSIBLE.

(SMF ¶ 129; Hans M. Gideon & Gideon Epstein, "The Obtaining of
Proper Handwriting Exemplars and Standards," emphasis in original,
Ex. A to Jordan Aff., Tab. 23.)   The parties also agree that
mechanical copying may distort the writings or eliminate
subtleties, such as pen lifts, hesitations, pressure or
"feathering."   (SMF ¶ 222; PSMF ¶ 222.)   Notwithstanding his
previous warnings about the use of copies, Epstein testified in

49

this case that copies produced today are of a higher quality than those generated at the time the article was produced and, therefore, some of the concerns expressed in the article have been mitigated. He still agreed, however, that it is optimum to review the original. (PSMF ¶ 219.)

It is undisputed that a number of subtle and critical handprinting features observable on examination of the original Ransom Note cannot be observed from an examination of a machine copy of the Ransom Note. (SMF ¶ 245; PSMF ¶ 245.) Plaintiff's experts, however, were not afforded the opportunity to consult the original Ransom Note, original exemplars, or the course-of-business writings of Mrs. Ramsey. Defendants refused to provide original exemplars, despite plaintiff's discovery requests.[25] (Pl.'s Br. In Opp. To Defs.' Mot. In Limine [87] at 20.) The Court concludes that any reliability concerns stemming from Epstein's failure to consult the originals should go to the weight of his testimony, but should not bar its admission, completely. To hold otherwise could create a perverse incentive for individuals not to allow an opponent access to original documents, in order to render those expert's opinion inadmissible.

In short, the Court is satisfied as to Epstein's ability to testify concerning perceived similarities and differences in Mrs.

---

[25] At the same time, plaintiff never sought a motion to compel such production. (See Defs.' Br. In Supp. Of Mot. In Limine [90] at 11 n.7.)

Ramsey's known handwriting and the Ransom Note. Any criticism of
Epstein's analysis by defendants goes to the weight of his
testimony.   Of more concern to the Court, however, is the
reliability of Epstein's ultimate conclusion concerning the
identity of the writer of the Note. As noted, Epstein claims that
he is "*100 percent certain* that Patsy Ramsey wrote the [R]anson
[N]ote," and in his professional opinion "*there is absolutely no
doubt* she is the author." (Pl.'s Stmt. Of Disp. Mat. Facts [88]
¶ 1.)   (emphasis added)

Nowhere in the submissions provided by plaintiffs is there
any attempt to show by what methodology Mr. Epstein reaches a
conclusion of absolute certainty that a given person is, in fact,
the writer of a questioned document.[26]   Defendants persuasively
argue that Epstein was unable to identify any unique

---

[26]   In his response to defendants' Motion In Limine,
plaintiff has provided conclusory affidavits from other
experts indicating that they agree with Epstein's methodology
and conclusion. Yet, those opinions beg the question.   One
does not know by what methodology these other individuals
reach their conclusion that Epstein can make a determination
with "absolute certainty."   When the predictive ability of a
professed skill is questioned, the belief of multiple
practitioners of that skill that its exercise produces a
reliable result still provides no basis for determining the
ultimate soundness of the determination.   Further, these
individuals were not disclosed as experts in the case and they
did not provide expert reports, as required by Rule 26. Fed.
R. Civ. P. 26(2)(B) (requiring that, unless otherwise agreed,
the proponent of an expert must disclose the expert's name and
a written report "prepared and signed by the witness" that,
*inter alia*, includes a "complete statement of all opinions to
be expressed and the basis and reasons thereof.")

characteristics of Mrs. Ramsey's handwriting that were mimicked in the Ransom Note.   (Def.'s Mtn. in Lim. [68] at 9).   Instead, Epstein bases his conclusion on perceived similarities between the two.   Id.   Yet, as noted by defendants, Epstein never indicates how many similarities or what kind of similarities are required before he can reach absolute certainty, 50% certainty, or no certainty, at all.   Further, as defendants also note, whenever encountering any differences between the known writing of Mrs. Ramsey and the Ransom Note, Epstein finds refuge in the explanation that Mrs. Ramsey must have been trying to disguise her handwriting.   (See id.)   While it is, of course, possible that differences between known writing and questioned documents are the result of a known writer's efforts to disguise her handwriting, it is just as plausible that the differences can occur because the known writer is not the author of the questioned matter.   On that issue, Epstein offers no hint of the methodology that he employs to distinguish between disguised writing and writing that is simply being provided by two different people.

The underlying notion behind Daubert, and all good science, is that a given premise or principle should be capable of being tested to determine whether the principle is, in fact, sound. Thus, if Epstein indicated, for example, that whenever a writer of known material has x number of similarities, there is a given probability that the writer wrote the note--and if this

52

methodology had been tested by reliable means in the past--then Epstein would have shown reliability in the methodology that he used to reach a determination of the likelihood of his conclusion. As it is, however, Epstein's explanation for his conclusion seems to be little more than "Trust me; I'm an expert." *Daubert* case law has indicated that such an assertion, which seems to be based more on intuition than on scientific reasoning, is insufficient.

Accordingly, the Court concludes that while Epstein can properly assist the trier of fact by pointing out marked differences and unusual similarities between Mrs. Ramsey's writing and the Ransom Note, he has not demonstrated a methodology whereby he can draw a conclusion, to an absolute certainty, that a given writer wrote the Note.[27] Such a holding is consistent with numerous other districts that have allowed a qualified handwriting expert to testify as to the "similarities" between a challenged document and a known exemplar, but have not allowed the expert to express his ultimate "opinion" on the matter. *See, e.g., United States v. Van Wyk*, 83 F.Supp.2d 515, 524 (D.N.J. 2000) (allowing an expert to testify about "the specific similarities and idiosyncrasies between the known writings and the questioned

---

[27]     In so holding, the Court does not rule out the possibility that, upon a proper showing, a handwriting expert might be able to demonstrate reliability sufficient to allow testimony concerning his conclusions regarding the identity of a questioned writer.   The Court simply holds that Mr. Epstein has not made that showing in this case.

writings, as well as testimony regarding, for example, how frequently or infrequently in his experience, he has seen a particular idiosyncrasy."); *United States v. Rutherford*, 104 F.Supp.2d 1190, 1194 (D. Neb. 2000)(limiting a forensic document examiner's testimony to "identifying and explaining the similarities and dissimilarities between the known exemplars and the questioned documents."); *United States v. Hines*, 55 F.Supp.2d 62, 68 (D. Mass. 1999) (permitting forensic examiner to testify about unique features common or absent in the writings). *But see United States v. Lewis*, 220 F.Supp.2d 548, 552 (S.D.W.Va. 2002) (finding that proponent of forensic document expert had failed to establish testimony's reliability); *United States v. Saelee*, 162 F.Supp.2d 1097, 1106 (D. Alaska 2001) (excluding handwriting expert testimony in its entirety as inherently unreliable). Therefore, Defendants' Motion in Limine to Exclude the Testimony of Mr. Epstein is **GRANTED, IN PART, AND DENIED, IN PART.**

## II.   Summary Judgment Motion

As noted, plaintiff's complaint asserts both a libel and slander claim, two subcategories of defamation. *See Nida v. Nichols*, 31 F.Supp.2d 1358, 1375 n.33 (N.D. Ga. 1998). Plaintiff asserts that defendants' mention of him as a suspect in the Book is a knowing falsehood because defendants knew that Mrs. Ramsey actually committed the murder and that Mr. Ramsey helped her cover it up. In short, plaintiff's success in this litigation requires

54

him to prove, by clear and convincing evidence, that defendants killed their child.

Defendants have moved for summary judgment [67].   In addition, defendants have moved for oral argument on defendants' motion for summary judgment [79].   Because the parties have provided thorough briefs, the Court finds it unnecessary to hold an oral argument.   Accordingly, defendants' Motion for Oral Argument [79] is **DENIED**.  Based on the record presently before it, and for the reasons stated below, the Court concludes that defendants' motion for summary judgment should be **GRANTED**.

### A.   Summary Judgment Standard

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits.   Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.   *Id.* at 322-23.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[28] designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248. An issue is genuine when the evidence is such that a reasonable jury could return a

---

[28] The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324.

56

verdict for the nonmovant. *Id.* at 249-50. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249-50. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue *for trial.*

## B.   Libel Claim

Georgia law defines libel as "a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and expose him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1(a). Truth is an absolute defense under Georgia law: if plaintiff cannot prove falsity, the libel and slander claim must fail. O.C.G.A. § 51-5-6; *Cox Enterprise, Inc. v. Thrasher*, 264 Ga. 235, 237, 442 S.E.2d 740, 742 (1994). In addition, "[t]o be actionable, the libel must be "published"--*i.e.*, communicated to a third party." *Mullinax v. Miller*, 242 Ga. App. 811, 814, 531

S.E.2d 390, 392 (2000).   There is no dispute over the fact that the allegedly defamatory comments in this case, contained in defendants' book, were indeed published.  The parties do disagree as to whether the statements were libelous and, if so, whether defendants acted with malice.

### 1.   **Were the statements libelous?**

As a general rule, the question of whether a published statement is defamatory is a question for the jury.  *Mead v. True Citizen, Inc.*, 203 Ga. App. 361, 362, 417 S.E.2d 16, 17 (1992) (citations omitted).   Nevertheless, when faced with a summary judgment motion in a defamation action, the "[t]rial judge should read and construe the publication as a whole, and thereafter may find that it is not defamatory, that it is defamatory, or that it is ambiguous and the question is [truly] one for a jury.   In considering whether a writing is defamatory as a matter of law, [the court should] look . . . at what construction would be placed on it by the average reader."  *Mead*, 203 Ga. App. at 362, 417 S.E.2d at 17 (citations omitted).

The passage at issue in the book emanated from a conversation, in August 1997, between plaintiff's then girlfriend, Jacqueline Dilson, and Pam Paugh, sister of Mrs. Ramsey. Specifically, Dilson contacted Paugh and told her that she believed plaintiff Wolf to be involved in the murder of JonBenét Ramsey.   (SMF ¶ 317; PSMF ¶ 317.)   Based on that initial

58

conversation, and subsequent information acquired by defendants, the following was said about plaintiff in the Book:

> Later that evening, as we were trying to relax, we received a call from Pam, who said that she had just gotten off the phone with a lady in Boulder. Jacqueline Dilson had reported to the Boulder police that she believed her live-in lover, Chris Wolf, might be the person they were seeking. When she couldn't get them to respond, she finally called Patsy's mother, Nedra, and she in turn called Pam, who immediately called Jackie back.

> Jacqueline Dilson worked at the Dakota ranch, a small retreat and conference center near Lyons, Colorado, which pushed New Age experiences. She had allowed Wolf to move into her trailer in 1995. Chris Wolf turned out to be a reporter for the *Colorado Daily* and the *Boulder County Business Report* with a master's degree in journalism. His strange behavior before Christmas and early in the morning after Christmas raised Dilson's concern about what Wolf had been doing all night.

> Apparently, Dilson had spent Christmas Day with Wolf, but he would not stay to have supper with her and her family. Somewhere around 10:00 P.M. Jacqueline went to bed, thinking Wolf had gone off on a spree of some kind or another. At around 5:30 A.M., sounds from the bathroom woke Jackie up, and she realized that Wolf was getting out of the shower. He had left dirty clothes all over the floor. Without explanation of where he'd been, Wolf crawled into bed and went to sleep.

> Later the next day, Dilson and Wolf watched the television news reports of JonBenét's death. To her surprise, she observed him becoming quite agitated. Wolf cursed and said that he believed JonBenét had been sexually abused by her father. For the rest of the evening, Wolf brooded over the case.

> According to Dilson, Wolf hated big business and had a fascination with world political disputes and political violence. Most importantly, she said that at one time Chris Wolf had been given a sweatshirt with the initials SBTC (the signature on the ransom note), which stood for Santa Barbara Tennis Club. We considered this

AO 72A
(Rev.8/82)

a very significant lead and gave all the information we had to the police.

We also learned that on January 30 police officers had stopped Wolf at 11:00 A.M. as he drove into Boulder; they discovered he was driving with a suspended license. The woman officer took him to the police station for further questioning when Wolf abruptly told her that the police would make better use of their time by chasing the killer of JonBenét Ramsey.  He definitely caught everyone's attention with that remark.  Detectives Ron Gosage and Steve Thomas started interrogating Chris Wolf with hard questions about our child.

When they asked Wolf to write some words from the ransom note, he refused.  The police put him in handcuffs, but he still refused.  Finally, the two detectives put him in jail, pending the resolution of his suspended license.  Later that day Wolf was released.

Wolf later reported that Steve Thomas and John Eller called him a few weeks afterward to come down to the police department.  Once there, they told him, "We have no interest in you."  But they did confirm that someone had given his name to police as a possible suspect.

Whatever the police's intentions, Wolf went on our suspect list.  He represented too many unanswered questions.

(SMF ¶ 318; PSMF ¶ 318; John and Patsy Ramsey, *The Death of Innocence: The Untold Story of JonBenét's Murder and How Its Exploitation Compromised the Pursuit of Truth* at 204-05 (2000) [hereinafter "*The Death of Innocence*".)

The book further stated:

> By March 1, 1999, we had reported more information on Chris Wolf to the authorities. One person had seen Wolf go into an angry tirade aimed at me after he read an article about our company printed in the *Boulder Daily Camera* in early 1996.  Apparently Wolf

AO 72A
(Rev.8/82)

accused the company I worked for, Lockheed Martin, of selling arms to South American countries.

(SMF ¶ 223; PSMF ¶ 223; *The Death of Innocence* at 329.)

The Court will assume that the statements made in the Book do defame plaintiff Wolf. The statements indicate that defendants and others considered plaintiff to be a potential suspect in the brutal murder of a child and also suggest that there was some basis for the suspicion. "Libel per se consists of a charge that one is guilty of a crime, dishonesty or immorality." *Barber v. Perdue*, 194 Ga. App. 287, 288, 390 S.E.2d 234, 235 (1989). If false, such statements could reasonably be held by a juror to constitute libel per se because the statements are "injurious on their face--without the aid of extrinsic proof." *See also Zarach v. Atlanta Claims Ass'n*, 231 Ga. App. 685, 688, 500 S.E.2d 1, 5 (1998) ("Defamatory words which are actionable per se are those which are recognized as injurious on their face--without the aid of extrinsic proof.")

A conclusion that the statements were libelous is not inconsistent with the recent holding by the Eleventh Circuit in another defamation action concerning the Ramsey case, also filed by plaintiff's counsel, Darnay Hoffman. In that action, *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222 (11th Cir. 2002), plaintiff Linda Hoffman-Pugh, also claimed that the defendants had libeled her in their book by creating a false impression that she was or had been

61

a suspect in the murder of JonBenét. The Eleventh Circuit, however, affirmed the district court's decision that the defendants' book, when considered as a whole, does not defame Ms. Hoffman-Pugh as a matter of law. *Id.* The court concluded that the book, when fairly read, did not convey that Ms. Hoffman-Pugh was a suspect in the murder.

Key to the Eleventh Circuit's analysis is the defendants' failure to ever state that Ms. Hoffman-Pugh, defendants' housekeeper, was considered to be a murder suspect by them or by the police. Instead, the Book states that, before they knew their daughter's fate, at a time when they believed her to have been kidnapped and were running through their minds people who knew JonBenét, the defendants never believed that Ms. Hoffman-Pugh would hurt their daughter even *if* she had kidnapped her because she was a "good, sweet person." *Id.* at 1226. In addition, the Eleventh Circuit notes that Ms. Hoffman-Pugh does not fit defendants' profile of the culprit detailed later in the Book, which describes a male, age 25 to 35, who is either a former convict or has been around hardened criminals, and who had access to a stun gun. *Id.* Finally, the court concluded that when, read in its entirety, the Book indicates that Ms. Hoffman-Pugh is not a suspect. *Id.* at 1227. Alternatively, the panel concluded that even if defamatory, the statements were "nonactionable statements of opinion." *Id.* at 1225.

62

In the instant case, however, plaintiff does fit the profile of the murderer set out in the book and was discussed in detail as a viable suspect in the murder investigation.     Indeed, in recognition of these substantial differences between the *Hoffman-Pugh* case and the case pending before this Court, the Eleventh Circuit noted that the statements regarding plaintiff were "not the situation before us."     *Id.* at 1227 n. 3.     In short, the "sting" or "gist" of the passages in the Book suggest that plaintiff is a viable suspect in the murder.   Such an accusation is defamatory.

Of course, that a given statement is defamatory does not mean that the defamation is actionable.   As noted *supra* and *infra*, truth is a defense to a libel action, as is the expression of an honestly held opinion.   Certainly, many of the statements about plaintiff Wolf, recounted above, are true.   That is, Ms. Dilson did recount the described information about what she believed to be plaintiff's suspicious behavior.   Likewise, plaintiff was questioned by the police concerning JonBenét's murder.[29]     Yet,

---

[29]   Indeed, defendants arguably understated the police department's interest in plaintiff.  Since 1997, plaintiff has been a long standing suspect of both the Boulder Police Department and the Boulder County District Attorney's Office in the murder investigation.   (SMF ¶¶ 285-286, 291; PSMF ¶¶ 285-286, 291.)    Contrary to what the Complaint indicates, Boulder authorities have yet to clear plaintiff of possible involvement in the murder (SMF ¶ 287; PSMF ¶ 287.)   Further, he is the only suspect to date to have been arrested in connection with the murder investigation.   (SMF ¶ 290; PSMF ¶ 290.)

AO 72A
(Rev 8/82)

ultimately, the inference one draws from the passage is the defendants' belief, not that plaintiff actually killed their daughter, but that there is reason to suspect that he might have. Defendants argue that this is a non-actionable opinion. Plaintiff has argued, however, that this is not an honestly held opinion because Mrs. Ramsey actually killed her daughter and her husband knows this. Accordingly, plaintiffs argues, the Ramseys could not believe that plaintiff, or anyone else is a *viable* suspect, because the Ramseys know that they are the perpetrators of the crime.

This Court likewise concludes that, as to this narrow theory of defamation articulated by plaintiff, the statements at issue are defamatory.

**2.   Were the statements made with malice?**

In addition to proving that the published statements were indeed defamatory, plaintiff bears the additional burden of establishing that defendants acted with "actual malice." Plaintiff bears this addition burden because he has stipulated that, for all purposes of this litigation, he is a "limited purpose public figure." (Stipulation [8].)   "A limited purpose public figure is 'an individual [who] voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.'"   *Little v. Breland*, 93 F.3d 755, 757 (11th Cir. 1996) (quoting *Gertz v.*

64

*Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)). Actual malice, in the *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, (1964), sense, is knowledge that the defamatory matter was false or that it was published with reckless disregard for whether it was false or not. *Morton v. Gardner,* 155 Ga. App. 600, 604, 271 S.E.2d 733, 737 (1980).

Plaintiff must prove falsity by clear and convincing evidence. *Straw v. Chase Revel, Inc.*, 813 F.2d 356, 361 n.6 (11th Cir. 1987); *Firestone v. Time, Inc.*, 460 F.2d 712, 721-23 (5th Cir. 1972) (Bell, J. specially concurring).[30]  Clear and convincing evidence:

> produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

*Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 285 n. 11 (1990) (internal quote omitted). In other words, the clear and convincing evidence "place[s] in the ultimate factfinder an abiding conviction that the truth of [the] factual contentions are 'highly probable'." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)(citing C. McCorick, Law of Evidence § 230, p.679 (1954)).

---

[30]  The Eleventh Circuit has adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

AO 72A
(Rev.8/82)

Plaintiff attempts to prove actual malice by what he asserts is clear and convincing evidence that defendants actually killed JonBenét and, therefore, made the above libelous statements that plaintiff was a *viable* suspect, knowing that such statements were untrue. As this is defendants' motion for summary judgment, all factual inferences must be drawn in favor of plaintiff. Further, as there is little factual dispute between the parties as to the evidence that exists, the Court will review each party's theory of the crime and the evidence proffered in support of the respective theory, indicating when an actual dispute of fact exists between the parties. The Court will compare the evidence in order to determine whether the record supplies clear and convincing support for the proposition that defendants are responsible for the murder of their child. If the record does not contain such evidence, defendants' motion for summary judgment must be granted. If the record does contain sufficient information from which a reasonable factfinder could impute criminal culpability to defendants, however, the Court must deny defendants' motion for summary judgment.

### 3.   Evidence in Support of the Intruder Theory

Defendants assert that the evidence establishes that Mrs. Ramsey did not murder her daughter JonBenét. (Defs.' Br. In Supp. Of Summ. J. [67] at 18.)  Specifically, defendants note that:

[a]fter a half-decade investigation into the murder of
JonBenét Ramsey, and year-long grand jury investigation,

66

> no plausible evidence proves Patsy Ramsey had anything
> to do with the murder of her child. Every prosecutor to
> examine this case agreed that no charge or crime should
> have been brought against [defendants].

(Defs.' Br. In Supp. Of Summ. J. [67] at 19-20; *see also* SMF ¶¶
85, 91-93; PSMF ¶¶ 85; 91-93.)  Defendants contend that evidence
gathered in the investigation of JonBenét's death instead shows
that she was abducted, sexually assaulted, tortured and murdered
by an intruder.  (*Id.*)

As Andrew Louis Smit, a respected homicide detective hired by
the Boulder Police Department to investigate this crime, has
noted, there are only two possible solutions to this crime: that
is, either someone in the Ramsey household committed the crime or
an intruder did it.  (Smit Dep. at 54.)  Defendants contend that
the weight of the *undisputed* evidence in the case is consistent
with an inference that an intruder killed their child.  (Defs.'
Br. In Supp. Of Summ. J. [67] at 19-20.)  The first questions then
are  whether an intruder could have entered the home and, if so,
is there evidence that an intruder, in fact, entered the home on
the date of the murder.  Defendants respond that the undisputed
evidence supplies an answer of "yes" to both questions. First,
defendants have indicated that their house was not secure during
the night of December 25, 1997, and that they had not turned their
security alarm on.  (SMF ¶ 127; PSMF ¶ 127.)  In addition, at

67

least seven windows and one door were found "open"[31] on the morning of December 26, 1997.   (SMF ¶ 126; PSMF ¶ 126.)   A number of windows were accessible from the ground level, including a window-well, with removable grate, over three windows that opened into a playroom area of the basement.   (SMF ¶ 128; PSMF ¶ 128.)   This window-well is located on the back side of the house, hidden from the front of the house and from neighbors.   (SMF ¶ 130; PSMF ¶ 130.)

There is likewise *undisputed* evidence of a disturbance in this window-well area: specifically the leaves and white styrofoam packing peanuts that had pooled in the window-well appeared to have been cleared from, or brushed to either side of, the center window's sill in the well.   (SMF ¶ 132; PSMF ¶ 132.)   In addition, this center window had a broken pane and was found open on the morning of December 26, with a suitcase and a glass shard from the window pane underneath it.   (SMF ¶ 135; PSMF ¶ 135.)[32]   Green foliage was also found tucked under the movable grate over the window well, indicating that the grate had been opened and closed

---

[31]   The term "open" was not defined.   It is, therefore, not clear if the entrances were ajar or unlocked.

[32]   The suitcase contained a pillow sham, duvet and Dr. Seuss book.   These items belonged to defendants, but they have indicated that the items were not normally stored in the suitcase.   (SMF ¶ 146; PSMF ¶ 146.)   A lab report indicated that fibers from the sham and duvet were found on the shirt that JonBenét was wearing when she was found in the wine cellar.   (SMF ¶ 147; PSMF ¶ 147.)

AO 72A
(Rev.8/82)

recently.  (SMF ¶ 131; PSMF ¶ 131.)  Further, the Boulder Police conducted experiments that showed a person could enter the basement playroom through the center window.  (SMF ¶ 133; PSMF ¶ 133.)  Moreover, leaves and debris, consistent with the leaves and debris found in the window well, were found on the floor under the broken window suggesting that someone had actually entered the basement through this window. (SMF ¶ 136; PSMF ¶ 136.)  Likewise, a leaf and white styro-foam packing peanuts, consistent with the leaves and packing peanuts found pooled in the window-well, were found in the wine-cellar room of the basement where JonBenét's body was discovered.  (SMF ¶ 134; PSMF ¶ 134.)  This evidence is consistent with an inference that whoever entered through this window ultimately walked to the wine-cellar room at some point.

Certain *undisputed* evidence of how defendants' house was found on the morning of December 26 is also consistent with the intruder theory of the crime.  For example, the lights were on in the basement, when first searched at approximately 6:15 a.m. that day.  (SMF ¶ 129; PSMF ¶ 129.)  In addition, the butler's door to the kitchen was found ajar that morning.  (SMF ¶ 137; PSMF ¶ 137.)  Defendants note that the butler's door was only a short distance away from the spiral staircase where the Ransom Note was found and within plain view of where the pad of paper used for the Ransom Note was found.  (SMF ¶ 138; PSMF ¶ 138.)  Moreover, contrary to media reports that had discredited an intruder theory, based on

AO 72A
(Rev.8/82)

the lack of a "footprint in the snow," there was no snow covering the sidewalks and walkways to defendants' home on the morning of December 26, 1996.   (SMF ¶ 139; PSMF ¶ 139.)   Hence, a person walking along these paths would have left no footprints.

Defendants further aver that the *undisputed* physical evidence is not consistent with an "accidental killing followed by staging," (Defs.' Br. In Supp. Of Summ. J. [67]), but instead is more consistent with a theory that the intruder subdued JonBenét in her bedroom and then took her to the basement, where she was sexually assaulted and subsequently murdered.   First, JonBenét's body was found bound with complicated and sophisticated bondage devices, namely neatly-made rope slipknots and a garrotte, designed to give *control* to the user.   (Defs.' Br. In Supp. Of Summ. J. [67] at 19; SMF ¶¶ 161, 163-164; PSMF ¶¶ 161, 163-164.) The parties agree that such devices necessarily were made by someone with expertise in bondage.   (SMF ¶¶ 162, 169; PSMF ¶¶ 162, 169.) While it is certainly possible that defendants[33] possessed such unusual and specialized skills, there is no evidence that establishes this fact.   Obviously, if defendants lacked the skills

---

[33]    Of course, plaintiff's primary theory, taken from Detective Steve Thompson's book, is that Mrs. Ramsey murdered her daughter and staged the scene.   According to this theory, Mr. Ramsey became complicit only the next day, after the Note was discovered, when he realized that the handwriting on the Note was his wife's.   *Supra* at 10.   Under this proposed timeline, he would not have been involved in making the bondage device.

to fashion this bondage device, then it necessarily had to be an intruder who crafted the implement.

Further, the end portion of the paintbrush and the cord used to construct the garrote were never found in the house, or elsewhere, nor was the latter sourced to defendants.[34] (SMF ¶ 159; PSMF ¶ 159.) (SMF ¶ 162; PSMF ¶ 162.) The black duct tape used on JonBenét's mouth has also never been sourced to defendants. (SMF ¶ 170; PSMF ¶ 170.) Animal hair, alleged to be from a beaver, was found on the duct tape. (SMF ¶ 183; PSMF ¶ 183.) Yet, nothing in defendants' home matches the hair (SMF ¶ 183; PSMF ¶ 183.), thereby suggesting either that the duct tape had been obtained from outside the home or that it had been carried outside the home at some point. Dark animal hairs were also found on JonBenét's hands that have not been matched to anything in defendants' home. (SMF ¶ 184; PSMF ¶ 184.)

The above evidence arguably suggests that whoever tied up JonBenét used some items brought from outside the home to do so. In addition, other fiber evidence supports an inference that some of these items from outside the home were, at one time, in the second floor area near JonBenét's bedroom. That is, fibers consistent with those of the cord used to make the slip knots and garrote were found on JonBenét's bed. (SMF ¶ 168; PSMF ¶ 168.)

---

[34] The paintbrush, whose middle piece was used to fashion the garrote, was found in the paint tray in the boiler room in the basement. *Supra* at 14.

AO 72A
(Rev.8/82)

This evidence is inconsistent with plaintiff's proposed timeline of events. That is, plaintiff has hypothesized that Mrs. Ramsey, in a moment of anger, had hit JonBenét's head against something hard in the second floor bathroom, thereby rendering her child unconscious, and then spent the rest of the night staging an elaborate kidnapping and torture scenario in the basement. Discovery of cord fibers, used to tie JonBenét's hands, in the latter's bedroom arguably undermines plaintiff's sequence of events.

Likewise, other items not belonging on the second floor were found there on the day after the murder, thereby suggesting that some preparation or activity was ongoing in that area on the night of the murder. Specifically, a rope was found inside a brown paper sack in the guest bedroom on the second floor; defendants have indicated that neither of these items belonged to them. (SMF ¶ 181; PSMF ¶ 181.) Regardless of its ownership, there is no explanation why a bag containing a rope would be in the guest bedroom. Further, small pieces of the material on this brown sack were found in the "vacuuming" of JonBenét's bed and in the body bag that was used to transport her body (SMF ¶ 181; PSMF ¶ 181), thereby suggesting that either the bag had been near JonBenét or that someone who had touched the bag had also touched JonBenét.[35]

---

[35]    Finally, items were left behind that defendants assert they did not own. (Defs.' Br. In Supp. Of Summ. J. [67] at 18-19.) A baseball bat not owned by the Ramseys found

72

Plaintiff, of course, argues that any evidence suggesting an intruder was staged by defendants.  Even assuming that all the above evidence could have been staged, however, defendants point to other evidence for which a theory of contrivance by them seems either impossible or highly implausible.  First, defendants note the existence of several recently-made unidentified shoeprints containing a "HI-TEC" brand mark were found in the basement imprinted in mold growing on the basement floor.  (SMF ¶¶ 151-152; PSMF ¶¶ 151-152.)  Defendants do not own any "HI-TEC" brand shoes and none of their shoes match the shoeprint marks.  (SMF ¶ 153; PSMF ¶ 153.)  Likewise, another similar partial shoeprint was found near where JonBenét's body was found.  (SMF ¶ 155; PSMF ¶ 155.)  The owner of the "HI-TEC" shoe that made the footprints at the murder scene has never been identified.  (SMF ¶ 154, 155; PSMF ¶ 154, 155.)  In addition, on the wine-cellar door, there is a palmprint that does not match either of defendants' palmprints.  (SMF ¶ 156; PSMF ¶ 156.)  The individual to whom it belongs has never been identified.  (SMF ¶ 156; PSMF ¶ 156.)

Of course, the existence of these shoeprints and palmprint is not dispositive, as they could have been made prior to the time of

_____

on the north side of the house has fibers consistent with fibers found in the carpet in the basement where JonBenét's body was found.  (SMF ¶ 185; PSMF ¶ 185.)  Brown cotton fibers on JonBenét's body, the paintbrush, the duct tape and on the ligature were not sourced and do not match anything in the Ramsey home.  (SMF ¶ 181; PSMF ¶ 181.)

the murder, but they are clearly consistent with an argument that an intruder was in the basement area. The defendants also offer other undisputed evidence that they contend clearly establishes that another male was near JonBenét at the time she was murdered. Specifically, defendants note that unidentified male DNA--which does not match that of any Ramsey--was found under JonBenét's fingernails.[36]   (SMF ¶¶ 173-174, 177; PSMF ¶ 173, 177.)   In addition, male DNA, again not matching any Ramsey, was found in JonBenét's underwear.   (SMF ¶ 175; PSMF ¶ 175.)   Likewise, an unidentified Caucasian "pubic or auxiliary" hair, not matching any Ramsey, was found on the blanket covering JonBenét' body.   (SMF ¶ 179-180; PSMF ¶ 179-180.)   As noted, some wood fragments from the paintbrush used to create the garotte were found in JonBenét's vagina.   Thus, given the existence of undisputed evidence that JonBenét was sexually assaulted and the discovery of DNA evidence on her person from an unidentified male--as well as no DNA from any Ramsey--the defendants argue that the inference of an intruder becomes almost insurmountable.   As to the above described evidence, plaintiff offers no explanation consistent with his theory of the crime.

Finally, defendants note the existence of evidence that they contend establishes, almost to a certainty, that JonBenét was

---

[36]   As noted supra, there is evidence that JonBenét was alive at the time she was strangled and that she may have struggled with her attacker.   Supra at 16-17.

taken from her bedroom and held against her will by an intruder.
Specifically, defendants point to evidence from the autopsy report
indicating that a stun gun was used on JonBenét. (SMF ¶ 140.)
Because it is logical to assume that JonBenét would struggle
against an attacker she did not already know, the use of a stun
gun helps to explain why no evidence of a struggle was found in
any of the bedrooms in defendants' home. (SMF ¶ 143; PSMF ¶ 143.)
Further, defendants state that they have never owned nor operated
a stun gun.   (SMF ¶ 142.)   In addition, no stun gun was ever
located at defendants' home nor is there any evidence that
defendants have ever owned such a gun. Further, the parties agree
that a stun gun could be used and not heard in other rooms of a
house.  (SMF ¶ 141; PSMF ¶¶ 140-141.)

Plaintiff does not agree that a stun gun was used, however,
arguing that the evidence establishing the same is inconclusive.
Yet, although plaintiff disputes that a stun gun was used in the
murder, he has failed to produce any evidence to suggest what
caused the burnlike marks on JonBenét. Specifically, defendants
have presented photographs of JonBenét taken Christmas morning
that clearly reveal the absence of any marks on her neck. (See
Defs.' Ex. 33 attach. To Summ. J. Mot. [68].)  Yet, the autopsy
report clearly shows reddish, burn-type marks on JonBenét's neck
and back.  (See Autopsy Photos attach. as Defs.' Ex. 27-30 to
Smit. Dep.)  Moreover, defendants have presented the testimony of

75

Dr. Michael Doberson, a forensic pathologist who examined the Boulder Coroner's autopsy report and autopsy photos, and who concluded that the injuries to "the right side of the face as well as on the lower left back are patterned injuries most consistent with the application of a stun gun." (Report of Michael Doberson, M.D., Ph.D. at 5(A) attach. as Ex. 3 to Defs.' Ex. Vol. I, Part A.) Defendants' evidence that a stun gun was used, then, stands unrebutted. In other words, plaintiff has failed to produce evidence that creates a material dispute of fact on this point or that offers an alternative explanation for the origin of these marks, other than a stun gun. Accordingly, the Court concludes that the undisputed facts indicate that a stun gun was used in the commission of the murder.

In addition, the Court notes that defendants have provided compelling testimony from homicide detective Andrew Louis Smit, who is widely regarded as an expert investigator, in support of the intruder theory. (SMF ¶ 168; PSMF ¶ 168.) Detective Smit has reviewed the evidence and prepared a comprehensive CD presentation that summarizes this evidence and offers the inferences that can be logically drawn from that evidence. From a review of this evidence, Detective Smit believes that JonBenét was subdued by a stun gun, taken from her bedroom by an unknown intruder, and then sexually assaulted, tortured and murdered by this intruder in the basement of the defendants' home in Boulder, Colorado. (SMF ¶ 3;

PSMF ¶ 3.)  Detective Smit's conclusion as to the cause and timing of JonBenét's pre-mortem injuries is shared by defendants' expert, the coroner of Arapahoe County, Colorado, Dr. Michael Doberson. (SMF ¶ 4; PSMF ¶ 4.)

Although most of Detective Smit's conclusions derive from his analysis of physical evidence, he has also testified that he has been unable to finds any motive for defendants to murder their daughter.  (Smit. Dep. at 146.)  Absent from the defendants' family history is any evidence of criminal conduct, sexual abuse, drug or alcohol abuse or violent behavior.  (SMF ¶¶ 117-119; PSMF ¶ 117-119.)  In addition, there was no evidence that JonBenét's bed was wet on the night of her murder.  (Smit Dep. at 145.)[37]

---

[37]   The Court has reviewed the autopsy photographs of JonBenét and they are gruesome.  They reveal deep ligature marks around her neck as a result of being strangled by a garotte.  As noted *supra* at 16-17, the evidence indicates that JonBenét was alive when strangled and may have tried to pull the garotte off her neck.  Indeed, a neighbor heard the sound of screams.  Likewise, part of the wood from the paint brush was found inside her vagina and the evidence indicates that she was sexually assaulted at a time when she was still alive. Sadly, JonBenét's last moments were painful and terrifying.

Admittedly, it is not unprecedented for parents to kill their children, sometimes even brutally.  Yet, plaintiff's theory of the motivation for the crime--that Mrs. Ramsey accidentally hit JonBenét's head on a hard object, thought she was dead, and then tried to stage a hoax kidnapping--seems at odds with his belief that although Mrs. Ramsey later became aware that JonBenét was alive, she nonetheless proceeded to garotte, torture, and sexually assault her child.  If Mrs. Ramsey had accidentally hit her child's head, one would think that, upon becoming aware that the child was still alive, the mother would have been just as likely to call an ambulance, as to commit a depraved torture/murder of the child.

AO 72A
(Rev.8/82)

In contrast, Detective Smit opined that there were several factors that could have motivated an intruder to commit this horrific crime.  First, defendants were prominent in the community and had thrown several large events at their home, thereby providing a large number of people the opportunity to learn the house's floor plan.  Second, Mr. Ramsey received considerable attention due to the financial success of his company.  In fact, news articles were published that detailed the company's financial success and mentioned Mr. Ramsey in great detail.  (SMF ¶ 121; PSMF ¶ 121.)  In the weeks leading up to the murder, Detective Smit notes that defendants had a large party at their home in which they entertained hundreds of people from their church. Also, Mr. Ramsey had spoken at his company's Christmas party and praised the employees for passing the one billion dollar mark in sales.  (Smit Dep. at 148.)  Third, Detective Smit states that JonBenét was a "pedophile's dream come true."  (SMF ¶ 122; PSMF ¶ 122.)  JonBenét received considerable public attention as "Little Miss Colorado" and through several beauty pageants in which she participated.  (SMF ¶ 121; PSMF ¶ 121.)  On December 6, 1996, three weeks before the murder, she was in the Lights of December Parade, an event thousands of people attended.  (Smit. Dep. at

---

Nevertheless, as any theory behind the motivation for Mrs. Ramsey to murder her child is just that--a theory--the Court has not factored any of these suppositions into its legal analysis of the evidence in the case.

78

147.)  In addition, on December 25, 1996, while playing at the home of a neighborhood friend, JonBenét told her friend's mother that "Santa Claus" was going to pay her a "special" visit after Christmas and that it was a secret.  (SMF ¶ 124; PSMF ¶ 124.)  The person who may have said this to JonBenét has never been identified.  (SMF ¶ 125; PSMF ¶ 125.)

Based on the above undisputed evidence, defendants contend they are entitled to summary judgment because there is virtually no evidence to support plaintiff's theory that they murdered their child, but abundant evidence to support their belief that an intruder entered their home at some point during the night of December 25, 1996 and killed their daughter.  As a legal matter, if plaintiff cannot prove, by clear and convincing evidence that defendants committed this crime, he cannot demonstrate that their statement concerning his status as a suspect were made with the requisite malice.  (Defs.' Br. In Supp. Of Summ. J. [67] at 17.) Defendants further contend that their legal position is buttressed by the fact that plaintiff has not yet been cleared as a suspect, by the Boulder Police Department.  (Id. at 17-18.)

### 4.    Evidence in Support of Plaintiff's Theory

Plaintiff admits that he has no direct evidence that Mrs. Ramsey committed the murder.  (Pl.'s Br. In Opp. To Summ. J. [88] at 9, 11 & 21-22.)  Rather, to show malice, he relies solely on circumstantial evidence to prove that Mrs. Ramsey murdered her

AO 72A
(Rev.8/82)

daughter and Mr. Ramsey assisted in the subsequent coverup. (*Id.*)
A plaintiff in a public figure libel case may successfully prove
actual malice by circumstantial evidence. *Harte-Hanks
Communications v. Connaughton*, 491 U.S. 657, 668 (1989); *Herbert
v. Lando*, 441 U.S. 153, 160 (1979). *See also Hunt v. Liberty
Lobby*, 720 F.2d 631, 643 (11th Cir. 1983)("Absent admission by
defendant that he knew his material was false or that he doubted
its truth, a public figure in prosecuting a libel action must rely
upon circumstantial evidence to prove his case.")

Yet, other than a contention that Mrs. Ramsey authorized the
Ransom Note, the circumstantial evidence proffered in support of
plaintiff's claim is based almost exclusively on the theories
espoused by former Detective Steve Thomas in his book.[38]   (*See*

---

[38]  Plaintiff does offer two arguments, not involving the
issue of the identity of the murderer, in support of a finding
of malice.   First, plaintiff argues that Mrs. Ramsey's
admission that she destroyed her handwritten book notes is
strong evidence of malice. (Pl.'s Br. In Opp. To Defs.' Summ.
J. Mot. [88] at 21 (citing to *Brown & Williamson Tobacco Corp.
v. Jacobson*, 827 F.2d 1119, 1134 (7th Cir. 1987) (stating that
intentional destruction of evidence is "strong evidence of
malice").)  The record, however, establishes that Mrs. Ramsey
threw away her handwritten book notes as she was writing the
Book and did not destroy any documents once this suit was
filed. (P. Ramsey Dep. at 21.)  Pre-litigation destruction of
documents does not indicate "actual malice." *Strange v. Cox.
Enters., Inc.*, 211 Ga. App. 731, 734, 440 S.E.2d 503, 507
(1994).

Plaintiff further contends that Mr. Ramsey's admission
that he avoided investigating any of the facts concerning
forensic evidence is also evidence of malice. (Pl.'s Br. In
Opp. To Defs.' Summ. J. Mot. [88] at 22.)  Mr. Ramsey did
state that he had seen evidence concerning plaintiff's

*generally* Pl.'s Br. In Opp. To Defs.' Summ. J. Mot. [88] at 6, 21;
PSDMF ¶¶ 44-75.)  Further, whereas Detective Smit's summary
testimony concerning the investigation is based on evidence,
Detective Thomas' theories appear to lack substantial evidentiary
support.  (*Id*.)  Indeed, while Detective Smit is an experienced
and respected homicide detective, Detective Thomas had no
investigative experience concerning homicide cases prior to this
case.  (Smit. Dep. at 69.)  In short, the plaintiff's evidence
that the defendants killed their daughter and covered up their
crime is based on little more than the fact that defendants were
present in the house during the murder.

    As the arguments in his brief opposing defendants' summary
judgment motion are largely restatements of the arguments he makes
in support of his efforts to have the testimony of his forensic
document examiners admitted, plaintiff implicitly acknowledges the
dearth of physical evidence supporting his argument. (*See id*. at
3, 5-6, 9-10, 13-19.)  In short, the only hard evidence, as

---

possible association with the case and received summaries of
the Boulder authorities' handwriting evidence, which concluded
that Mrs. Ramsey probably did not write the Ransom Note.  (J.
Ramsey Dep. at 12, 62 & 73-74.)  He also asserts that he had
no reason to doubt any of this information.  (*Id*. at 73-74.)
As a matter of law, he is entitled to rely on this
information.  *See New York Times Co v. Conner*, 365 F.2d 567,
576 (5th Cir. 1966) (defendant entitled to rely on single
source even if source one-sided).  *See also McFarlane v.
Sheridan Square Press, Inc*., 91 F.3d 1501, 1510 (D.C. Cir.
1996) (stating there is no independent duty to corroborate
information, if no reason to doubt truthfulness.)

AO 72A
(Rev.8/82)

opposed to theories, that plaintiff proffers to support his accusation that Mrs. Ramsey murdered her child is evidence indicating that she wrote the Ransom Note. The Court agrees with plaintiff that, if plaintiff adduced clear and convincing evidence from which a reasonable jury could infer that Mrs. Ramsey wrote the Ransom Note, this evidence would then be sufficient to create a jury issue as to whether Mrs. Ramsey killed her child. In other words, if Mrs. Ramsey wrote the Ransom Note, this Court could conclude, as could a reasonable jury, that she was involved in the murder of her child.

The question then is whether plaintiff has proffered such clear and convincing evidence. This Court has earlier ruled that plaintiffs' expert, Mr. Epstein, is qualified to compare Mrs. Ramsey's handwriting with that contained in the Ransom Note for the purposes of pointing out similarities in the two. The Court, however, has concluded that Epstein cannot properly testify that he is certain that Mrs. Ramsey was the author of the Note. For purposes of assessing whether plaintiff has met its burden of proof, however, the Court will analyze the evidence, assuming that Epstein could testify as to his proffered conclusion, as well as assuming that he could testify only as to similarities between both the Ransom Note and Mrs. Ramsey's known handwriting samples.

82

5.   **Analysis of the Two Theories**

   a.   **Consideration of Epstein's Testimony**
        **That There Were Similarities Between Mrs.**
        **Ramsey's Handwriting and the Ransom Note**

As discussed *supra,* much of the physical evidence is consistent with an inference that an intruder came into the Ramsey's home and murdered their child. Specifically, there was a broken window in the basement and the window well for that window showed signs that someone may have entered the house through it. Indeed, some of the foliage and debris from that window well was found in the room where JonBenét's body was found. Further, the evidence of stun gun injuries to JonBenét suggests that she was taken by someone who wanted to keep her quiet as he removed her from her bedroom; a parent would not need a stun gun to remove a child from her bedroom. Conversely, the use of a stun gun by the killer is totally at odds with plaintiff's theory that the violence against JonBenét began by Mrs. Ramsey accidentally hit her daughter's head on the bathtub or bathroom floor. In addition, the presence of a bag containing a rope in a guest bedroom near JonBenét's arguably supports a notion that some premeditation and preparation attended the crime.

Other physical evidence is consistent with a theory that an intruder was in the home. There was a recently made shoeprint, in a moldy area in the basement, that matched no shoes owned by the Ramseys. There was also a palmprint on the door to the small room

83

AO 72A
(Rev 8/82)

where JonBenét's body was found that did not match the Ramseys' prints.  DNA evidence was further consistent with the possibility of an intruder, as JonBenét had the DNA of an unknown male under some of her fingernails and on her underpants.  The evidence also indicated that JonBenét had been sexually assaulted and her vagina contained wood fibers from the paint brush used to fashion the garotte.

The method by which JonBenét was killed also suggests it more likely that she was killed by an intruder than by her mother. JonBenét was strangled through the use of a garotte and bondage device that was sophisticated and employed the use of a series of tightly and neatly made knots that would appear to have taken some time to make.   There is no evidence that the defendants had the skill to create such a device.  Moreover, it is plaintiff's theory that, after thinking she had accidentally killed her daughter, Mrs. Ramsey worked quickly, before the household awoke, to set up a staged kidnapping scenario.  The creation of this bondage device would appear to have required more time and calm than one would think Mrs. Ramsey could have mustered under the circumstances.

Plaintiff has the burden of proving by clear and convincing evidence that the Ramseys murdered their child; they have no burden to prove that they did not commit the crime.  The above recited evidence falls well short of the requisite proof that the

84

defendants killed their child.  Plaintiff argues, however, that the Ransom Note provides this necessary proof.

At first blush, and even without an appraisal of the handwriting, the Ransom Note seems to support plaintiff's argument that the kidnapping was a hoax set up by someone in the house.  It is an extremely long and detailed note of over three pages. Moreover, an examination of the notepad on which the note was written indicates that the writer had attempted some earlier drafts of the note.  In addition, the writer had apparently not even brought his own materials, but instead had used a note pad and felt marker from the Ramsey's home.  These facts suggest that the killer had not come prepared with a ransom note already written, as one would expect a diligent kidnapper to do.  Further, one does not  assume that an intruder, intent on beating a hasty retreat, would take the time to practice writing a note or to write a long, detailed note. These assumptions then might suggest that someone in the house contrived the note.

Defendants have argued, however, that it is just as plausible that the killer had been hiding away in the home for many hours, waiting for the household to go to sleep, before he sprung into action.  That waiting time would have allowed him the leisure to write a note.  Further, the length of time that it took to practice and write the note could also conceivably undermine a notion that Mrs. Ramsey wrote it.  Under plaintiff's scenario,

85

Mrs. Ramsey was working quickly to create a staged crime scene before her husband and son awoke. Given those time constraints, and presumably a desire to provide as little handwriting as possible for purposes of future analysis, she arguably would not have written such a long note. Accordingly, the existence of this peculiar, long Ransom Note does not necessarily favor, as the killer, either an intruder or Mrs. Ramsey.

Thus, the only conceivable piece of evidence by which plaintiff can hope to carry his burden of proof is evidence that indicates that Mrs. Ramsey actually wrote the note. Factoring into the analysis the testimony of Mr. Epstein that there are similarities between Mrs. Ramsey's handwriting and the Ransom Note does not, however, enable plaintiff to meet that burden. The fact that there may be similarities between the two hardly constitutes persuasive evidence that Mrs. Ramsey actually wrote the Note. Without that proof, plaintiff cannot show that Mrs. Ramsey was the killer.

**b.    Consideration of Epstein's Testimony That He Was Absolutely Certain that Mrs. Ramsey Wrote the Ransom Note**

The Court has earlier indicated its conclusion that there is insufficient reliability to Mr. Epstein's methodology to permit him to state his conclusion that Mrs. Ramsey wrote the Ransom Note. As noted *supra*, Epstein opined that he is "*100 percent certain*" that Patsy Ramsey wrote the Ransom Note and that "*there*

86

*is absolutely no doubt*" that she is the author. *Supra* at 51. The Court believes its conclusion on the admissibility of this evidence to be correct. Further, as the identify of the writer is virtually the only evidence that plaintiff can offer to shoulder its burden, then the question of the identity of the writer is synonymous with the underlying question in this litigation: did Mrs. Ramsey kill her child. Nevertheless, even if the Court were to permit Epstein to testify as to the above conclusion, the Court does not believe his testimony would provide the "clear and convincing evidence" necessary for a reasonable finder of fact to conclude that Mrs. Ramsey wrote the note.

As stated before, "clear and convincing" evidence requires "a clear conviction, without hesitancy of the truth." *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 285 n. 11 (1990). The parties have agreed that handwriting analysis is, at best, an inexact and subjective tool used to provide probative, but not clear and convincing evidence, of a questioned document's author.   (SMF ¶ 212; PSMF ¶ 212.)   Nonetheless, the Court will assume that there could be cases where the handwriting in question is either so obviously not the handwriting of a particular individual or so close a match to that person's penmanship, that a finder of fact could comfortably rely on the handwriting, alone, to reach a particular conclusion. Indeed, well before the days of forensic handwriting experts, courts have allowed lay witnesses to

testify that they recognized the handwriting of particular documents as the handwriting of someone with whose penmanship they were familiar. Further, appropriate testimony of forensic experts can greatly assist the jury in its undertaking.

That said, while there may be cases in which handwriting examination, alone, can be dispositive, this case is not one of that group. Here, as noted, several factors necessarily reduce the weight a reasonable juror could give to Epstein's conclusion. First, Epstein did not consult the original Ransom Note nor obtain original exemplars from Mrs. Ramsey. Second, as noted by defendants, Epstein deviated from the very methodology that he has previously asserted was necessary to make a reasoned judgment. Most significant to the Court in its determination that Epstein's conclusion cannot carry the day for plaintiff, however, is the unanimity of opinion among six other experts that Mrs. Ramsey cannot be determined to have been the writer of the Note. As noted *supra,* the Boulder Police Department and District Attorney's Office had consulted six other handwriting experts, all of whom reviewed the original Ransom Note and exemplars. *Supra at* 21-22. Although two of these experts were hired by defendants, four were independent experts hired by the police. None of these six experts were able to identify Mrs. Ramsey as the author of the Ransom Note. Instead, their consensus was that she "probably did not" write the Ransom Note. *Supra* at n. 14.

Given the contrary opinion of six other experts, whose ability to examine the documents was necessarily superior to Epstein's, and given Epstein's failure to explain the methodology by which he can make absolute pronouncements concerning the authorship of a document, this Court does not believe that a reasonable jury could conclude that Mrs. Ramsey was the author of the Ransom Note, solely on the basis of Epstein's professed opinion to that effect. In reaching this conclusion, the Court is aware that it is not permitted to make credibility judgments in ruling on summary judgment motions. For example, were there six eyewitnesses on one side of a question and one eyewitness on the other side, the Court would not take from a jury the factual question on which these witnesses were testifying. With regard to Epstein's testimony, however, the Court is not attempting to assess credibility. Mr. Epstein may sincerely believe that Mrs. Ramsey wrote the Note and the jury may well credit his sincerity. Nevertheless, no matter how earnest Epstein may be, the fact remains that he has not explained his basis for reaching absolute certainty in his conclusion and, accordingly, the weight and impact of his testimony would necessarily be less than the weight of the contrary testimony of six other experts.[39]

---

[39]    The Court's judgment on this matter is the same whether these other six experts were as vague concerning their methodology as was Epstein or whether they, in fact, gave solid explanations for their reasoning.

89

In sum, plaintiff has failed to prove that Mrs. Ramsey wrote the Ransom Note and has thereby necessarily failed to prove that she murdered her daughter. Moreover, the weight of the evidence is more consistent with a theory that an intruder murdered JonBenét than it is with a theory that Mrs. Ramsey did so. For that reason, plaintiff has failed to establish that when defendants wrote the Book, they "in fact entertained serious doubts as to the truth of the publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Hemenway v. Blanchard*, 163 Ga. App. 668, 671-72, 294 S.E.2d 603, 606 (1982). Accordingly, the Court **GRANTS** defendants' motion for summary judgment as to plaintiff's libel claim.

**III. Slander**

In addition to his claims for libel, plaintiff asserts that several statements made by defendants to the press fit within one of the categories of slander per se recognized by Georgia law: imputing to another a crime punishable by law. O.C.G.A. § 51-5-4(a). In particular, plaintiff refers to defendants' March 24, 2000 appearance on the *Today Show* with host Katie Couric. During the course of the broadcast, the following conversation occurred:

> Katie Couric: You pepper the book with fleeting references to some other people that you seem to question. You talk about Bill McReynolds, who played Santa at your Christmas party. You also mention his wife who, in a strange twist, wrote a

90

                play years before about a girl murdered
in a basement.

John Ramsey:    The point in the book was to clarify
from our viewpoint why these people have
been mentioned a lot in the media, and
also to point out that there are
legitimate leads that need to be
followed.

          .  .  .  .

Katie Couric:    You also mention Chris Wolfe, a total
stranger whose girlfriend reported that
he disappeared on Christmas night and
was very agitated, rather--when he
watched the news of the murder on TV.

John Ramsey:    Uh-huh (affirmative).

Katie Couric:    Why do you mention him.

John Ramsey:    Because he'd been widely mentioned in
the news.  And we wanted to clarify the
facts that we knew.

John Ramsey:    **I can tell you when--when we first
started looking at--at one particular
lead early on--my reaction was, "This is
it.  This is the killer."  And our
investigator said, "Whoa, whoa, whoa."
He'd say, "Don't do a Boulder Police on
me.  Don't rush to conclusions."**

(Transcript of *Today Show*, March 24, 2000.) (emphasis added)  The

parties agree that, as Mr. Ramsey made the last statement, NBC

displayed a picture of Chris Wolf on the screen.

    As with the libelous statements discussed above, while not

textbook, these statements are arguably slanderous.  With the

slander claim, however, the factual predicate for plaintiff's malice argument is weaker than with the libel claim. Specifically, although the emphasized quote suggests Mr. Ramsey's belief that an unnamed suspect might be the killer--which was a malicious statement, if Mr. Ramsey knew that his wife was the killer--plaintiff has not demonstrated that defendant John Ramsey intended to refer to plaintiff when he made that statement. Moreover, even though the photograph of plaintiff appeared on the screen when defendant made the statement, it is undisputed that defendant had no control over NBC's editing decisions.

Nevertheless, even had defendant intended to refer to plaintiff, the statements are still not malicious, for the reasons discussed *supra*, with regard to the libel claim. Accordingly, the Court **GRANTS** defendants' motion for summary judgment as to plaintiff's slander claim.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendants' motion for summary judgment [67]; **GRANTS** as to Ms. Wong **and GRANTS in part and DENIES in part** as to Mr. Epstein defendants' motion in limine to exclude the testimony of Cina Wong and Gideon Epstein [68]; and **DENIES** defendants' motion for oral argument [79].

92

SO ORDERED, this $31$ day of March, 2003.

_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE